```
 1                                      Pages 1 - 37

 2

 3                  UNITED STATES DISTRICT COURT

 4                NORTHERN DISTRICT OF CALIFORNIA

 5            BEFORE THE HONORABLE EDWARD M. CHEN

 6   CAREN EHRET,                    )
                                     )
 7                  Plaintiff,       )
     vs.                             )
 8                                   )Case No. 14-cv-00113 EMC
     UBER TECHNOLOGIES, INC.,        )
 9                                   )San Francisco, CA
                                     )Thursday, August 14, 2014
10                  Defendant.       )1:36 p.m.
     _____)
11
                         TRANSCRIPT OF PROCEEDINGS
12        (HEARING ON DEFENDANT'S MOTION TO DISMISS COMPLAINT)
     APPEARANCES:
13
     For Plaintiff:
14
                          RAM, OLSON, CEREGHINO & KOPCYNSKI, LLP
15                        BY:  MICHAEL FRANCIS RAM, ESQ.
                          555 Montgomery Street - Suite 800
16                        San Francisco, CA 94111
                          (415)433-4949
17
                          LAW OFFICES OF HALL ADAMS, LLC
18                        BY:  HALL ADAMS, III
                          33 North Dearborn Street - Suite 2350
19                        Chicago, IL 60602
                          (312)445-4900
20   For Defendant:
                          QUINN, EMANUEL, URQUHART & SULLIVAN
21                        BY:  ARTHUR MILES ROBERTS, ESQ.
                               STEPHEN A. SWEDLOW, ESQ.
22                        50 California Street - 22nd Floor
                          San Francisco, CA 94111
23                        (415)875-6600

24
     Reported by:  MARGARET "MARGO" GURULE, CSR #12976
25                 PRO TEM COURT REPORTER, USDC
```

```
1                    P R O C E E D I N G S
2    August 14, 2014                           1:36 p.m.
3
4         THE CLERK:  Please be seated.  Calling Case
5    C14-0113, Ehret vs. Uber Technologies.
6         Appearances, Counsel.
7         MR. RAM:  Good afternoon, Your Honor.  Michael
8    Ram, for the plaintiff, and may I please introduce my
9    co-counsel, Hall Adams, from Chicago.
10        MR. ADAMS:  Good afternoon, Your Honor.
11        THE COURT:  All right.  Good afternoon, Mr. Adams.
12        MR. ROBERTS:  Good afternoon, Your Honor.
13        Arthur Roberts, on behalf of Defendant Uber
14   Technologies, Inc., and with me is Steve Swedlow.
15        THE COURT:  All right.  And good afternoon,
16   Mr. Roberts and Mr. Swedlow.
17        MR. SWEDLOW:  Good afternoon.
18        THE COURT:  All right.  Okay.  We are on for
19   defendant's motion to dismiss the amended complaint, and
20   there are several issues.
21        Let me just go through the ones quickly that I don't
22   think need a lot of time, and then focus on the ones that
23   are -- I think, you know, warrant discussion.
24        First of all, there is a question of whether the
25   pleading complies with Rule 9 in terms of the specificity
```

1  that's required in a case alleging fraud.  And I believe

2  that it does meet the standard.

3      It is specific in terms of what the representation is,

4  about the gratuity being automatically added, and therefore,

5  you know, no need to provide gratuity to the drivers.  It

6  appears on website, allegedly, and on the app "Uber."  It is

7  true.

8      We don't know exactly when the plaintiff may have

9  looked at it.  There is an allegation that on September 9th

10  of 2012, plaintiff used the Uber app to arrange a taxi ride

11  to Chicago and paid the 20 percent gratuity.  But the

12  importance of Rule 9 is to set forth for the defendant's

13  benefit, in large part, who and what, where, how, how it was

14  fraudulent, et cetera, et cetera, and I think that's been

15  set forth here, with sufficient specificity to give fair

16  notice to the defendant.

17      I know it doesn't have every single detail.  There's

18  going to be some factual issues as to, you know, how do you

19  know that there is a factual basis for asserting that the

20  gratuity is not remitted in full and all of that.  But

21  that's been clearly teed up, and for pleading purposes, I'm

22  not going to require more.

23      Now, the question of standing under the UCL and the

24  CLRA -- sort of what's the injury here?  Where is the loss

25  of money and property, which normally is required.  And I

1  think that the issue here that is -- that's at question -- I
2  guess my question to you is:  Why isn't that addressed by
3  the *Kwikset* case, the California Supreme Court decision, in
4  *Kwikset* that said the mislabeling of something that is
5  represented to be made in the USA when it is not, which the
6  plaintiff claims was material to it, or him or her, and they
7  wouldn't have bought it otherwise -- and I think there is a
8  similar allegation here that -- and maybe you can correct me
9  if I'm wrong -- that plaintiffs say, "Well, had we known
10 that this gratuity was not all going to the driver, we may
11 not have engaged in this transaction."
12     If they do say that, then it seems to me to be kind of
13 analogous, but you tell me.
14            MR. ROBERTS:  I always find it wise to address
15 what the Court is concerned about, so I'll start with the
16 *Kwikset* case.  So there are lines of case that the
17 plaintiffs rely on and then lines of cases that -- or a line
18 of cases that the defendant relies on here.
19     *Kwikset* is what I would call a classic
20 benefit-of-the-bargain case, as is the *Kohl's* case, and the
21 reason it's distinguished from the circumstance or the
22 allegations of this case are as follows:
23     If a good is represented of a certain character, like
24 "Made in the USA," that is the quality of the goods.  And
25 the benefit of the bargain would be that you purchase a good

1  that satisfies the promise, like "Made in the USA" or a good

2  of a value of $200 that you were able to purchase for a good

3  of the value of $100.

4      Now, this is at the pleading stage where we take every

5  allegation in the complaint as true.  So whether or not the

6  good is of the quality that was promised, it's more of a

7  fundamental legal question.

8      Here, what was promised, assuming the allegations are

9  correct, is that a metered fare would be charged and an

10  additional 20 percent, gratuity, would also be charged.

11  That's a mandatory charge and fee that was agreed to be paid

12  by the rider or consumer in this case, and it doesn't affect

13  the quality of the good.

14      THE COURT:  Why doesn't it constitute a character

15  of what is being sold though?  I mean, when you are paying

16  something, you're thinking it's going to be split this way,

17  80 percent here, 20 percent here.  In my heart, it makes me

18  happy because I'm the one that -- you know, et cetera, et

19  cetera.

20      I mean, isn't this analogous to laws governing, for

21  instance, how donations to charities work?  There are

22  certain laws that say -- I mean, if a charity represented

23  that 90 percent goes directly to the beneficiaries, to, you

24  know, whatever the beneficiary is -- beneficiaries are, and

25  not to overhead and that kind of stuff, and in fact,

1  30 percent goes -- and 70 percent is pocketed or used for

2  overhead.  The person still gives the same amount, but it

3  seems to me it makes a difference to the character of what

4  they're giving or getting, at least in the sense of what

5  they think they're giving to, is different.

6          MR. ROBERTS:  Right.  So I think that is the

7  argument that the plaintiffs make.  The difference -- first

8  of all, there is no case that either party has cited that

9  says when a -- when the division of a charitable

10  contribution is misrepresented, you have a claim as the

11  party making the donation, or in this case, the party

12  paying.  It's a very distinct claim from using the facts of

13  this case.

14      The party who paid, the consumer, was promised,

15  according to the complaint, to pay a metered fee and

16  20 percent extra, called gratuity.  That amount was paid.

17  That's what was agreed to be paid and was paid.  And like in

18  *Searle* and *Peralta*, the California courts, the state courts,

19  have determined that, for the UCL and the CLRA, when the

20  total cost is represented correctly -- meaning there was no

21  deception -- where the charge is mandatory, the interest in

22  who gets the money is a curiosity that is not cognizable as

23  a cause of action, meaning whether -- in the *Searle* case, it

24  was whether or not the service charge was given to the

25  service provider or kept by the company.  In our case, it

```
1   would be whether the gratuity is given to the service

2   provider or kept by the company.

3         THE COURT:  Well, but part of that turns on the

4   term "service charge" is ambiguous.  That could be easily

5   construed as being kept by the provider.  I mean, there is

6   no, necessarily, implication or implicit promise or explicit

7   promise it's going to go to the server.  It's just a service

8   charge that is added on like any other fee.

9         MR. ROBERTS:  Right.  And if it wasn't for Searle,

10  I would -- I could -- I would understand the argument that

11  that's a question of fact, whether service charge is

12  deceptive or not, meaning was it a promise that the server

13  would get some or not.  But what Searle held is that, even

14  if that is deceptive, substantively, the interest as to who

15  gets the money between the person providing the service and

16  the company is a curiosity that is not actionable under the

17  UCL.

18        THE COURT:  Well, except that's based in part upon

19  the nature of the representation and the labeling of that.

20  Calling it a service charge does not imply any promise to do

21  anything with it; whereas, if you call it a gratuity -- for

22  instance, what if they started charging tax, some kind --

23  they assess some kind of sales tax.  Instead of 8 1/2

24  percent, it's represented, well, there is a transportation

25  tax in San Francisco, 22 percent or something like that,
```

1   when, in fact, there is none, or hotel taxes are overstated

2   consistently against the consumer.

3      You say, Well, a consumer is going to pay that much

4   anyway.  It's -- but the representation is that this was for

5   a particular thing and it's going to go to the Government;

6   it's going to be taxed.  It's hard to believe that the

7   consumer has no interest in a false or misleading

8   representation as to what that -- the charges are.

9      And that's the thing -- that's the difference about the

10  service charge.  That's not a misrepresentation.  A service

11  charge is a service charge.  It doesn't say it's a tip.  I

12  guess some people think it is but --

13        MR. ROBERTS:  Well, I don't -- I think it goes

14  beyond what I would need to establish, that anything that

15  you call a fee could or could not be a misrepresentation

16  actionable by the payer.  But in this case, because of the

17  existence of *O'Connor*, also before this Court, it presents

18  the stark contrast between whether the payer has a claim for

19  damages for having paid what they agreed to pay, versus the

20  service provider who has a claim for the money that was

21  paid, based on alleged misrepresentation, to receive the

22  gratuity.  They are distinct claims.  Obviously, on behalf

23  of my client, I disagree with that -- that the plaintiffs in

24  *O'Connor* have a claim, but that's not really what is at

25  issue here.

1    If the service provider or taxi driver has a claim for

2 that 20 percent, then -- let's take the breach of contract

3 claim, for example, then the rider paid exactly what they

4 agreed to pay, and the remedy would be, "Give the money to

5 the taxi driver that you promised to give to the taxi

6 driver, and then we're made whole."

7    In the circumstance where a pretend tax was tacked on

8 that doesn't really exist, the question would be:  Does that

9 tax have to be remitted to the entity that you promised to

10 give it to, and is that a claim for the entity, which has

11 been an actual case in the state of Illinois, or does the

12 payer of that tax have the cause of action?  It's just a

13 different question.  So, here, we're talking about whether

14 the person --

15         THE COURT:  Well, the question is whether the

16 consumer who has been charged in -- for such a

17 misrepresented tax has a remedy under the UCL for fraud and

18 misrepresentation, I would think.  That's how it works.

19         MR. ROBERTS:  Right.  That's a straightforward

20 question.  But the Court in *Searle* said, Even assuming that

21 the term 'service charge' is deceptive and caused patrons to

22 pay more, that who gets the service charge, even if it's

23 deceptive is not cognizable.  It's a curiosity that is not

24 actionable under the UCL.

25    And that's similar to this circumstance where, even if

1  it would hurt the payer's heart that the gratuity was split

2  between Uber and the driver, that doesn't make it a cause of

3  action under the UCL or the CLRA simply because they would

4  prefer that the gratuity all went to the driver instead of

5  the company.

6        THE COURT:  So the UC -- so the UCL only addresses

7  hurt of the pocketbook and not hurt of the heart.

8        MR. ROBERTS:  Well, in shorthand, yeah, that's our

9  position, which is that if you have a psychological injury

10  where you would like the money to have gone to where it was

11  supposed to go, but you agreed to pay the money, and the

12  service was of the quality that was provided, then you don't

13  have a cause of action.  And that's really the distinction

14  between the "Made in the USA" claims or the fictional retail

15  price claims that are cited in the cases in our brief.

16        THE COURT:  But about the but-for argument, that

17  but for this representation or this misrepresentation, some

18  of the consumers wouldn't have purchased this ride.

19        MR. ROBERTS:  Well, that's -- I think that's --

20  the citation for that is the *Aron vs. U-Haul* case.  That

21  is -- was a circumstance where the charge was avoidable.  It

22  was a refuel charge that the payer or consumer could either

23  pay or not, and the Court found that to be a distinction and

24  the way it distinguished *Searle* from a mandatory charge.  So

25  you can't have gotten the service and the billing that the

1    Uber provided through the taxi company and chose not to pay
2    the gratuity.  It was a mandatory charge.  Whereas, in the
3    *Aron vs. U-Haul* case, it was an avoidable charge.  That was
4    actually what the Court defined as a distinction.
5         In the other circumstance, in the complaint, in our
6    case, it's not a but-for allegation.  If it was, we would be
7    in a different circumstance.  Paragraph 16 of the complaint
8    says -- although it starts, "But for" -- it says, But for
9    Uber's misrepresentation, plaintiff would not have a agreed
10   to or paid Uber the full amount that Uber charged her and
11   that she paid to Uber.
12        That's not possible.  That's a fictional world where
13   Ms. Aron could have chosen to pay some smaller portion or
14   not to pay the gratuity because Uber might get some.  So if
15   the allegation in the complaint, which it is not -- and I
16   hate to bleed back to the 9(b) point, but we're discussing
17   it so -- it's not a but-for allegation here.
18        It is understandable why it's not a but-for allegation
19   here.  Because then the allegation in the complaint for the
20   individual and the class that would be putative are only
21   those people who would not have taken the ride at all and
22   would have taken a different taxi or something else, but for
23   the misrepresentation, alleged misrepresentation.
24             THE COURT:  What about that point?
25             MR. ADAMS:  Judge, Counsel strikes exactly where

1  Ms. Uber was -- or Ms. Ehret was defrauded.  She paid to

2  Uber sums for taxi transportation that she would not have

3  paid to Uber but for it's having misled her about where

4  those portions were to be paid.

5       THE COURT:  Well, but it's all or nothing.  That's

6  a fictional hypothesis to say, Well, she wouldn't have paid

7  the 20 percent.  She could not have avoided -- if her choice

8  were limited -- "I take the ride" or "I don't take the

9  ride," if it had been fully disclosed -- let's say it had

10 been fully disclosed that half of that 20 percent goes to

11 Uber as -- I don't know, a finder's fee or something -- and

12 only 10 percent goes to the driver, if she says, Well, I

13 wouldn't have -- in that case, if it ain't all going to the

14 driver, "I'm not going to that Uber cab.  I'm going to take

15 my business to Lyft or somewhere else."

16    Then you have a cause -- then you have a *Kwikset* sort

17 of a thing where there is an economic -- an economic harm.

18 Somebody outlaid money for a product they didn't want to

19 get.

20       MR. ADAMS:  Judge, she did have choices.  She

21 could have walked out to the curb and hailed a taxicab and

22 paid the meter rate.  She could have used some other

23 transportation for hire.  Instead she was duped by Uber into

24 using an Uber arranged ride, based on Uber's representation

25 that it would charge her only the metered rate, and it would

1    add this gratuity that would be paid to the driver.

2            THE COURT:  Okay.  So the question, the but-for

3    question is:  Had Uber properly disclosed fully what it was

4    doing with the 20 percent, would she still have gotten into

5    that Uber cab?

6        You don't allege that in here because it said, but for

7    the misrepresentation would not have agreed to pay the full

8    amount.  Now, if it said, "Plaintiff would not have

9    purchased the Uber ride," then I think you're squarely

10   within a "but-for," and I think that's an easy case.

11       Here, you're left with more the -- you can't show that

12   economically, there would have been a different outcome;

13   that is, she still would have taken the ride.  Not happy

14   about it.  She would have still did it.  She would have

15   liked to get her money back, but that's not an option.

16       So the harm she suffers at that point is really a

17   misrepresentation as to where -- I don't know if you want to

18   call it psychic harm or an ethical, moral kind of harm that

19   she suffered that she thought the driver was getting paid,

20   and now, at least as far as she's concerned, the driver is

21   getting shortchanged.

22            MR. ADAMS:  Judge, following on that theme, we

23   cite a couple of cases in addition to *Aron* where courts have

24   rejected that analysis, have rejected that line of argument

25   for finding no claims under the UCL.  One of those is the

1    Johnson case and this recycling fee that was not, in fact, a

2    recycling fee that the plaintiff paid to Walmart.  It was

3    just like the so-called gratuity here, additional revenue to

4    Walmart.

5        We cited the *SiriusXM* case where a so-called "royalty"

6    was charged that wasn't the royalty at all.  It was a

7    mandatory charge.  The plaintiff in that case had to pay the

8    whole royalty, and the Court sustained the UCL claim in that

9    case.

10            THE COURT:  Even without a finding of economic

11   harm in the sense of any but-for causation?

12            MR. ADAMS:  I think the point of those cases,

13   Judge, is that the Courts did find economic harm in that the

14   plaintiffs were misled into paying this money to Walmart,

15   SiriusXM to U-Haul in the *Aron* case, by this

16   misrepresentation, and that's alleged in our complaint.

17       We allege that Caren Ehret would not have paid the full

18   20 percent, had she not been misled as to it being a

19   gratuity.

20            THE COURT:  But could Ms. Johnson, in the Walmart

21   case, have withheld the recycling fee or not paid it

22   somehow?

23            MR. ADAMS:  She could not have entered into the

24   transaction at all, just like Ms. Ehret could have.

25            THE COURT:  But she didn't have a choice of

```
1   breaking it up?
2           MR. ADAMS:  Correct.
3           THE COURT:  All right.  Well, then how is that any
4   different, Counsel.
5           MR. ROBERTS:  Well, Your Honor, I was just looking
6   in the index of cases in their brief for Johnson.
7           THE COURT:  It is an unpublished decision, right?
8           MR. ROBERTS:  Oh, maybe I'm looking in the wrong
9   spot in the table of contents.
10          MR. ADAMS:  It's cited at page 15 of our
11  opposition.  And Judge, the one other thing I would say
12  while we're checking our cites and so forth --
13          MR. ROBERTS:  Well --
14          MR. ADAMS:  -- is I think, Judge, a case that,
15  strangely enough, supports Caren Ehret's theory of having
16  sustained damage here, is that Searle against Wyndham case
17  on which the plaintiff -- on which the defendant relies so
18  heavily.
19      And that is where the Court there makes a clear
20  distinction between the service charge and a gratuity.  And
21  the Court, in Searle, distinguishes gratuity in a way that
22  clearly suggests that, had the guest in that case, been
23  misled into paying gratuity, based upon a
24  mischaracterization of the charge, like we have in our case,
25  the plaintiff would have had a claim under the UCL.
```

1      MR. ROBERTS:  Two points.  One, that's not what

2  *Searle* holds.  *Searle* holds that some patrons were misled

3  into paying an additional gratuity.  And even in light of

4  that misrepresentation and deception, that there is no cause

5  of action because the split of the money between the service

6  provider and the company is one of curiosity.

7      So we have to be careful about what *Searle* actually

8  held.  It did distinguish between gratuity and service

9  charge, but not for whether a cause of action exist for the

10  payer as opposed to the recipient, meaning the service

11  provider.

12      Looking back now, I found *Johnson*.  *Johnson* is a claim

13  for a nine dollar recycling fee, when you buy a new battery

14  and give them your old battery.  So that is -- just like it

15  is in U-Haul -- an avoidable charge because you don't have

16  to give them your old battery.

17      The other case that was cited is the *Walgreen* case.

18  But the allegation in the *Walgreen* case, which is in

19  footnote 8 of the brief is that they would have bought a

20  different juice.  That's what -- excuse me -- that's the

21  allegation that the Court doesn't see in the complaint and

22  therefore didn't find valid, meaning the claim wasn't valid.

23  So this is -- whether it's called 9(b) -- or whether it's a

24  particularity point or not, the cause of action under *Searle*

25  and *Peralta* for UCL and CLRA doesn't exist for the payer for

1   determining whether or not the service provider or the

2   company keeps the money.  Whether it exists for the service

3   provider as a claim is the issue in *O'Connor*, not in this

4   case.

5        The distinction between the cases cited by plaintiffs,

6   *Aron*, *Johnson*, and all the other cases, is that when the

7   case, when the charge is not misrepresented as to the total

8   cost -- it's mandatory -- then your interest in who gets the

9   money is a curiosity that is not actionable.  When it's an

10  avoidable charge, meaning the company got extra money

11  through the misrepresentation that could have been avoided,

12  then it is actionable because that lie led to the payment

13  of, for example, that nine dollars, or that lie lead to the

14  payment, in the *U-Haul* case, of $20.

15          THE COURT:  Because there is a causation?

16          MR. ROBERTS:  Because you lie and say --

17          THE COURT:  Because there is a causal relationship

18  there.

19          MR. ROBERTS:  Because you can allege, which you

20  have to under the UCL, the three magic things, which is

21  reliance, causation, and damages caused by the reliance.

22          THE COURT:  Well, and *Kwik* said -- Kwikset does

23  have as its fourth element, quote, "Plaintiffs would not

24  have bought the locked sets otherwise."  I mean, that's an

25  indication of materiality, but it also suggests that there

```
 1   has to be some causal relationship to some pocketbook harm.
 2            MR. ROBERTS:  Because the Court has to be able to
 3   make the plaintiffs whole on their theory.  And particularly
 4   in the context of a putative class, you would be valuing the
 5   psychological situation of who got the money between the
 6   taxi driver and the company.
 7       I mean, we're not at class certification.  But that's
 8   different than saying, for people who would not have bought
 9   a Kwikset lock or given their battery to wherever the
10   batteries went, or bought the juice at Walgreen's, that's a
11   but-for causation that you wouldn't have engaged in the
12   transaction or the part or the transaction that was
13   avoidable, and that's a different required allegation that
14   you could then push throughout the course of the case.
15            THE COURT:  Well, let me ask.  The monetary remedy
16   under the UCL generally is restitution, correct?  You get
17   injunctive relief.  You don't get damages.  You don't get
18   consequential damages and that sort of thing.  It's not a
19   breach of contract?
20            MR. ADAMS:  That's correct.
21            THE WITNESS:  So how would restitution work in
22   this case?  And this also informs the breach of contract
23   claim and everything else that I have been struggling with.
24   How do you get restitution in this case?
25            MR. ADAMS:  Judge, from our standpoint, provided
```

```
 1   with the necessary information, it's relatively simple to do
 2   it, and that is that the defendant pays back to its
 3   passengers all of the sums that it retained that it
 4   characterizes as so-called gratuity for the driver.
 5              THE COURT:  So it's partial restitution?  I mean,
 6   normal restitution, you reverse the transaction back to the
 7   status quo ante, and you give back what you bought and you
 8   get back everything you paid.  You can't give back the ride,
 9   so you can't -- that's not going to work here.  And so
10   you're not entitled to the full refund.  Otherwise, you end
11   up with a free ride.
12       So is the next best thing a partial -- basically a
13   partial refund, a refund of the fraudulent portion?
14              MR. ADAMS:  Yes.
15              THE COURT:  And is there authority for that?  Have
16   courts issued restitution where you otherwise can't break it
17   up that way?
18              MR. ADAMS:  If you don't mind Mr. Ram addressing
19   that?
20              THE COURT:  Sure.
21              MR. RAM:  Thank you, Your Honor.  I have tried a
22   number of UCL cases.  And as the Court knows, there is no
23   jury.  It's just tried to the Court; it's all apropos.  And
24   the Court, under the UCL -- and we can brief this if the
25   Court would like -- has all sorts of discretionary power to
```

```
 1   consider whatever the defendant can submit as to what the
 2   Court should consider in exercising it's equitable
 3   discretion.  And part of what the defendant can submit, of
 4   course, here, is the value that was received.  You know, the
 5   Court weighs all of that, and that's not really at the class
 6   certification stage.  Obviously that's at the trial stage.
 7   But the short answer is the Court certainly has the
 8   discretion to basically do whatever the Court sees as fair,
 9   looking at all of it.
10          THE COURT:  Even if it means breaking it up in not
11   a straight restitution of the amount paid but some portion
12   of that.  So if it was misrepresented that there was a tax
13   or something, and in fact, there was no tax, or it was
14   overstated by four percent, restitution can obtain with
15   respect to that portion?
16          MR. RAM:  Yes, Your Honor.  Your Honor can look at
17   whatever equitable factors either side wants to submit and
18   then decide what is fair under all of those circumstances.
19          THE COURT:  Partial restitution is within the
20   Court's equitable discretion under the UCL?
21          MR. RAM:  Absolutely, Your Honor.
22          MR. ROBERTS:  My only response to that would be,
23   so when we get to trial, there is great discretion under the
24   UCL for what the Court can fashion as a remedy.  But that
25   can't be used to satisfy the individual plaintiff's standing
```

```
 1   requirements to have damages proximately caused by the
 2   misrepresentation.  That part --
 3             THE COURT:  No, I understand those are two
 4   separate inquiries.  But I asked because one could argue
 5   that one sort of informs the other; that is, if that the
 6   Court could, looking down the road, issue partial
 7   restitution, that suggests, well, maybe -- even if you had
 8   to buy it as a whole -- this is your distinction -- it's not
 9   just returning the battery for a recycling fee or opting not
10   to pay, you know, this portion, it's all or nothing.  And
11   when it's all, even though a portion of it was fraudulently
12   represented, there is no remedy.  But if, in fact, if you
13   look at the tail end, there is a remedy that might be
14   available.  I wonder if that suggests the front end -- well,
15   shouldn't somebody have standing, you know, if the remedy
16   and the standing are -- have some kind of alignment?
17             MR. ROBERTS:  Right.  The problem with -- or my
18   view of the problem with looking at it that way, sort of the
19   ends would justify the means, is that the California state
20   courts in Searle and Peralta have said, that in this
21   circumstances, there is no action under the UCL.
22       If we just take the facts of Searle, where the Court
23   acknowledged that it was fraud -- deceptive to call it a
24   service charge and not informed the person buying the food
25   at the hotel that the service provider was getting all of
```

1  it.

2      They paid a separate amount of money, meaning some

3  people in that class paid a separate amount of money as an

4  additional gratuity.  But the split of the service charge

5  was determined to be a non-actionable curiosity, even if, as

6  you note, the Court could have taken the case and said, "I

7  now can figure out that you paid extra money" -- on average,

8  10 percent extra gratuity -- "that you wouldn't have paid if

9  you knew the service charge was part of that or all of that

10  was going to the service provider."

11          THE COURT:  So your reading of *Searle* is that,

12  even if it had been denominated gratuity and not service

13  charge, and further said, "To be paid to the server - don't

14  worry about it," close quote, the outcome of *Searle* would

15  still be the same because it would still be only a matter of

16  mental or emotional curiosity?

17          MR. ROBERTS:  Right.  That who got the money is a

18  curiosity that could also be deceptive.  I wonder whether

19  the people who delivered the food would have a cause of

20  action in the circumstance you have articulated.  But that's

21  not the claim being pursued here.  It's the person who paid

22  a mandatory amount that they couldn't just pay part of.  And

23  as the Court noted in the very first paragraph of the

24  opinion, they could go somewhere outside the hotel and get

25  food.  So in that sense, they don't have a cause of action.

1          MR. ADAMS:  Judge, if I might say one additional
2    thing about the premise of this whole *Searle*-related
3    argument: that the only damage that Caren Ehret can allege
4    here is a quantifiable economic injury, I think *Searle*
5    rejects that.
6          *Searle* starts its discussion with an extended overview
7    of what tips and gratuities are all about and makes the
8    comment that, quote, "A tip is an entirely gratuitous,
9    entirely subjective, and very personal transaction," close
10   quote.  It goes on, near the end of its discussion, to
11   distinguish between that kind of a gratuity and the service
12   charge that was imposed by the hotel in that case.
13         Caren Ehret, in this case, has an interest in what is
14   the disposition of the money that she pays to Uber.  She
15   intends that 20 percent be paid to the driver of her taxi as
16   a gratuity that's a very personal decision that she makes as
17   a passenger.
18         Uber does not have a legal right to mislead her into
19   paying more than the metered rate that it assured her it
20   would charge for the taxi transportation service.  So the no
21   harm/no foul doesn't wash if you consider what a passenger
22   intends the gratuity to do.
23          THE COURT:  All right.  Well, let me ask about the
24   CLRA and the claim that you have here.  And one of the
25   allegations is that there is a representation as to the

1   characteristics of the services that are being provided.

2   And one of the characteristics here is that, included in

3   that is a 20 percent gratuity.  And what is wrong with that?

4   And in the *SiriusXM* case -- that's a District Court case,

5   right, out of New York?  Isn't that -- didn't that involve a

6   representation that the defendant was passing through a

7   royalty fee where the actual royalty fee was less.  That

8   seems like a case where it's not divisible.  It's part of

9   the integrated sum that's paid.  So why isn't there a CLRA

10  claim here?

11          MR. ADAMS:  Why?

12          MR. ROBERTS:  Why isn't there?

13          THE COURT:  Why isn't there, yeah.

14          MR. ROBERTS:  Well, the CLRA claim is disposed of

15  by *Peralta v. Hilton*, which is a CLRA cause of action that

16  was dismissed for the same reason *as Searle* was ultimately

17  dismissed at the motion to dismiss stage.  The *SiriusXM* case

18  that you're referencing, I don't think, was under California

19  law.  I'm just looking for it in the brief here.

20          MR. ADAMS:  Judge, it was a New York court

21  applying California law.

22          THE COURT:  Right, applying Section 70, 85 and 89,

23  I think.

24          MR. ROBERTS:  Right.  So these were -- I mean, the

25  distinction we would make is that the fee was hidden, as

1  opposed to fully disclosed.  And what we state in our brief

2  is that the defendant overcharged for royalty costs that

3  were represented as passed through, meaning the full cost

4  and/or total cost was not presented with no deception.

5  That's really the distinction between *Searle* and *Peralta* and

6  this case, is that when the full cost is presented with no

7  deception, and that charge is mandatory, then you don't have

8  a cause of action as to how the money is split, and that's

9  not the factual circumstance of *Sirius*.

10        THE COURT:  What's your response to that?

11        MR. ADAMS:  Judge, I'm not sure, frankly, I

12  understand that argument.  The cases are directly analogous

13  in the sense that *SiriusXM* characterized this charge as

14  being a passthrough of which it would retain zero.

15     In our case, Uber represented the so-called gratuity as

16  a pass through, of which it would retain zero.  They are

17  equally misleading in that respect.

18        MR. ROBERTS:  Okay.  So just last point,

19  hopefully, on this:  That is, as we noted, a Federal

20  District Court in New York who was deciding a CLRA case,

21  which is related to the UCL, I think before *Searle* and

22  *Peralta* were decided by the California State Court.  So a

23  court in New York, interpreting California law, should be --

24  the guiding principle should be they should be applying

25  California law as the highest court in California or a court

1  in California would apply it.  So if those factors --

2          THE COURT:  It's not persuasive authority?

3          MR. ROBERTS:  It's not persuasive authority that

4  it predates the holding of *Searle*, which is if the total

5  cost is not misrepresented and the charge is mandatory, the

6  split between who gets it is a curiosity by the payer, which

7  is not to say that somebody else might have claim, meaning

8  the person who was supposed to get whatever money was

9  misrepresented but that the payer doesn't have a claim under

10  the UCL or the CLRA in that circumstance.

11          MR. ADAMS:  Judge, as we point out in one of our

12  footnotes, although I don't claim to have mastered all your

13  local rules, our view is that this Peralta case isn't

14  citable.  It isn't even good as persuasive authority.  It is

15  unpublished, and it predates 2007.  And my understanding is

16  that, under your local rules, that makes it not fair game

17  for this Court's consideration.

18          THE COURT:  All right.  Let me ask -- well, let me

19  just make one final comment on the extraterritorial

20  question.  I think there is a debate going on now, and I

21  think several judges on this court have been struggling with

22  the question about extraterritorial application of

23  California law, at least Labor Code stuff in the face of a

24  choice of law provision, and we are still struggling with

25  that.  But in this case --

1          (Screams from the hallway.)

2          MR. ROBERTS:   Somebody just won the lottery,

3   maybe?

4          THE COURT:   I guess.   I hope that's what it was.

5      I think the law is pretty clear that, where there is a

6   claim of -- although there is a general presumption against

7   extraterritoriality, that presumption doesn't apply to the

8   UCL and the CLRA where it's claimed that the nonresident was

9   injured by fraudulent misrepresentation disseminating from

10  within California.   So you look to where the wrongful

11  conduct occurred, and in that case -- and in this case, you

12  know, that's the claim here, that Uber is based locally,

13  that its website is hosted here, et cetera, et cetera, et

14  cetera.   It's that the alleged misrepresentation emanates

15  from California.

16         MR. ROBERTS:   Can I briefly respond to that?

17         THE COURT:   Yeah.

18         MR. ROBERTS:   So we know -- I don't want to bleed

19  into the case management conference, but we, last week,

20  received the initial disclosure documents from plaintiff.

21  And you shouldn't consider facts at this stage for

22  determining extraterritoriality.   It's difficult not to

23  consider facts when you're trying to determine where did the

24  misrepresentation emanate.   But the distinction between all

25  of the cases cited by plaintiff and the one case, *Sullivan*,

1  that the California Supreme Court decided, is this: when the

2  product, actual product, is made in California and then sent

3  out, or where there is some allegation beyond just a general

4  allegation that all misrepresentations emanated from

5  California, then you're in a different circumstance for the

6  extraterritorial application of the statutory claims.  And

7  we're only talking about statutory claims here.

8      The reason why I say that is in *Sullivan*, the 2011

9  California Supreme Court case, with respect to the UCL --

10  here's what the Court said:

11      Neither the language of the UCL, nor its legislative

12  history, provides any basis for concluding that the

13  legislature intended the UCL to operate extraterritorially.

14  Accordingly, the presumption against extraterritoriality --

15  I pronounced that wrong -- applies to the UCL in full force,

16  meaning the presumption would be you don't apply it

17  extraterritorially.

18      If it's sufficient in a complaint to simply say, All

19  the misrepresentations emanated from California because it's

20  a California company, and that means it applies extra -- you

21  apply it extraterritorially, then you can always apply its

22  extraterritorially to a company that's based in California.

23  And the *Sullivan* court specifically addressed that.  And

24  what the *Sullivan* Court determined for *Oracle*, which is

25  obviously based in California, is even if the employment

1   decision to not pay employees came from California.

2        The actual important fact was that the non-payment, the

3   thing that should have been paid even if it was decided in

4   California, took place elsewhere.  And that's just what

5   happened here.

6        The misrepresentations that are cited come from the

7   Uber-Chicago website.  But the non-payment to the driver of

8   the portion of the gratuity that was allegedly due, that

9   driver took place -- we know exactly where -- in Chicago, at

10  4401 North Racine Avenue.  So that's where the alleged

11  non-payment took place.

12       And under the California Supreme Court precedent, that

13  means you can't simply say Oracle or Uber makes all of its

14  decisions that are actionable in California, so then you

15  just apply UCL or CLRA to that company because it's

16  California based.

17            THE COURT:  So even if the misrepresentation were

18  made here in this state and then disseminated through the

19  Internet, et cetera, throughout the country, that is not

20  enough if the ultimate consummation of that

21  misrepresentation, the harm causing from that -- that flowed

22  from that, i.e., the payment induced thereby --

23            MR. ROBERTS:  Or lack of payment.

24            THE COURT:  -- or elsewhere, that is too much of

25  an essential component so as to viciate any claim that the

1  fraud occurred here in California?

2          MR. ROBERTS:  Yes and no.  I mean, I don't think

3  you can -- you could make a broad-based rule, but I don't

4  think you can say you never can apply UCL for -- in other

5  states, or extraterritorially, unless the payment or

6  non-payment occurred in California because not everything is

7  going to be so closely analogous.

8      The *Sullivan* case happened to deal with the failure to

9  pay employees something.  That decision was made in

10  California.  Other cases that are cited by plaintiffs deal

11  circumstances where the product at issue came from

12  California.  It was made in California.  So then it was sent

13  outside of California, and California law should apply to

14  that product because it came from California.

15     The analogy in the modern information era is that,

16  without any basis -- because Uber is based in California,

17  the alleged lie that was told in Chicago must have come from

18  California.  We know from the documents it didn't actually

19  came from -- it came from Uber-Chicago, which is a separate

20  website from Uber-San Francisco.

21     So we would have to look past the complaint to know

22  that.  But to simply make an allegation that you lied and

23  you're California based, so you made up the lie in

24  California, would mean you always apply California law

25  outside of California.

1          THE COURT:  All right.  Let me hear the response

2   to that.

3          MR. ADAMS:  Judge, in this case, specifically in

4   this case, in your complaint that you're being asked to

5   consider, we have alleged that the misrepresentations and

6   omission were made here in San Francisco; originated here in

7   San Francisco; that all the decision-making with respect to

8   them occurred here in San Francisco.  There is a not only a

9   choice of law provision in the Uber terms and conditions

10   that provides that California law will apply to the

11   relationship between the parties here.  There was a form

12   selection provision that caused us to show up here in the

13   first place.

14      And so you have a circumstance where you have a taxicab

15   passenger in another city who has to come to San Francisco

16   to exercise her rights and to seek relief.  She's told that

17   California law has to apply.  But Uber argues that even --

18   because it defrauded her while she was in Chicago, Illinois,

19   even though it did that while Uber was operating and

20   communicating its fraud from here in San Francisco, that she

21   has no remedy under California law.  That isn't what the

22   cases we have cited hold.

23          THE COURT:  What case stands -- is best for the

24   proposition that the place of -- the origins or the

25   misrepresentation in a service case, not in a products case,

1  has, is given the dominant weight?

2          MR. ADAMS:  Judge, at page 18 of our opposition

3  brief, we filed -- or we cite several cases in support of

4  the proposition that, particularly where there is a choice

5  of law provision that eliminates this presumption of

6  non-extraterritoriality, that the important facts are those

7  facts regarding where the misconduct was committed, not

8  where the injury occurred.  And if you consider those

9  cases -- and we would respectfully suggest that these cases,

10  the *Sullivan* case involving *Oracle*, and this most recent

11  *Lyft* decision involving the California Labor Laws, the wage

12  and hours provisions, are rather an anomaly because of the

13  interplay of those enactments with the UCL that shouldn't

14  control in circumstances that we've alleged in this case.

15          MR. ROBERTS:  May I briefly respond?

16          THE COURT:  Yes, briefly.

17          MR. ROBERTS:  First of all, I don't think *Sullivan*

18  can be called an anomaly because it uses the presumption of

19  non extraterritoriality, applies to the UCL, and it's a

20  California Supreme Court case.

21      But rather than go through *Chavez* and *Mattel* and *iPhone*

22  and all of the cases cited -- you could probably just

23  compare the page cited by plaintiff of their brief with

24  footnote 9 at page 10 and 11 of our brief and then decide

25  for yourself, "Who is characterizing these cases correctly

1  or incorrectly?"

2      With respect to the choice of law provision, I do want

3  to be clear as to what it is Uber has argued in all

4  circumstances.  In Chicago, the forum selection clause was

5  enforced to require the case to be filed out here.  The case

6  now filed out here, it isn't that no remedy exists.

7          THE COURT:  No, you're applying Illinois law.

8          MR. ROBERTS:  No.  It's that no statutory UCL or

9  CLRA remedy exists, and that's clear from the case law.  And

10  I'm reluctant to do this, but I'll cite -- in the case of

11  *Wright*, which Your Honor decided, the whole -- I'll read it.

12          THE COURT:  No, I'm familiar with it.  And I'm

13  familiar with the interrelationship, and that's what is

14  being reexamined these days in terms of the relationship

15  between the presumption that lies with respect to

16  extraterritoriality or not of California laws like wage and

17  hour laws and a choice of law provision in a prior contract.

18          MR. ROBERTS:  Right.  The only additional point I

19  was trying to make is, if you choose California law -- so

20  there is a choice -- like in *Gravquick* or like it was

21  discussed in *Wright*, you take that statutory law as it is,

22  meaning, if it doesn't apply extraterritorially and you live

23  outside the state, you don't get it.

24          THE COURT:  No, I understand.  I understand.

25          MR. ROBERTS:  But that's totally different from

```
 1   whether you can bring a common law claim that wasn't statute
 2   based for a person who is living in Illinois against a
 3   California company.  That's not the claim here, and a
 4   different analysis would apply because the body of law is
 5   saying the UCL and CLRA apply only to California and it
 6   doesn't exist for common law.  Meaning this isn't trying to
 7   get the plaintiff caught in the switches where you have no
 8   claim because you have agreed to California law.  It's just
 9   you don't have a California statutory claim living in
10   Chicago, riding a taxi in California.
11              MR. ADAMS:  Nor, Your Honor, under those
12   circumstances, if you accepted the Uber view of that body of
13   law, would this plaintiff have any claim for statutory
14   relief under comparable Illinois enactments that provide
15   consumers like this plaintiff with protections that are
16   intended to be broader than the common law.
17       Uber's argument here would deprive the plaintiff of
18   those statutory remedies that originate either in her home
19   jurisdiction or in this jurisdiction.
20              THE COURT:  Why would it deprive -- why would it
21   prevent the application of Illinois statutory laws?
22              MR. ADAMS:  This is the Uber argument, that
23   because California law applies, based on its choice of law
24   provision, that the plaintiff --
25              THE COURT:  I thought the argument is that
```

1  California law does not apply; that the choice of law

2  incorporates a territorial limit, and therefore any attempt

3  to apply California law is nullified or is nonexistent and

4  does not provide the application of some other territorial

5  law.

6      MR. ROBERTS:  Right.  Or California common law --

7  I guess I don't want to make an argument that is not at

8  issue, meaning there isn't those other claims -- I said it

9  without the plural.  There aren't those other claims in this

10 complaint.  So what we might argue, if a different cause of

11 action was pled, I don't know.  I would have to research it

12 to figure out what my answer to that would be.

13     THE COURT:  All right.  Let's -- obviously I have

14 to rule on these issues, so I'm wondering how much sense it

15 makes to go forward trying to start setting dates and thing

16 because some of these are -- if I were to grant your motion,

17 what's left?

18     MR. ROBERTS:  Nothing, as long as I get to

19 articulate the breach of contract argument that we're going

20 to make.

21     THE COURT:  Well, I have that.  I have to move on.

22 If I were grant your motion in total, there wouldn't be

23 any -- nothing to schedule?

24     MR. ROBERTS:  There would be nothing to schedule

25 and if plaintiffs chose to file a different --

1          THE COURT:  Except for leave to amend, and that's

2    an if.

3          MR. ROBERTS:  Right.

4          THE COURT:  So the question is whether it makes

5    sense to start setting dates for discovery cutoff and

6    discussing this question of bifurcation or not and dates for

7    class cert until we get past this front door, which, you

8    know, I think I have to deal with here.

9          MR. ROBERTS:  And being hopefully optimistic, at

10   least keeping the chance open that we might win, that would

11   be our preference.  And it isn't as if -- we can become back

12   whenever you tell us to come back and set the schedule.  So

13   it isn't as if we're gone forever if we walk away today

14   without a schedule leading up to class cert or trial.

15         THE COURT:  I think what I would like to do is set

16   a further status in, let's say, three weeks, and give me

17   enough time then to rule on these matters.  We can come back

18   here and then see what we've got and then set dates

19   according to that.

20      And my intention is, if this case is going to proceed,

21   I'm going to, you know, set down some dates and put this on

22   a reasonable fast track.

23         MR. ROBERTS:  And so we will just wait to do

24   anything until then?

25         THE COURT:  I think that's what I would like to do

1   is set -- defer the status conference out for three weeks,

2   if I'm here. I'm assuming I'm here.

3           THE CLERK:  That would be September 11th, Your

4   Honor.

5           THE COURT:  And that will be at --

6           THE CLERK:  10:30.

7           THE COURT:  -- 10:30.  And that will give me a

8   timeline within which to resolve these questions.

9           MR. ADAMS:  Thank you very much for your time.

10          THE CLERK:  Would you like a status report?

11          THE COURT:  Yeah, a week before, or let's say

12  three days before the hearing.  Okay?

13          MR. ROBERTS:  Okay.

14          (Hearing concluded at 2:29 p.m.)

15

16

17

18

19

20

21

22

23

24

25

```
1                        REPORTER'S CERTIFICATE

2                             *    *    *

3           I, MARGO GURULE, a Pro Tem Certified Shorthand

4    Reporter for the United States Court, Northern District of

5    California, hereby certify that the foregoing is a correct

6    transcript from the record of proceedings in the

7    above-entitled matter.

8

9    Dated:  August 28, 2014

10

11

12

13

14    _____

15                   MARGARET "MARGO" GURULE
                      CSR No. 12976
16

17

18

19

20

21

22

23

24

25
```