1        UNITED STATES DISTRICT COURT

2        NORTHERN DISTRICT OF CALIFORNIA

3   Before The Honorable Donna M. Ryu, Magistrate Judge

4   EHRET,                          )
                                    )
5           Plaintiff,              )
                                    )
6       vs.                         )    No. C 13-00113-EMC
                                    )
7   UBER TECHNOLOGIES, INC.,        )
                                    )
8           Defendant.              )
    _____)

9

10                               Oakland, California
                                 Wednesday, November 26, 2014

11  TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
                RECORDING 11:29 - 11:57 = 28 MINUTES

12

13  APPEARANCES:

14  For the Plaintiff:
                                 Myron M. Cherry and Associates
15                               30 North LaSalle Street
                                 Suite 2300
16                               Chicago, Illinois 60602
                         BY:  JACIE C. ZOLNA, Esq.
17
                                 Ram, Olson, Cereghino
18                                & Kopczynski, LLP
                                 555 Montgomery Street
19                               Suite 820
                                 San Francisco, California
20                                94111
                         BY:  MICHAEL F. RAM, Esq.
21
    For the Defendant:
22                               Quinn, Emanuel, Urquhart
                                  & Sullivan, LLP
23                               50 California Street
                                 22nd Floor
24                               San Francisco, California
                                  941
25                       BY:  ARTHUR M. ROBERTS, Esq.

2

1   Transcribed by:          Echo Reporting, Inc.
2                              Contracted Court Reporter/
                                Transcriber
3                              echoreporting@yahoo.com
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

3

1 <u>Wednesday - November 26, 2014</u>                              11:29 a.m.

2                         P-R-O-C-E-E-D-I-N-G-S

3                              ---oOo---

4          THE CLERK:  Calling Civil Case 14-00113-EMC, Ehret

5 versus Uber Technologies, Incorporated.

6      Please state your appearances, Counsel.

7          MR. ZOLNA (telephonic):  Good morning, your Honor.

8 This is Jacie Zolna.  I'm appearing by phone for Plaintiff

9 Karen Ehret.

10         THE COURT:  Good morning.

11         MR. RAM:  Good morning, your Honor.  Michael Ram

12 for the Plaintiff as well.

13         THE COURT:  Good morning.

14         MR. ROBERTS:  Good morning, your Honor.  Arthur

15 Roberts for the -- for the Defendant.

16         THE COURT:  Good morning.

17     Okay.  Let me ask Mr. Roberts, how is the search being

18 conducted?  Is it search terms or is it other kinds of

19 technology assisted medium?

20         MR. ROBERTS:  The parties agreed on a set of

21 search terms which we've applied across all five of the

22 custodial E-mails that we collected, and now we have a set

23 of five attorneys working full time to review those E-mails

24 that hit on the search terms for responsiveness and

25 privilege and other issues.

4

1          THE COURT:  Has there been any quality control

2  done by the parties jointly?  So, in other words, some check

3  to see whether your search terms -- which is a rather

4  outdated way of doing this but it still happens -- whether

5  your search terms are pulling up a good set of the documents

6  you're actually trying to retrieve as opposed to irrelevant

7  documents?

8          MR. ROBERTS:  The -- so I've looked at some of the

9  documents in the review platform myself, and in every review

10  when you use search terms, there are obviously going to be

11  nonresponsive documents.  I couldn't give you a percentage

12  in terms of responsive and nonresponsive, but the search

13  terms that we used, which include, you know, taxicab, Uber

14  taxicab, gratuities are the key terms in the case, it

15  appears that the search terms have captured the relevant

16  documents.  I've seen documents and communications on the

17  key issues in the case, which is how did Uber actually

18  calculate its fee and commission and gratuity.  Those are

19  all in the -- in the set of E-mails that the Plaintiffs are

20  going to receive on December 19th.

21          THE COURT:  Okay.  So let me make two points that

22  I would like you to bear in mind.

23      First of all, the Court takes the ESI guidelines and

24  checklists very seriously, and what those principles or

25  guidelines and checklist suggest is that this is a

5

1 cooperative, iterative process. It's not one side does

2 something and then -- and sort of, you know, behind a velvet

3 curtain and just shoots documents or results out to the

4 other side.

5 It has to be a discussion. So, for example, if there's

6 a burden argument, I'm not going to know enough about that

7 burden if there wasn't some attempt at joint quality

8 control, especially where the parties are using traditional

9 search terms. So, for example, if you say, "Well, it turned

10 out 60,000 documents," maybe 30,000 of them could just be

11 eliminated by a better search, and I don't know because the

12 parties haven't really tested that. So that's one thing I'd

13 just like you to bear in mind going forward.

14 The other part of that is that if it's not done that

15 way, what the parties risk is that going forward, if it

16 turns out that additional searches have to be done and I

17 find out there wasn't a cooperative discussion about the

18 custodians or about the search terms, then it's more likely

19 that someone may have to either do another search, which is

20 costly, or -- or have to bear some of the costs and search

21 because there wasn't a good discussion.

22 So that's why early on the Court -- that's why we

23 created those instruments, and it expresses the expectation

24 of the Court about how discovery is to be conducted. I

25 didn't get a sense from the letter that that's the kind of

6

1  process that you all are going through, particularly about

2  the custodians.  So I could be wrong, but I just want you to

3  know how I view these things just so you have that

4  information prior to coming back on if there's going to be

5  further disputes.  Okay.

6      So, turning to the disputes at issue in this particular

7  letter, let me give you my tentative and then allow you to

8  argue back.

9      With respect to the additional custodians, this is what

10  I -- well, first of all, Mr. Roberts, Mr. MacDonald, can you

11  confirm when he stopped being the general manager of

12  Toronto?

13          MR. ROBERTS:  He switched from the general manager

14  of Toronto to the general manager of Chicago according to --

15  and this is according to a conversation we had with him in

16  May of 2013.

17          THE COURT:  Did he have any involvement in U.S.

18  operations before May 2013?

19          MR. ROBERTS:  I don't know the answer to that

20  specifically.  What I do know is that the GMs are

21  essentially the CEO's of their individual cities, and they

22  have lots of autonomy and authority over, you know, the

23  services that are provided in those cities.  So he would

24  have had exclusive control over Toronto.  Alan Penn would

25  have had --

7

1        THE COURT:  Do you know anything about his history

2  prior to coming to Chicago?  So we know he was GM of

3  Toronto.  Do we know anything else about him?

4        MR. ROBERTS:  I believe he started as GM at

5  Toronto.  Beyond that, I don't have any additional

6  information at my fingertips.

7        THE COURT:  So you don't know whether he's stayed

8  as the GM of Toronto or moved?

9        MR. ROBERTS:  Oh, he was no longer -- once he

10  became GM of Chicago, he was no longer GM of Toronto.  Now

11  he's a GM of the midwest region.

12        THE COURT:  Okay.  He stated as the GM of Toronto?

13        MR. ROBERTS:  That's my understanding.  That may

14  not be exactly correct, but I know that he was the GM of

15  Toronto for a long time.  I don't know if he started in that

16  position or not.

17        THE COURT:  Do you know when he started?

18        MR. ROBERTS:  I do not.  This --

19        THE COURT:  How can you be arguing about Mr.

20  MacDonald when you don't have a lot of information about

21  him?

22        MR. ROBERTS:  Well, the argument is that we've

23  identified the GM's for each of the five cities during the

24  relevant time frame.

25        THE COURT:  Which is interesting, but I want to

1  know -- but there may be other people other than the GM's of

2  those five cities who are likely custodians, the searches

3  for whom will not be -- the relevance will outweigh the

4  burden.  So I need to be able to assess Mr. MacDonald.

5       Let me turn to your opponent then.  Mr. Ram, what do

6  you know about what -- Mr. Ram or Mr. Zolna, what do you

7  know about Mr. MacDonald?

8            MR. ZOLNA:  Your Honor, this is Mr. Zolna, and Mr.

9  MacDonald -- Uber had served actually three different

10 iterations of their initial Rule 26(a) disclosures, and in

11 each iteration of those disclosures, they only identified

12 one person with potential knowledge of the facts of the

13 case, and that person was Andrew MacDonald.

14      We also asked Uber an interrogatory several months ago

15 asking to identify each person with knowledge of the facts

16 alleged in the complaint and any answer of affirmative

17 defenses.  They also identified one person, and that was Mr.

18 MacDonald.

19      So at least a few months ago, he was going to be

20 apparently, at least to us, their lead person or lead

21 witness in defense of this case.  So that's why we believe

22 he should be added.  We know there's other lawsuits around

23 the country, including Chicago, in which Mr. MacDonald has

24 testified in about issues relevant to this case.

25            THE COURT:  Okay.  That's an important -- that's

9

1   an important fact about the Rule 26.  It wasn't in your

2   letter, but -- and I was about to rule against you on that,

3   but if he -- is he listed as a single person with -- with

4   knowledge and support of the defenses at Uber on this?

5         MR. ROBERTS:  That's correct, your Honor.  And

6   there's a good explanation for that, which is that Mr.

7   MacDonald is the individual that we've been using in several

8   of the cases as our 30(b)(6) witness.  He's familiar with

9   Chicago obviously because he became the GM in Chicago in May

10  of 2013.  He was our witness at a preliminary injunction

11  hearing in a separate case in Chicago that involved taxicab

12  companies suing for unfair competition.  At the very, you

13  know, sort of beginning of our investigation, we needed to

14  disclose someone with some understanding of these facts.  We

15  disclosed Mr. MacDonald.

16     As our investigation has continued, we've realized that

17  the people most knowledgeable about the time frame at issue

18  in this case are the five GM's that we've identified as

19  custodians and whose E-mails we're now reviewing.

20        THE COURT:  Okay.  So here's my tentative.

21  Kalanick and Graves should be named as custodians, and all

22  Uber said is that they're likely to be -- to have been

23  copied on E-mails.  They didn't -- but that's sort of the

24  sole reason why Uber thinks they shouldn't be custodians,

25  but this was a startup.  It started up pretty -- not that

1  long ago.  One of the key issues in this case is about

2  structuring the pricing and gratuity levels for Uber rides,

3  and it's something that CEO and VP were likely to have been

4  involved in.  I didn't hear Uber say that they were not

5  involved in that, simply that other custodians would capture

6  most of the same information.

7      So I was not persuaded by the burden argument.  My

8  tentative is that Kalanick and Graves and MacDonald should

9  all be custodians but not Camp (phonetic).  There's no

10 showing that Camp would have been a likely custodian on

11 these issues.

12     Mr. Ram, do you want -- or Mr. Zolna, do you want to

13 argue briefly on that?

14         MR. ZOLNA:  Your Honor, we -- we'll accept your

15 decision on this.  We did ask in our letter brief for some

16 other list of employees.  Obviously we don't know everyone

17 who was involved in the marketing, et cetera.  That's

18 information in the exclusive possession of Uber.  We've

19 obviously done some research on our own to come up with some

20 names.

21     But we asked just for a list of employees -- and this

22 is back, you know, in 2012.  Uber wasn't that big of a

23 company at least in terms of employees -- so we can identify

24 or potentially identify or at least have a discussion with

25 Uber about possibly identifying other people who may fall

11

1 within or potentially have discoverable information for the

2 ESI search.

3         THE COURT:  Okay.  So this gets me to the -- back

4 to the ESI checklist and guideline issue, and this

5 particular dispute is what brought it to mind.  If I'm

6 recalling correctly, the ESI checklist talks about the --

7 the responsibility of the parties to discuss custodians by

8 job title and/or names.

9     So the idea is to have a cooperative, iterative

10 discussion up front early on who are the likely custodians,

11 and that's usually something you can identify by job title

12 or even by name because sometimes people know who's

13 involved.  It's not -- it's not that the -- the Defense

14 shouldn't say "Plaintiffs, tell me who you think the people

15 are," and it shouldn't be the Plaintiffs saying, "Well, give

16 me your list so I can tell you, Defendant."  It's a

17 cooperative discussion.

18     I'm not going to require at this point -- I'm not going

19 to require the Defendants to voluntarily turn over

20 organizational charts, but those are probably going to be

21 subject to discovery, and it may well make sense for you to

22 agree -- like I said, I'm not going to order you, but you

23 may want to agree to turn them over so that you can have a

24 discussion about who the likely custodians are.

25     If this came to me for a decision, I would likely have

1  a more detailed discussion with everyone about balancing the
2  burdens against the benefits.  So we -- I would expect the
3  parties to dig down and tell me why particular custodians
4  make the most sense and which ones are on the fringes.  I'd
5  want to hear more about burden, and I'd want to hear about
6  phasing, because maybe it would make sense to start with a
7  certain group and branch out from there.  That's usually how
8  I analyze these.  Okay.

9       So at this point, the ruling on the request --

10           MR. ROBERTS:  Your Honor, may I just address your
11  tentative ruling before it seems to be about to become final
12  on the custodian issue?

13           THE COURT:  Sure.  And, just for the record, this
14  is Mr. Roberts.

15           MR. ROBERTS:  Yes.  Thank you.  I apologize.

16      So just to take a step back for a moment, this is a
17  false advertising case, and the two key bits of discovery
18  are what did Uber represent to consumers and then what did
19  Uber actually do and was there a discrepancy between those
20  two issues.

21      Now, the discovery that we've given them so far and
22  what did Uber represent to consumers, that's pretty much
23  complete at this point in terms of the marketing and the
24  advertisements.  So they have that half, and now what they
25  need to do is compare that to what the actual practice was.

1    And in terms of that piece of the discovery, we've

2  given them an interrogatory response on how Uber calculated

3  the gratuity.  We've given them the documents that we gave

4  to drivers at the time explaining to them how Uber would

5  charge its fees and commissions and gratuities.  The

6  Plaintiffs have that.  And then on December 19th, they're

7  going to get all of the E-mail communications from the five

8  GM's on this topic.  That is going to be more than enough

9  for them to understand exactly how Uber was calculating its

10 gratuity.

11    If at that time, after they review the documents that

12 we produce on December 19th, they decide they still have

13 questions, then it may make sense to add additional

14 custodians.  They said repeatedly in their CMC statements

15 that they are ready to file their motion for class

16 certification.  That's the next step in this case.

17    They've said specifically -- I can quote them:

18              "Plaintiff would like to file a

19         motion for class certification as soon

20         as possible and believes she can do so

21         after Defendant's initial production of

22         documents, i.e., before Defendant's

23         production of E-mails and ESI."

24    So they don't need any of this information, according

25 to them, to file their motion for class certification, which

14

1 is going to happen in February.  That's the schedule that

2 Judge Chen has set for that.  And in Judge Chen's scheduling

3 order, he wrote:

4            "There's a further CMC" -- this is

5            after class certification -- "further

6            CMC is set for April 23rd at 1:30 p.m.

7            Further discovery, ADR, and trial date

8            to be discussed at that time."

9    So if there's a need to add additional custodians and

10 for Uber to spend several hundred thousand dollars, which is

11 what this is going to cost, to review, you know, documents

12 from additional custodians, let's talk about it at that

13 time.  They're going to have everything they need by

14 December 19th in order to understand what did Uber say and

15 was there a difference between what it did and what it said.

16            THE COURT:  Okay.  So my ruling is no ruling.

17 You've argued burden.  I've told you what my concerns were

18 about the burden argument.

19    I don't -- I see that these are relevant.  I didn't see

20 Judge Chen segmenting discovery in quite the way that you

21 described.

22            MR. ROBERTS:  I'm not saying he --

23            THE COURT:  Nor do I find very persuasive the

24 argument that they have everything they need because they've

25 said they can file class cert.  If they had everything they

1   need, they wouldn't be here on a discovery motion.

2      So I'm going to order that those additional custodians

3   be added in to the search at this time.  As I suggested, if

4   you want to do some quality control on the search terms

5   cooperatively, perhaps it will be easier.  You can weed

6   things out faster because you will have figured out where

7   some of the search terms are not really generating much bang

8   for the buck, and you don't need lawyers.  You don't need

9   lawyers around the clock to do a lot of this review.  Most

10   people are doing this through paralegals or case clerks, but

11   that's really up to you.

12      So on the custodian --

13         MR. ZOLNA:  Your Honor, I -- I'm sorry to

14   interrupt, but I -- you know, in terms of the review, I

15   believe Mr. Roberts indicated that there was somewhere in

16   the neighborhood of 80,000 documents before the review,

17   before privilege and responsiveness review.

18      Well, that's a big number.  If you look at it in

19   context, it really isn't.  Typically cases like this have

20   several hundred thousands of documents, and we would

21   advise --

22         THE COURT:  Mr. Zolna, I just -- Mr. Zolna, I just

23   ruled on --

24         MR. ZOLNA:  Yes.

25         THE COURT:  -- your behalf.  So let's move on.

1 There's another matter behind you that I'd like to get to.

2 Okay.  So sorry if I'm being pretty directive here, but I

3 want to make sure we air the issues but -- and then move on.

4 You'd raised the question of whether I'm going to order Uber

5 to give a list of titles and names of potential custodians.

6     My ruling was that I'm not going to order them to turn

7 over organizational charts, but -- but I have explained why

8 it might make good sense to do so informally as part of the

9 ESI exchange, and I explained how I'm going to analyze any

10 questions about whether a certain number or type of

11 custodian is too burdensome or -- or not or whether there

12 should be some phasing.  But we will cross that bridge when

13 we come to it.

14     In any event, the Plaintiff can propound discovery to

15 obtain organizational charts if Uber chooses not to turn

16 them over informally.

17     On the date range issue, here's my tentative.  I agree

18 with Plaintiff that the opening date should be one year

19 before launch of the taxi service.  That seems like a

20 reasonable period of time.  I thought that Uber's proposal

21 was not reasonable, and the scope of relevant discovery

22 often includes some historic information to give context.

23 One year before the launch of the taxi service is reasonable

24 in light of the issues in the case.

25     As to the end date, I thought that the Plaintiff's

1 proposal was too generous.  The switch date was March 26,

2 2013.  I don't think the Plaintiffs need an additional nine

3 months or so.  I think it would be sufficient -- well, and I

4 also thought that the Defense was a little too lean on this

5 five days after the switch, not reasonable.  But I would

6 allow until June 30th at 2013.

7      So the period -- the date range would be April 18th,

8 2011 through June 30th, 2013.

9      I will hear very brief argument on this if anyone wants

10 to argue it.

11          MR. ROBERTS:  Arthur Roberts, your Honor.

12      With respect to the beginning date of the date range,

13 we've interviewed the GM of Chicago, Alan Penn.  He told us

14 that the decision to launch Uber Taxi in Chicago was made in

15 March of 2013, which is the month previous to when it

16 actually started.

17      Uber, as you mentioned earlier, was a, you know,

18 startup, few employees.  It can move very quickly.  I've

19 taken a look at the E-mails from February 1st until April

20 18th, 2013, which is when the service started, and there

21 wasn't anything in February about this.  It wasn't until

22 March that the discussion started happening and it got off

23 the ground really quickly.

24          THE COURT:  Then the -- there won't be very much

25 burden in producing the documents.

1          MR. ROBERTS:  Your Honor, there are going to be

2 documents that hit on these search terms.  They have a lot

3 of Google alerts, you know, that talk about taxis and cabs.

4 I've seen a lot of those in the production.  It's going to

5 take time to go through those.  There's just no reason to

6 extend the date range that far before given that the

7 decision to launch the service wasn't even made until March

8 2013.

9          THE COURT:  Okay.

10          MR. ROBERTS:  Or 2012.

11          THE COURT:  Well, that's the representation of a

12 -- a witness, but I -- the Plaintiffs get a chance to test

13 that, and this is not three years.  It's not five years.

14 It's not two years.  It's one year before the launch, which

15 strikes me as a reasonable period of time.

16          MR. ROBERTS:  Can I just add one more thing, which

17 is that --

18          THE COURT:  Yes.

19          MR. ROBERTS:  -- the other cities were launched at

20 the earliest in September of 2012.  So it may make sense or

21 we think it makes sense if there's going to be an earlier

22 start date for it just to apply to Mr. Penn, who is the GM

23 of Chicago.  It doesn't make sense for the Boston date

24 range.  Boston didn't even start until January of 2013.  It

25 doesn't make sense for that to go all the way back to April

1   2011.  So if we can do this on a custodian by custodian

2   basis, we think that would lessen the burden.

3               THE COURT:  Let me hear from the Plaintiffs.

4               MR. ZOLNA:  Well, your Honor, unless you're going

5   to change your mind, I don't think I -- the Plaintiffs will

6   have much argument.  I think you pretty much hit it on the

7   head.  If there is -- we have a pretty narrow set of search

8   terms that really focus on both taxi as a required term and

9   gratuity as -- really are the predominant terms.

10      So if nothing was going on six months before let's say

11  Boston, well, then there isn't going to be much to review.

12  But doing it by custodian by custodian I don't think is the

13  right way to do this.

14              THE COURT:  What I think what Mr. -- my

15  understanding what Mr. Roberts is arguing is that the search

16  terms are still generating a lot of non-responsive documents

17  if you look -- if I order that things go back to April 18th,

18  2011.  There'll be a year's worth of stuff that needs to be

19  reviewed that isn't going to be responsive and that takes

20  time to review.

21      I think this goes back to the earlier issue that I

22  raised.  If that's the issue, Mr. Roberts, then I would like

23  you to get a sample of 100 of those documents, meet with the

24  Plaintiffs, see if you can figure out a way to tweak the

25  search so that it at least for that period of time requires

20

1  -- is more likely to cull out the nonresponsive materials,

2  and that will save time.  But, otherwise, I think it's fine

3  to run it from April 18th, 2011 for all custodians.  Let's

4  keep it simple.  And if it's true that the talk did not

5  really start happening until a few months before the launch

6  of each city and you do your search correctly, then it will

7  not take as much -- it will not be as much of a burden.

8  Okay.

9       So that's the ruling.  Is there anything further on

10 this letter?

11           MR. ROBERTS:  In terms of the end date, your

12 Honor, which we haven't discussed yet, your Honor proposed

13 June 30th, 2013.  I mean, all the discussions about the old

14 way of calculating the gratuity are going to be well before

15 that.  They're going to have all of the communications about

16 why Uber switched to a new way of calculating the gratuity

17 on March 25th.  All of those communications are going to

18 happen well before March 2013.  We just don't see the

19 relevance of extending it all the way out to June.

20           THE COURT:  So part of the problem is that Uber

21 took such extreme positions on this letter that, you know, I

22 guess they can't help but have an effect on the way I'm

23 doing this.  So March 26, 2013 is the switch-over date.  You

24 wanted a cutoff that was five days after that switch.  That

25 strikes me as just patently unreasonable.  I thought the

1 Plaintiffs' was too long, but I think building in a couple

2 of months to verify that the switch actually happened, that

3 it's going as everybody is saying it was supposed to go is

4 not a burdensome amount of time and allows enough of a

5 period of time for Plaintiffs to verify and validate or --

6 Uber's representations about the facts or contradict them.

7      So June 30th strikes me as more than reasonable, and

8 that's six months less than what the Plaintiffs wanted. So

9 that's the ruling.

10        MR. ROBERTS: Understood.

11        THE COURT: Okay. Anything further?

12        MR. ROBERTS: One other point, your Honor. Judge

13 Chen has ordered the party -- or ordered Uber to produce all

14 E-mail documents by December 19th. If we're adding three

15 additional custodians to that and increasing the date

16 range --

17        THE COURT: It's -- it's Uber.

18        MR. ROBERTS: Pardon?

19        THE COURT: It's Uber. So I'm -- I know -- you

20 know, part of what I need to account for are the parties'

21 relative resources. Uber is well equipped to be able to

22 review these documents. I don't have the power to extend

23 Judge Chen's deadlines.

24        MR. ROBERTS: I recognize that. This is Arthur

25 Roberts. I recognize that, your Honor. And so what I'm

1   proposing is that the three new custodians be put on a

2   separate length and time line.  We can do the increased date

3   range for the preexisting five custodians, but as it is,

4   with the current review, we're barely going to make the

5   deadline.

6           THE COURT:  What do Plaintiffs say about this?

7           MR. ZOLNA:  I -- I don't think we would oppose a

8   -- this sounds more like a call Mr. Roberts and I should

9   have after the -- after court today, but I don't think we

10  would oppose a modest extension.

11          THE COURT:  Okay.  Why don't you meet and confer

12  and put your proposal -- let me just think about this.  So

13  Judge Chen ordered December 19th.

14      I think to save him some effort, please make your

15  proposed order to me, and if I need to talk to Judge Chen,

16  then I can pick up the phone and do that.  Okay.

17          MR. ROBERTS:  Thank you, your Honor.

18          THE COURT:  Okay.  Anything further?

19          MR. ROBERTS:  Not from the Defendant.

20          THE COURT:  How about from the Plaintiffs?

21          MR. ZOLNA:  No, your Honor.  I appreciate allowing

22  me to appear by phone today to accommodate my holiday travel

23  schedule.

24          THE COURT:  Okay.  Well, happy Thanksgiving to all

25  of you.  Thank you.

23

1          MR. RAM:  Thank you very much, your Honor.  Happy

2  Thanksgiving.

3          MR. ROBERTS:  Thank you, your Honor.

4      (Proceedings adjourned at 11:57 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

24

1                     CERTIFICATE OF TRANSCRIBER

2

3      I certify that the foregoing is a true and correct

4 transcript, to the best of my ability, of the above pages of

5 the official electronic sound recording provided to me by

6 the U.S. District Court, Northern District of California, of

7 the proceedings taken on the date and time previously stated

8 in the above matter.

9      I further certify that I am neither counsel for,

10 related to, nor employed by any of the parties to the action

11 in which this hearing was taken; and, further, that I am not

12 financially nor otherwise interested in the outcome of the

13 action.

14

15

16              Echo Reporting, Inc., Transcriber

17              Wednesday, December 3, 2014

18

19

20

21

22

23

24

25