QUINN EMANUEL URQUHART & SULLIVAN, LLP
John B. Quinn (SBN: 090378)
johnquinn@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017-2543
Telephone:     (213) 443-3000
Facsimile:      (213) 443-3100

Stephen A. Swedlow (*Pro hac vice*)
stephenswedlow@quinnemanuel.com
500 W. Madison Street, Suite 2450
Chicago, IL 60661-2510
Telephone:     (312) 705-7400
Facsimile:      (312) 705-7401

Arthur M. Roberts (SBN: 275272)
arthurroberts@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, CA 94111-4788
Telephone:     (415) 875-6600
Facsimile:      (415) 875-6700

Attorneys for Defendant
Uber Technologies, Inc.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CAREN EHRET,<br><br>            Plaintiff,<br><br>   v.<br><br>UBER TECHNOLOGIES, Inc.,<br><br>        Defendant. | Case No. 3:14-cv-00113-EMC<br><br>**OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br>Judge:    Edward M. Chen<br>Hearing:  October 8, 2015 at 1:30 PM<br>Location: Courtroom 5 |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................1

FACTUAL BACKGROUND ....................................................................................2

    A.    The uberTAXI Option .................................................................2

    B.    The Fee Uber Received .................................................................3

    C.    Statements to Users Regarding the 20% Charge Varied Throughout the Class Period ...................................................................4

    D.    Statements to Drivers Regarding the Gratuity Calculation Varied Throughout the Class Period .........................................................5

    E.    The End of the Class Period .........................................................6

LEGAL STANDARD .............................................................................................6

ARGUMENT ..........................................................................................................7

I.    Plaintiff's Claim Does Not Satisfy Rule 23(a)(2)'s Commonality Requirement or Rule 23(b)(3)'s Predominance Requirement ...........................................................7

    A.    Many Class Members Were Not Exposed to Any Representation About the 20% Charge .........................................................................7

    B.    Class Members Were Exposed to Significantly Different Statements Regarding 20% Charge .................................................................12

    C.    For Plaintiff's CLRA Claim, She Has Failed to Provide Any Evidence That the Representations Were Material to Users ...........................................18

    D.    The Court Would Have to Conduct Individualized Inquiries to Determine Which Class Members Are Subject to an Arbitration Clause ................................21

II.    Plaintiff's Claim Is Not Typical of the Class ......................................22

III.    The Class Cannot Be Certified Because Many Class Members Lack Article III Standing ...............................................................................23

CONCLUSION .....................................................................................................23

# TABLE OF AUTHORITIES

**Page**

## Cases

*Algarin v. Maybelline, LLC*,
   300 F.R.D. 444 (S.D. Cal. 2014)................................................................20

*Am. Exp. Co. v. Italian Colors Rest.*,
   133 S. Ct. 2304, 186 L. Ed. 2d 417 (2013) ...........................................6

*Astiana v. Kashi Co.*,
   291 F.R.D. 493 (S.D. Cal. 2013) .....................................................18, 19

*Badella v. Deniro Mktg. LLC*,
   2011 WL 5358400 (N.D. Cal. Nov. 4, 2011) ...................................18, 19

*Berger v. Home Depot USA, Inc.*,
   741 F.3d 1061 (9th Cir. 2014)............................................1, 8, 13, 14, 17

*In re Clorox Consumer Litig.*,
   301 F.R.D. 436 (N.D. Cal. 2014)................................................8, 9, 10, 12

*Cohen v. DirecTV, Inc.*,
   178 Cal. App. 4th 966 (2d Dist. 2009) ...........................................15

*Comcast Corp. v. Behrend*,
   133 S. Ct. 1426, 185 L. Ed. 2d 515 (2013) .......................................6, 7

*ConAgra Foods*,
   2014 WL 2702726 ...........................................................................18, 19

*Davis-Miller v. Automobile Club of Southern California*,
   201 Cal. App. 4th 106 (2011)...........................................................8, 12

*Delarosa v. Boiron, Inc.*,
   275 F.R.D. 582 (C.D. Cal. 2011) ....................................................11

*Fairbanks v. Farmers New World Life Ins. Co.*,
   197 Cal. App. 4th 544 (2011)...........................................................9

*Faulk v. Sears Roebuck & Co.*,
   2013 WL 1703378 (N.D. Cal. Apr. 19, 2013) ...............................18, 19

*Gonzalez v. Proctor & Gamble Co.*,
   247 F.R.D. 616 (S.D. Cal. 2007).....................................................13

*Hanon v. Dataproducts Corp.*,
   976 F.2d 497 (9th Cir. 1992).............................................................22

*Harris v. Las Vegas Sands L.L.C.*,
   2013 WL 5291142 (C.D. Cal. Aug. 16, 2013) ............................13, 16, 22

*Jones v. ConAgra Foods, Inc.*,
    2014 WL 2702726 (N.D. Cal. June 13, 2014) ..............................................15, 18, 19

*Kaldenbach v. Mut. of Omaha Life Ins. Co.*,
    178 Cal. App. 4th 830, 100 Cal. Rptr. 3d 637 (2009) ....................................12, 13, 15

*Knapp v. AT & T Wireless Servs., Inc.*,
    195 Cal. App. 4th 932 (2011) ..............................................................................15

*Martinez v. Welk Grp., Inc.*,
    2012 WL 2888536 (S.D. Cal. July 13, 2012) .......................................................14

*Massachusetts Mut. Life Ins. Co. v. Superior Court*,
    97 Cal. App. 4th 1282, 119 Cal. Rptr. 2d 190 (2002) ..........................................12

*Mazza v. Am. Honda Motor Co.*,
    666 F.3d 581 (9th Cir. 2012) ....................................1, 8, 9, 10, 11, 12, 22

*Mohamed v. Uber Technologies, Inc.*,
    2015 WL 3749716 (N.D. Cal. June 9, 2015) ........................................................21

*O'Shea v. Epson Am., Inc.*,
    2011 WL 4352458 (C.D. Cal. Sept. 19, 2011) ......................................................23

*Pablo v. ServiceMaster Global Holdings Inc.*,
    2011 WL 3476473 (N.D. Cal. Aug. 9, 2011) .........................................................21

*Perrine v. Sega of Am., Inc.*,
    2015 WL 2227846 (N.D. Cal. May 12, 2015) ...........................................14, 17, 18

*Pfizer Inc. v. Super. Ct.*,
    182 Cal. App. 4th 622 (2d Dist. 2010) ..............................................................9, 11

*S. Bay Chevrolet v. GM Acceptance Corp.*,
    72 Cal. App. 4th 861 (1999)............................................................................13, 22

*Sevidal v. Target Corp.*,
    189 Cal. App. 4th 905, 117 Cal. Rptr. 3d 66 (2010) ........................................9, 10

*Stearns v. Ticketmaster Corp.*,
    655 F.3d 1013 (2011) ...........................................................................................14

*Steroid Hormone Product Cases, supra*,
    181 Cal. App. 4th 145, 104 Cal. Rptr. 3d 329 ....................................................12

*In re Titanium Dioxide Antitrust Litig.*,
    962 F. Supp. 2d 840 (D. Md. 2013) .....................................................................21

*In re Tobacco II Cases*,
    46 Cal. 4th 298, 207 P.3d 20 (2009) ...............................................................11, 12

*In re Valence Tech. Sec. Litig.*,
    1996 WL 119468 (N.D. Cal. Mar. 14, 1996) ........................................................22

*Tietsworth v. Sears, Roebuck & Co.*,
  2012 WL 1595112 (N.D. Cal. May 4, 2012) ........................................................................23

*Wal-Mart Stores, Inc. v. Dukes*,
  131 S. Ct. 2541, 180 L. Ed. 2d 374 (2011) .................................................6, 7, 19

*Wolph v. Acer Am. Corp.*,
  272 F.R.D. 477 (N.D. Cal. 2011) ........................................................................18

## **Rules**

Federal Rule of Civil Procedure 23 ........................................................................6, 7, 21

Plaintiff seeks to certify a nationwide class of individuals who used the Uber application to request taxicab rides. She claims Uber misled consumers by charging a service fee that Uber mislabeled as a 20% "gratuity," but her claim rests on a fundamental misunderstanding of how fares were calculated, disclosed, and charged. There is no wrong to be righted here, and certifying this class would deprive Uber of its due process right to advance unique defenses against individuals who never saw, relied upon, or suffered prejudice as a result of the supposedly misleading advertisements. The Court should deny Plaintiff's motion.

*First*, Plaintiff cannot establish commonality or predominance because she cannot show that all class members viewed the allegedly misleading representations about the 20% charge. To the contrary, many users downloaded and used the Uber application without ever seeing any representation about the 20% charge. In fact, many users emailed Uber saying that they were unaware of the charge before requesting their ride. The Court should deny certification on this ground alone. *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 596 (9th Cir. 2012) (vacating order certifying class in part because it was "unreasonable to assume that all class members viewed" the misleading representations).

*Second*, even among the small group of class members who may have seen a representation about the 20% charge, those representations varied in fundamental ways. *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1069 (9th Cir. 2014) (affirming denial of certification where class members were exposed to varying statements regarding a 10% charge). Plaintiff has presented the Court with representations on Uber's website and elsewhere that described the 20% charge as a "gratuity," but, at best, she has given the Court half the story. As Plaintiff knows, and as she should have disclosed to the Court, many other communications, including multiple communications to Plaintiff herself, described the fee as a "gratuity *and service charge*" or "gratuity *and service fee*." Numerous webpages, marketing emails, and email-receipts, including the one sent to Plaintiff, identified the 20% charge as a gratuity and service charge or service fee. The putative class members received different combinations of advertisements and, therefore, whether any of those combinations was "likely to mislead the public" presents distinct questions

of law and fact.  This lack of uniformity constitutes a second, independent basis to deny certification.

*Third*, the Court should deny Plaintiff's motion because she failed to present evidence that the misrepresentations she alleges are material.  Without such evidence, Plaintiff is not entitled to a presumption of class-wide reliance, and individualized issues of reliance will predominate.

*Fourth*, a large number of putative class members are subject to a binding arbitration clause, which, as several courts have held, creates individualized issues defeating certification.

*Fifth*, Plaintiff's claims and defenses will not be typical of those of the class and she will be subject to the unique defense that she was expressly told about the practice that was allegedly hidden before taking her ride.

*Finally*, for the same reasons discussed above—most class members never saw the representations at issue and the representations differed—the vast majority of class members lack Article III standing.

Uber respectfully requests that the Court deny Plaintiff's motion for class certification.

## FACTUAL BACKGROUND

### A.    The uberTAXI Option

Uber Technologies, Inc. ("Uber") has developed a popular mobile-phone application ("Uber App") that enables users to easily request transportation from several types of transportation providers in hundreds of cities across the world.  *See* Decl. of Allen Penn at ¶¶ 3, 6. The options available vary by city.  *Id*. at ¶ 6; Decl. of Josh Mohrer at ¶ 5; Decl. of Michael Pao at ¶ 5; Decl. of Ilya Abyzov at ¶ 5; Decl. of Rachel Holt at ¶ 5.  One of the options available through the Uber App in a small minority of cities is called "uberTAXI."  *Id*.  The uberTAXI option allows users to request a ride in a traditional taxicab.  *Id*.  UberTAXI started as an experimental program in Chicago in April 2012, and later became available in New York in August 2012, Boston in September 2012, San Francisco in October 2012, and Washington D.C. in January 2013.  Penn Decl. at ¶ 7; Mohrer Decl. at ¶ 6; Pao Decl. at ¶ 6; Abyzov Decl. at ¶ 6; Holt Decl. at ¶ 6.

With uberTAXI, taxi drivers use their taxicab meters as normal, and at the end of a trip enter the metered fare into the Uber App.  Penn Decl. at ¶ 8; Mohrer Decl. at ¶ 7; Pao Decl. at ¶ 7;

Abyzov Decl. at ¶ 7; Holt Decl. at ¶ 7. During the time frame at issue here, Uber then automatically added 20% to the metered fare to determine the total amount charged to the rider. *Id.* A third-party payment processor charged the rider for the trip. *Id.* The total amount paid by the rider was then remitted to the taxi driver, less the fee paid by the driver to Uber, pursuant to the driver's agreement with Uber. Penn Decl. at ¶ 9; Mohrer Decl. at ¶ 7; Pao Decl. at ¶ 7; Abyzov Decl. at ¶ 7; Holt Decl. at ¶ 7.

Unlike many putative class members, Plaintiff used uberTAXI to request just a single ride from a taxi driver in September 2012. Am. Compl. ¶ 15. For her ride, she paid $15.90, calculated by adding 20% to the $13.25 fare specified by the driver. See Decl. of Arthur Roberts, Ex. D (Plaintiff's receipt). She acknowledges that she knew Uber would receive some fee for its request services. Roberts Decl., Ex. C (Ehret Depo. Tr.) at 47:20-47:23 ("Q: When you took the Uber Taxi ride to home, did you have some assumption that Uber was going to make some money from that ride? A: Sure"). Plaintiff does not claim that there was anything wrong with the ride she received or the total price she paid. *See generally* Am. Compl. Plaintiff claims only that Uber took approximately half of the 20% "gratuity" for itself instead of paying it all to the driver. *Id.* at ¶ 13. Plaintiff, a Chicago resident, seeks to bring a California law claim on behalf of a nationwide class of uberTAXI users who she believes were misled by Uber's description of the 20% charge as a "gratuity," when it was actually a gratuity *and* service charge. *Id.* at ¶¶ 16-17.

**B.    The Fee Uber Received**

Plaintiff fundamentally misunderstands how Uber's payment system worked. The rider generally paid the metered fare plus a 20% additional automatic payment.[1] The taxi driver received that entire amount, minus a fee the driver paid to Uber. *See* Penn Decl. at ¶ 9; Mohrer Decl. at ¶ 7; Pao Decl. at ¶ 7; Abyzov Decl. at ¶ 7; Holt Decl. at ¶ 7. Uber's fee was generally calculated by applying a percentage (usually 10%) to the amount of the metered fare entered by the taxi driver. *See* Penn Decl. at ¶ 10; Mohrer Decl. at ¶ 8; Pao Decl. at ¶ 8; Abyzov Decl. at ¶ 8;

---

[1]    In some cities, Uber also collected a booking or dispatch fee. Pao Decl. at ¶ 7; Abyzov Decl. at ¶ 7; Holt Decl. ¶ 8.

Holt Decl. at ¶ 8. Uber collected the rider's payment on behalf of the taxi driver, and on a periodic basis, riders' payments were remitted to the taxi driver, less the fee paid by the taxi driver to Uber. Penn Decl. at ¶ 9.

**C.      Statements to Users Regarding the 20% Charge Varied Throughout the Class Period**

Because Uber was a fast-growing company and uberTAXI was a new product, Uber's descriptions of the fees for uberTAXI evolved over time. The 20% charge has been described in the following ways:

- Initially, Uber described the 20% charge as a "gratuity and service fee." In the April 18, 2012 post on Uber's blog originally announcing uberTAXI, Uber described the pricing as follows: "Drivers will input the meter fare into the driver application. A 20% charge to cover gratuity *and service fees* will be added to the fare." Penn Decl., Ex. D at 2 (emphasis added).

- On the same day, Uber also sent an email to all users in Chicago, *including the Plaintiff*, with the same language: "[a] 20% charge to cover gratuity and *service fees* will automatically be added to the metered fare." Penn Decl., Ex. B at 2 (emphasis added).

- For a short period of time after uberTAXI was first available in Chicago, users in Chicago who opened the application saw a "splash screen" that stated "Uber will add a 20% gratuity & *service charge* to the metered fare." Penn Decl. ¶ 18, Ex. B at 2, Ex. D at 1 (emphasis added). During most of the class period, however, users in every city would have been able to open the application and select the uberTAXI option without ever seeing a representation about the 20% charge. *Id*. at ¶¶ 17; Mohrer Decl. at ¶ 11; Pao Decl. at ¶ 12; Abyzov Decl. at ¶ 12; Holt Decl. at ¶ 12.

- Email receipts sent to users, including the Plaintiff, during the relevant time frame stated that the 20% charge was a "Gratuity & *Service Charge* (20%)." *See, e.g.*, Penn Decl. at ¶ 15, Ex. E (emphasis added); Mohrer Decl. at ¶ 10; Pao Decl. at ¶ 10; Abyzov Decl. at ¶ 10; Holt Decl. at ¶ 10; Roberts Decl., Ex. D.

- Taxicab drivers using the uberTAXI platform have also made various oral representations to riders about the 20% charge. *See, e.g.*, Roberts Decl., Ex. B.

- Other descriptions of the 20% charge, however, did not describe the charge as a "service charge" or a "service fee." Instead, on some webpages and emails, viewed by only a small portion of the putative class, Uber described the 20% charge as a "20% gratuity for the driver" or simply as a "20% gratuity." Mot. at Ex. A.

Despite these various descriptions, no matter how the 20% charge was described, the underlying amounts paid and received by rider and driver remained constant. For example, on a

$10 metered fare, the rider paid $12 ($10 + 20%), the driver kept $11, and Uber received $1 (10% of $10).  *See, e.g.,* Penn Decl. ¶¶ 10.  Whether Uber described the 20% charge as a gratuity and service charge or simply a gratuity, the amount Uber received as a fee from the driver ($1) and the amount the driver kept ($11) did not change.

### D.     Statements to Drivers Regarding the Gratuity Calculation Varied Throughout the Class Period

Although Uber's fee was always calculated as a percentage of the metered fare paid by a rider, Uber experimented with a number of different ways to describe this arrangement to drivers.

In Washington, D.C., the driver onboarding documents stated that "[t]ip is included in the amount we charge, guaranteeing you a 20% tip!" and that Uber receives "10% of the meter."  Holt Decl., Ex. A at 2.  In San Francisco, driver onboarding documents stated that "Uber will add a 20% gratuity to the fare" and that "Uber keeps 10% of the fare."  Abyzov Decl., Ex. A at 6.  Thus, in both D.C. and San Francisco, during the class period the written onboarding materials stated that drivers would receive the full gratuity and 90% of the metered fare.  Holt Decl. at ¶ 8; Abyzov Decl. at ¶ 8.

The driver onboarding documents in Chicago and Boston varied.  In Chicago, one document stated that "[t]ip is included in the amount we charge, guaranteeing you a 20% tip!" and "Uber takes 10% of the meter fare only," Penn Decl., Ex. A at 8, while another stated that "[t]ip is included in the amount we charge, guaranteeing you a 12% tip!," *id.* at 2.  In Boston, one document stated that "[t]ip is included in the amount we charge, guaranteeing you a 10% tip!," that Uber "takes 10%" and that the driver keeps the "entire fare," Pao Decl., Ex. A at 2, whereas another stated that Uber would add a "20% gratuity" and receive "10% of the fare," *id.* at 8.  In New York, the driver-orientation documents said that drivers would keep the "meter fare" and a "12% tip from meter fare."  Mohrer Decl., Ex. A at 2.

These descriptions are simply different ways of describing the same transaction; mathematically, the outcome is the same, but some of the descriptions require fewer mathematical steps.  Again, on a hypothetical $10 metered fare, the rider paid $12, the driver kept $11, and Uber's fee was calculated as $1.  The amount the driver kept can be described as the full metered

fare plus a 10% gratuity ($10 + $1) or can be described as 90% of the metered fare and the full gratuity ($9 + $2). Either way the driver keeps $11. The only concrete aspect of this transaction are the specific amounts each party paid and received, and those amounts can be described in a number of ways. But under any scenario, the driver always received the same amount of money from the single sum paid by the rider, and the driver paid Uber the same fee calculated as a percentage of that amount.

### E. The End of the Class Period

Beginning on or about March 25, 2013, Uber enabled users to adjust the gratuity for uberTAXI rides to any value between 0% and 30.0%, in increments of 5.0%. Penn Decl. at ¶ 16; Pao Decl. at ¶ 11; Abyzov Decl. at ¶ 11; Holt Decl. at ¶ 11. Plaintiff has acknowledged that the class period and damages end after this date. Mot. at. 3.

### LEGAL STANDARD

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432, 185 L. Ed. 2d 515 (2013) (internal quotations omitted). "A party seeking class certification must affirmatively demonstrate his compliance with" Federal Rule of Civil Procedure 23. *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551, 180 L. Ed. 2d 374 (2011). The Court must undertake a "rigorous analysis" to determine whether Plaintiff has carried her burden under this Rule. *Id.* Rule 23's requirements are "stringent" and "in practice exclude most claims." *Am. Exp. Co. v. Italian Colors Rest.*, 133 S. Ct. 2304, 2310, 186 L. Ed. 2d 417 (2013). The Rule "does not set forth a mere pleading standard." *Dukes*, 131 S. Ct. at 2551. Instead, a party must "be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, typicality of claims or defenses, and adequacy of representation, as required by Rule 23(a)." *Comcast*, 133 S. Ct. at 1432 (internal quotations omitted). "The party must also satisfy through evidentiary proof at least one of the provisions of Rule 23(b)." *Id*

**ARGUMENT**

## I. Plaintiff's Claim Does Not Satisfy Rule 23(a)(2)'s Commonality Requirement or Rule 23(b)(3)'s Predominance Requirement

Plaintiff has failed to establish commonality or predominance under Rules 23(a)(2) and (b)(3). Under Rule 23(a)(2), Plaintiff must show that "there are questions of law or fact common to the class." *Dukes*, 131 S. Ct. at 2550-51. Plaintiff must do more than merely list "common 'questions'—even in droves"—applicable to the entire class. *Id.* at 2551. Plaintiff must show "the capacity of a classwide proceeding to generate common *answers*." *Id.* "Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Id.* Similarly, Rule 23(b)(3) "requires a court to find that 'the questions of law or fact common to class members predominate over any questions affecting only individual members.'" *Comcast*, 133 S. Ct. at 1432. "Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)." *Id.*

Plaintiff's proposed class is a patchwork of "dissimilarities" and individualized issues. Plaintiff seeks to certify a class that includes "[a]ll individuals who arranged and paid for taxi rides through Uber's service from April 18, 2012 to March 25, 2013." Mot. at 3. But the individuals in this class differ in many key respects, including (1) whether the individual saw *any* representation about the 20% charge at issue; (2) which of the varying representations about the 20% charge the individual saw; (3) whether the individual considered that representation material, and (4) whether the individual is subject to a binding arbitration clause. These dissimilarities and individualized issues preclude certification.

### A. Many Class Members Were Not Exposed to Any Representation About the 20% Charge

The class Plaintiff proposes includes individuals who were never exposed to any representation about the 20% charge. Many of the proposed class members who "arranged and paid for taxi rides through Uber's service" never saw *any representation* regarding the 20% charge before taking their ride, and thus could not possibly have relied on any such representation. Because these proposed class members have no claim against Uber as a matter of law, Plaintiff's UCL and CLRA claims cannot be certified. *See Berger v. Home Depot USA, Inc.*, 741 F.3d 1061,

1068 (9th Cir. 2014) (holding that "class certification of UCL claims is available only to those class members who were actually exposed to the business practices at issue" and that a CLRA claim can only be certified if the "allegedly misleading statements were actually made to the consumers in the class").

Courts regularly deny certification of UCL and CLRA claims where members of the proposed class did not see the advertisements at issue. For example, the plaintiffs in *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581 (9th Cir. 2012) claimed that defendant had falsely advertised its vehicles' braking systems. *Id.* at 586. Like Plaintiff here, the *Mazza* plaintiffs sought to certify a class of *all* purchasers of the defendant's product, regardless of whether each purchaser had seen the advertisements at issue. *Id.* at 596. The Ninth Circuit, however, explained that "'a consumer who was never exposed to an alleged false or misleading advertising . . . campaign' [cannot] recover damages under California's UCL." *Id.* (quoting *Pfizer Inc. v. Superior Court*, 182 Cal. App. 4th 622, 632 (2010)). Because it "was unreasonable to assume that all class members" were exposed to the advertising at issue in *Mazza*, the Ninth Circuit vacated the District Court's order granting certification. *Id.*

More recently, in *In re Clorox Consumer Litig.*, 301 F.R.D. 436 (N.D. Cal. 2014), the court denied certification because some proposed class members had not seen the allegedly misleading advertising before their purchase. Plaintiffs in *In re Clorox* claimed that the defendant falsely represented to consumers that its cat litter product was "superior to other cat litter brands." *Id.* at 443. But the court noted that "the superiority claims appeared in small print on the back of a minority of [defendant's] packages" and that there was evidence that many consumers did not actually read these claims. *Id.* at 444-45. Because "many, or even most, members of the proposed classes did not see, much less rely upon, the allegedly misleading superiority claims" the court held that plaintiffs' class could not be certified. *Id.* at 443-44.[2]

---

[2] Several California appellate courts have also held that class certification is inappropriate where many class members never saw the allegedly false advertising. *See, e.g.*, *Davis-Miller v. Automobile Club of Southern California*, 201 Cal. App. 4th 106, 125 (2011) ("An inference of (footnote continued)

Like the putative class members in *Mazza* and *Clorox*, many of the individuals in Plaintiff's proposed class never saw the allegedly misleading claims. Individuals could, and did, open the Uber App and request a ride through uberTAXI without ever seeing any representation about the 20% charge. *See* Penn Decl. at ¶ 17; Mohrer Decl. at ¶ 11; Pao Decl. at ¶ 12; Abyzov Decl. at ¶ 12; Holt Decl. at ¶ 12. When downloading and opening the app, a user would not see any representation about the 20% charge. *Id.* And after opening the app, a user could select the uberTAXI option, set a pickup location on the map, and request a pickup, all of which the user could do without seeing any representation about the 20% charge.[3] *Id.*

This is not a case where the alleged representations at issue were on the product itself, like in the case of a false-labeling case where most purchasers may have seen the statements at issue. Instead, the vast majority of the representations that Plaintiff relies upon are on Uber's website, *see* Mot. at Ex. A, which users would not have to view before downloading and using the application on their smartphones. Like the *Mazza* and *Clorox* cases discussed above, it is "unreasonable to assume that all class members" were exposed to the allegedly misleading statements about the 20% charge. *Mazza*, 666 F.3d at 596.

---

classwide reliance cannot be made where there is no evidence that the allegedly false representations were uniformly made to all members of the proposed class"); *Fairbanks v. Farmers New World Life Ins. Co.*, 197 Cal. App. 4th 544, 562 (2011) ("[W]hen the class action is based on alleged misrepresentations, a class certification denial will be upheld when individual evidence will be required to determine whether the representations at issue were actually made to each member of the class"); *Pfizer Inc. v. Super. Ct.*, 182 Cal. App. 4th 622, 632 (2d Dist. 2010) (vacating order to certify class under the UCL because "large numbers of class members were *never exposed* to the [allegedly misleading] labels or television commercials"); *Sevidal v. Target Corp.*, 189 Cal. App. 4th 905, 909-10, 117 Cal. Rptr. 3d 66, 70 (2010) (affirming denial of class certification where many putative members did not see the alleged misrepresentation and thus "there [was] no basis for concluding that [defendant] improperly acquired any money or property from consumers who purchased goods without having any exposure to misinformation").

[3] When uberTAXI first launched in Chicago, there was a short period of time during which users would be shown a "splash screen" advertising the new request option when they selected the uberTAXI option. *See* Penn Decl. at ¶ 18. But as discussed below, this "splash screen" described the 20% charge as a "gratuity and service charge," and thus putative class members who saw it have no claim against Uber as a matter of law.

Moreover, Uber's case against certification here is even stronger than the one in *Mazza*. The Ninth Circuit in *Mazza* said only that is was "unreasonable to *assume* that all class members" saw the representations. *Id.* (emphasis added). Here, not only is that assumption unreasonable, but Uber has *proof* that putative class members never saw the allegedly misleading statements. Many putative class members emailed Uber customer service saying they had never seen *any* statement about the 20% charge before using uberTAXI. *See, e.g.*, Roberts Decl., Ex. A at 134 (November 12, 2012 Chicago client support email: "I wasn't sure how tipping worked . . . Once I got the receipt, I saw that a 20% tip was automatically included. Perhaps there is a way to make this more clear for first-time users"); *id.* at 77 (March 10, 2013 Washington, D.C. client support email: "Unaware that gratuity was included (since it doesn't state that anywhere on your app)"); *id.* at 113 (January 9, 2013 Chicago client support email: "I thought tips were automatically included, didn't know it was an additional 20%"); *id.* at 16 (December 23, 2012 San Francisco client support email: "nobody warned me that the gratuity will also be charged"); *id.* at 133 (November 17, 2012 Chicago client support email: ". . . later saw I'd been charged a 20% auto-gratuity"). Exhibit A to the Declaration of Arthur Roberts contains a total of 84 customer-service emails from users who never saw any representation about the 20% charge before they "arranged and paid for taxi rides through Uber's service from April 18, 2012 to March 25, 2013." Mot. at 3.

These 84 customer-service emails, of course, do not represent everyone who knew nothing about the 20% charge, but reflect only the emails of individuals who actually chose to write Uber to tell them about it, and whose emails happened to be in the documents Uber discovered while applying the parties' agreed-upon search terms to selected custodians. Roberts Decl. at ¶¶ 3-5. The total universe of individuals who never saw the claim is undoubtedly far larger, but identifying which individuals were exposed to statements about the 20% charge would require individualized inquiries that, under *Mazza* and *Clorox*, precludes class certification. *Mazza*, 666 F.3d at 596; *In re Clorox*, 301 F.R.D. at 444-45; *see also Sevidal v. Target Corp.*, 189 Cal. App. 4th 905, 926 (2010) (affirming denial of certification because, although misrepresentations regarding "Made in US" *could have* been seen on defendant's website if users clicked a link

showing additional information about a product, defendant had evidence that many users did not click on the link and therefore "were 'never exposed' to the alleged misrepresentation").

Nevertheless, relying on *In re Tobacco II Cases*, 46 Cal. 4th 298, 207 P.3d 20 (2009) ("*Tobacco II*"), Plaintiff argues that no individualized issues of reliance could possibly exist because "it is sufficient for the plaintiff to 'establish an inference of justifiable reliance . . . by showing a material misrepresentation.'" Mot. at 9 (quoting *Delarosa v. Boiron, Inc.*, 275 F.R.D. 582, 589 (C.D. Cal. 2011)). In other words, Plaintiff asks this court to assume that every user of the uberTAXI request option relied on representations about the 20% charge, even though many— if not most—never even saw those representations.

California courts have rejected this exact argument on multiple occasions. For example, the *Mazza* plaintiffs made the same argument Plaintiff puts forth here, that under *Tobacco II* the court could certify a class regardless of whether all members had been exposed to the misrepresentation at issue because an "inference of reliance was appropriate." *Mazza*, 666 F.3d at 595. The Ninth Circuit rejected this argument. The court explained that this inference was appropriate in *Tobacco II* only because "*Tobacco II's* holding was in the context of a 'decades-long' tobacco advertising campaign where there was little doubt that almost every class member had been exposed to defendants' misleading statements." *Id.* at 596. Where the scope of advertising was more limited, there was no reason for the court to assume that all class members saw the advertisements at issue, and thus it made little sense to assume that all class members relied on those advertisements. *Id.*; *see also Pfizer*, 182 Cal. App. 4th at 632 (denying certification because there was "no evidence that a majority of [defendant's] consumers viewed any of [the allegedly misleading] commercials").

As in *Mazza*—where the advertisements at issue included TV commercials, brochures, magazine advertisements and intranet videos spanning from 2005 to 2008—here the advertisements at issue are much more "limited [in] scope" than the "decades-long" campaign in *Tobacco II*. *Mazza*, 666 F.3d at 586-87, 596. Plaintiff's class period is less than one year and the allegedly misleading advertisements appeared on only a handful of webpages and emails. Mot. at 3, Ex. A. In fact, Plaintiff even admitted that she herself never saw any promotional materials or

news stories about uberTAXI before taking her ride. Roberts Decl., Ex. C (Ehret Dep. Tr.) at 20:10-20:16 ("Q: Do you recall seeing any promotional materials specifically from Uber about Taxi prior to taking that taxi ride? A: No. Not specifically, no. Q: Do you recall seeing any news stories about Uber Taxi before taking that taxi ride? A: No").

The plaintiffs in *In re Clorox* also argued that common issues predominated because the court could presume class-wide reliance in that UCL false advertising case. *Id.* at 444. Again, the court rejected the plaintiffs' argument because the question of reliance was irrelevant given that many class members *had never seen* the alleged false advertising in the first place. *Id.* at 445. Plaintiff here makes exactly the same argument that the court in *In re Clorox* criticized in strong terms—Plaintiff "appear[s], remarkably, to argue that any materially misleading product advertisement is automatically presumed under California law to reach and influence all of the product's customers." *Id.* But "[t]he presumption established in *Tobacco II* was much more limited, and it applied only to reliance, not exposure. . . . *Tobacco II* does not mean that Plaintiffs[] [is] entitled to a presumption that every purchaser of [an uberTAXI ride] during the class period was exposed to the misleading statements." *Id.* As in *Mazza* and *In re Clorox*, many people in Plaintiff's class did not see the representations at issue. Accordingly, common issues do not predominate and the Court must deny class certification.[4]

**B.** **Class Members Were Exposed to Significantly Different Statements Regarding 20% Charge**

Even among those putative class members who *were* exposed to statements about the 20% charge, the statements were not at all uniform. Whether Uber's statements were "likely to

---

[4] The California cases Plaintiff cites are not to the contrary because they all involved uniform statements or omissions made to *every member* of the proposed class. *Davis-Miller*, 201 Cal. App. 4th at 124 (holding that plaintiff's "citation to *Steroid Hormone Product Cases, supra,* 181 Cal. App. 4th 145, 104 Cal. Rptr. 3d 329, is not helpful to her case" because there was "no evidence that the allegedly false representations were uniformly made to *all members* of the proposed class") (emphasis added); *Kaldenbach v. Mut. of Omaha Life Ins. Co.*, 178 Cal. App. 4th 830, 849, 100 Cal. Rptr. 3d 637, 652 (2009) (rejecting plaintiff's reliance on *Massachusetts Mut. Life Ins. Co. v. Superior Court*, 97 Cal. App. 4th 1282, 119 Cal. Rptr. 2d 190 (2002) because that case "involved identical misrepresentations and/or nondisclosures by the defendants made to the *entire class*") (emphasis added).

---

mislead," *Kaldenbach*, 178 Cal. App. 4th at 850, any particular putative class member would depend on *which* statement(s) about the 20% charge they saw. As Plaintiff indicates, some uberTAXI webpages and email communications described the 20% charge as a "gratuity." *See* Mot. Ex. A. But many other advertisements and statements described the 20% charge as a "gratuity *and service charge*" or "gratuity *and service fee*." *See* Penn Decl. at ¶¶ 12-15, 18, Ex. B-E; Mohrer Decl. at ¶ 10; Pao Decl. at ¶ 10; Abyzov Decl. at ¶ 10; Holt Decl. at ¶ 10. Class members that saw the latter representations have no claim against Uber because, even assuming Uber took part of the 20% charge as alleged, this practice would have been fully disclosed. *See, e.g.*, *S. Bay Chevrolet v. GM Acceptance Corp.*, 72 Cal. App. 4th 861, 878, 889–89 (1999) (holding that a business practice was not deceptive under the UCL because plaintiff "knew, understood, agreed, and expected" it); *Harris v. Las Vegas Sands L.L.C.*, No. CV 12-10858 DMG FFMX, 2013 WL 5291142, at *5 (C.D. Cal. Aug. 16, 2013) (dismissing UCL and CLRA claims based on an allegedly misrepresented fee, holding that representation was not false or misleading because of the components of the fee were adequately represented both before purchase and in an email afterward).

When class members are exposed to differing statements, some of which may be actionable and some of which are not, determining which statement each class member saw is an individual issue that precludes class certification. *See, e.g.*, *Berger*, 741 F.3d at 1069 (denying certification of UCL and CLRA claims where class members were exposed to varying statements regarding 10% charge); *Gonzalez v. Proctor & Gamble Co.*, 247 F.R.D. 616, 624-24 (S.D. Cal. 2007) (denying class certification of UCL and CLRA claims because "plaintiffs could not allege that the same representations were specifically made to each class member, thus preventing the court from permitting an inference of reliance").

For example, in *Berger* the Ninth Circuit affirmed the denial of class certification in a lawsuit involving Home Depot's alleged failure to fully inform customers of the optional nature of a 10% surcharge. 741 F.3d at 1068–69. Like Plaintiff here, the plaintiff in *Berger* sought to represent all of the defendant's consumers of a particular service, even though those individuals were exposed to varying statements about the charge at issue. *Id*. at 1069. Plaintiffs argued that

individualized issues of reliance did not predominate because "if a material misrepresentation has been made to the entire class, an inference of reliance arises as to the class." *Id*. at 1070 (quoting *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1022 (9th Cir. 2011)).

The Ninth Circuit rejected this argument. The court held that the class could not be certified because plaintiff had "not alleged that each individual was exposed to the same misrepresentations." *Id*. at 1069. In particular, the court noted that the "parties contest the existence and form of any signs in Home Depot stores that alert customers to the optional nature of the" charge, and because "any oral notice given by Home Depot employees about the optional nature of the [10% charge] during a particular rental transaction would necessarily be a unique occurrence." *Id*. A presumption of reliance, the Ninth Circuit found, was only appropriate to the extent all class members had been exposed to a uniform message. *Id*. Because it would require individualized inquiries to determine what each class member had been told about the charge, the court declined to presume class-wide reliance and affirmed denial of certification. *Id*.

The court in *Perrine v. Sega of Am., Inc.*, No. 13-CV-01962-JD, 2015 WL 2227846 (N.D. Cal. May 12, 2015) denied certification for the same reasons. There, the plaintiffs argued that the defendant misrepresented the nature of its video game. *Id*. at *1. But representations about defendant's video game came from multiple sources— "a series of 'actual gameplay' demonstrations" as well as "trailers and commercials." *Id*. at *3. Some of these representations contained the allegedly misleading representations, and others did not. *Id*. Plaintiff argued that the law nevertheless entitled them to a presumption of reliance, and that this variation in representations "d[id] not matter" because one webpage that did include the misrepresentation "was accessible through this time period." *Id*.

Again, the court rejected this argument and denied certification. The court held that "a presumption of reliance does not arise when class members were exposed to quite disparate information from various representatives of the defendant" and that, because plaintiff "ma[de] no attempt to limit the class to those who were exposed to the allegedly misleading advertising . . . it is overbroad and not certifiable." *Id*. at *2 (internal quotations omitted); *see also Martinez v. Welk Grp., Inc.*, No. 09CV2883 AJB, 2012 WL 2888536, at *5 (S.D. Cal. July 13, 2012) (denying class

certification because "not all class members were exposed to the same representations" and "individualized inquiries would be necessary to determine what [defendant] represented or omitted to each class member"); *Jones v. ConAgra Foods, Inc.*, No. C 12-01633 CRB, 2014 WL 2702726, at *1 (N.D. Cal. June 13, 2014) (denying class certification because "consumers were exposed to label statements that changed over time and from product to product").

California appellate courts also hold that variation in representations precludes certification. *Knapp v. AT & T Wireless Servs., Inc.*, 195 Cal. App. 4th 932, 944 (2011) (affirming denial of certification of UCL and CLRA claims where liability "necessarily turns on an individualized assessment of which representations were made to each proposed class member"); *Cohen v. DirecTV, Inc.*, 178 Cal. App. 4th 966 at 979 (2d Dist. 2009) (affirming denial of class certification of UCL and CLRA claims where the proposed class would include consumers who "never saw [defendant's] advertisements or representations of any kind before deciding to purchase the company's HD services, and subscribers who only saw and/or relied upon advertisements that contained no mention of" the aspects of defendant's service at issue); *Kaldenbach,* 178 Cal. App. 4th at 849 (affirming denial of class certification of UCL and CLRA claims because plaintiff failed to show "identical misrepresentations and/or nondisclosures by the defendants made to the entire class").

Like the putative class members in the above cases, the individuals in Plaintiff's proposed class received different representations about the 20% charge from a diverse array of sources. Despite Plaintiff's repeated claim that this case involves "uniform" representations, Mot. at 1, 6, 8—a claim that Plaintiff knows is false—the evidence establishes that users received differing representations about the charge from, at least: (1) Uber's website, (2) the Uber App, (3) emails Uber sent to users, (4) communications users had with drivers, and (5) Uber receipts. Some of those sources conveyed the representations Plaintiff claims were misleading, some of them did not. Moreover, an individualized inquiry is necessary to determine the content of many representations that the putative class members received (*e.g.*, users' communications with drivers.).

As Plaintiff has identified, some of the representations from these sources said that the 20% charge was simply a "gratuity." For example, Plaintiff relies on an Uber blog post that stated "Uber will automatically add a 20% gratuity for the driver." Mot. Ex. A at 9. Plaintiff also identifies an email Uber sent that refers to the charge as a "20% gratuity." Mot. Ex. A at 6.[5]

But many other sources identified the charge as a "gratuity and service charge" or "gratuity and service fee." For example, the initial announcement of uberTAXI posted on Uber's blog said that the 20% charge was a "gratuity and service fee." Penn Decl., Ex. D at 2. An email announcing uberTAXI sent to every user in Chicago—including Plaintiff—also described the charge as a "gratuity and service fee." Penn Decl., Ex. B at 2, Ex. C at 1. Moreover, a "splash screen" that appeared in the app for a limited time after uberTAXI was announced in Chicago stated the 20% charge was a "gratuity and service charge." Penn Decl., Ex. B, at 2 (*see* image of application in email/blog post); Penn Decl. at ¶ 18. Further, emailed receipts sent to uberTAXI users identified the 20% charge as "Gratuity & Service Charge (20%)." *See, e.g.*, Penn Decl. at ¶ 15, Ex. E; Mohrer Decl. at ¶ 10; Pao Decl. at ¶ 10; Abyzov Decl. at ¶ 10; Holt Decl. at ¶ 10. Indeed, even Plaintiff's receipt identifies the 20% charge as a "Gratuity and Service Charge (20%)."[6] Roberts Decl., Ex. D.

Moreover, taxicab drivers relayed information about the 20% charge to users, adding an additional layer of individual issues into Plaintiff's proposed class. Many of the proposed class

_____

[5] Plaintiff also relies on an internal Uber document that purports to present various options for potential uberTAXI pricing structures. Mot. Ex. F at 2. One of those options is labeled "charge more, hide it in the gratuity." *Id.* Plaintiff claims that this proves that Uber was "keeping a portion of the gratuity charge." Mot. at 2. In reality, this was nothing more than unartful drafting—the presentation clearly indicates that, even with this option, Uber still would have taken its fee from drivers from the "Base Taxi Fare," not the gratuity charge. Mot. Ex. F at 2. Moreover, this option was *rejected* by Uber, and so *never* represented the reality in any city at any time. *See* Mot Ex. O. More importantly, however, this document has nothing to do with any issue presented at the class certification stage.

[6] Although users received receipts after having already taken a taxicab ride, the statement the 20% charge was a "Gratuity and Service Charge" creates, at a minimum, an individualized issues of exposure and reliance for any subsequent rides. *See Harris*, 2013 WL 5291142, at *5 (dismissing UCL and CLRA claims based on allegedly misleading fee where defendants "explicitly disclosed" the fee in an e-mail sent to the consumer after the transaction).

members sent Uber customer service emails indicating that their drivers had made representations to them about the gratuity charge, and these representations were far from uniform. *See* Roberts Decl., Ex. B. Plaintiff alleges that *her* taxi driver told her "that Uber retains a portion of his gratuity." Mot. at 3. But given the differing explanations that Uber made to drivers about the gratuity calculations—sometimes saying that drivers would received the full metered fare plus a 10% gratuity, and other times saying drivers would receive the full gratuity and 90% of the metered fare, *supra* § D—other taxicab drivers explained to users that they retained the full gratuity. *Compare* Mot. at 3 (arguing that plaintiff's taxi driver told her "that Uber retains a portion of his gratuity") *with* Roberts Decl., Ex. B at 13 ("when I asked him if he automatically gets the 20% added on he said yes"). Without individualized inquiries into each class member's experience, it is impossible to know what information about the 20% gratuity each taxicab driver relayed to each Uber user. *See Perrine*, 2015 WL 2227846 at *2 (holding that "a presumption of reliance does not arise when class members were exposed to quite disparate information from various" individuals) (internal quotations omitted); *Berger*, 741 F.3d at 1069 (holding that "any oral notice" that class members received "would necessarily be a unique occurrence").

In sum, even among the minority of individuals who may have seen some representation about the 20% charge before taking their ride, the Court would have to conduct an individualized inquiry to determine which of the varying representations, or combinations or representations, each individual saw or heard. *See* Roberts Decl., Ex. C (Ehret Dep. Tr.) at 49:15-49:17 ("Q: People who knew the fee split within the gratuity, were they deceived at the time? A: You'd have to ask them"). The Court would have to inquire into what emails each individual received, what webpages they visited and when, what they saw when they turned on the Uber App, the details of their conversations with taxicab drivers, whether they reviewed their receipts, and more. These individualized issues make classwide determination of liability impossible and thus certification must be denied.[7]

---

[7] Even if Plaintiff sought to limit her class to those users who had actually viewed the alleged misrepresentations, class certification would still be inappropriate because such a class would not
(footnote continued)

### C. For Plaintiff's CLRA Claim, She Has Failed to Provide Any Evidence That the Representations Were Material to Users

The law does not entitle Plaintiff to a presumption of reliance for her CLRA claim even among those individuals who did see the alleged misrepresentation. Although, under the CLRA, "a plaintiff may demonstrate that a defendant's alleged deceptive conduct caused the same damage to the class by showing that the alleged misrepresentation would have been material to reasonable persons," courts have denied class certification based on a failure to establish materiality. *ConAgra Foods*, 2014 WL 2702726, at *15-17 (denying certification because individualized issues predominated where "[t]he only evidence Plaintiffs rely on in support of [the] contention" that a statement was material was an expert declaration which the court found "lacking"); *Faulk v. Sears Roebuck & Co.*, No. 11-CV-02159 YGR, 2013 WL 1703378, at *9 (N.D. Cal. Apr. 19, 2013) (denying certification because "[i]t is [plaintiff's] burden in moving for class certification of his CLRA claim to establish that common questions predominate" and plaintiff did "not point to common proof that would establish the materiality element of his own claim and his conclusory arguments do not meet that burden"); *Astiana v. Kashi Co.*, 291 F.R.D. 493, 508 (S.D. Cal. 2013) (denying certification where individualized issues of reliance predominated because "[a]bsent stronger evidence as to what consumers perceived or what they would find material, the inference of reliance does not apply); *Badella v. Deniro Mktg. LLC*, No. C 10-03908 CRB, 2011 WL 5358400, at *8 (N.D. Cal. Nov. 4, 2011) (denying certification because, unlike cases where "plaintiffs had identified common sources of proof [of materiality] beyond the packaging,

---

be ascertainable. Plaintiff has offered no way, nor could she, of determining which users of uberTAXI saw a particular blog post, email or in-app representation, or what any given driver said to that particular user about the gratuity during their ride. There would be no feasible way to determine the membership of this class. *See Perrine*, 2015 WL 2227846, at *3-4 (refusing to allow Plaintiff to redefine class to include only those individuals who saw allegedly actionable advertisements because there was "no good way to identify" individuals who "have been exposed to Defendants' at-issue advertising" given that "[c]ertainly, defendants have no records of who viewed what when, and plaintiff has not identified any document-based method of identifying this information").

including expert testimony, and data from defendants return rates and consumer surveys . . . Plaintiffs here have not pointed to any other common sources of proof besides the text" at issue).[8]

Here, Plaintiff provides the Court with no common proof establishing that the alleged representations about the 20% charge were material. Plaintiff does not even present *an argument* as to why the alleged representations may have been material. *See* Mot. at 9-10. Instead, Plaintiff simply claims that individualized issues of reliance cannot predominate because "Plaintiff will be able to demonstrate that Uber's misrepresentations were objectively material." Mot. at 10. But whether Plaintiff "will" demonstrate materiality is irrelevant; the law requires her to do so in her motion for class certification. *Dukes*, 131 S. Ct. at 2551 (Rule 23 "does not set forth a mere pleading standard"); *ConAgra Foods*, 2014 WL 2702726, at *15-17; *Faulk*, 2013 WL 1703378, at *9; *Astiana*, 291 F.R.D. at 508; *Badella*, 2011 WL 5358400, at *8.[9]

It defies common sense to assume that a reasonable person would find Uber's alleged misrepresentation material. Individuals in Plaintiff's proposed class presumably understood—as did Plaintiff—that Uber received *some* fee for connecting the user to the taxicab driver. *See* Roberts Decl., Ex. C (Ehret Dep. Tr.) at 47:20-47:23 ("Q: When you took the Uber Taxi ride to home, did you have some assumption that Uber was going to make some money from that ride? A: Sure"). Plaintiff does not claim Uber should not have received a fee from her payment, but instead claims only that Uber's fee should not have come from the portion of her payment that she believes was the gratuity. But no reasonable person would find this material because even if it

---

8   The cases cited by Plaintiff for the proposition that "[m]ateriality of the misrepresentation is an objective standard that is susceptible to common proof," Mot. at 9, do not relieve Plaintiff of her burden of actually *showing* some common proof that would suggest that the alleged misrepresentation was material. *See, e.g.*, *Wolph v. Acer Am. Corp.*, 272 F.R.D. 477, 488 (N.D. Cal. 2011) (plaintiff identified "common sources of proof" of materiality, including statements "shown at the point of purchase," expert testimony, "benchmarking results, retailer return rates, consumer return surveys, customer inquiry databases and third party recommendations").

9   "It is [Plaintiff's] burden in moving for class certification of [her] CLRA claim to establish that common questions predominate." *Faulk*, 2013 WL 1703378, at *9. Plaintiffs generally satisfy their burden on the materiality element of their CLRA claim with expert testimony. *See, e.g.*, *ConAgra Foods*, 2014 WL 2702726, at *15-17. Plaintiff has offered no such testimony.

were possible to prove that Uber calculated its fee based on the gratuity portion of the rider's payment rather than the metered fare portion, under either scenario the driver kept exactly the same amount of money from the rider. As discussed, on a $10 metered fare where the rider pays $12 ($10 + 20%), whether the driver keeps 90% of the metered fare and the full 20% charge ($9 + $2) or 100% of the metered fare and half the 20% charge ($10 + $1), the driver always keeps $11. It simply cannot be material for a rider to want the driver to keep $9 + $2 instead of $10 + $1.

Further, Plaintiff could never offer common proof of materiality here because users chose to request uberTAXI rides for different reasons, and thus user's expectations and desires about the 20% charge also varied. "[I]f the issue of materiality or reliance is a matter that would vary from consumer to consumer, the issue is not subject to common proof, and the action is properly not certified as a class action." *Algarin v. Maybelline, LLC*, 300 F.R.D. 444, 453 (S.D. Cal. 2014). Here, Plaintiff stated that she chose to request an uberTAXI ride because she was looking for a traditional taxicab but "was having a difficult time" finding one. Roberts Decl., Ex. C (Ehret Dep. Tr.) at 18:11-18:17. But other users chose to take an uberTAXI ride for completely different reasons, including that they had positive experiences with other Uber request options, none of which automatically provide the driver with any gratuity. *See, e.g.*, Roberts Decl., Ex. A at 75 ("my gut instinct was not to tip in cash based upon my previous Uber experiences"); *id*. at 70 ("We gave a few bucks because we weren't sure if tip was included in a regular cab. That was the first time doing a cab. We usually do black cars. The guy ended up getting a very good tip. Next time I will know better"). The degree to which this diverse group of individuals cared about or relied on statements about the gratuity charge is not subject to common proof. Roberts Decl., Ex. C (Ehret Dep. Tr.) at 50:23-51:2 ("Q: So how does that create harm if they don't care where the money goes? A: You'd have to ask them. I mean, that's up to the person").

Because Plaintiff has offered no evidence, source of evidence, or even argument that Uber's alleged misrepresentation was material, the law does not afford Plaintiff a presumption of reliance for her CLRA claim. This is yet another reason why, with regard to Plaintiff's CLRA claim, individualized issues of reliance predominate and the proposed class cannot be certified.

**D. The Court Would Have to Conduct Individualized Inquiries to Determine Which Class Members Are Subject to an Arbitration Clause**

Plaintiff's proposed class also raises individualized inquiries relating to an arbitration clause in Uber's terms and conditions. A number of courts have held that "where certain members of a class are subject to contracts containing arbitration clauses, while other class members are not, those differences in contractual relationships destroyed the commonality and typicality of the class." *In re Titanium Dioxide Antitrust Litig.*, 962 F. Supp. 2d 840, 861 (D. Md. 2013); *Pablo v. ServiceMaster Global Holdings Inc.*, No. C 08-03894 SI, 2011 WL 3476473, at *2 (N.D. Cal. Aug. 9, 2011) (denying certification where "[a]lthough it is not clear how many putative class members signed arbitration agreements, the evidence currently before the Court supports an inference that a significant number did, and that a significant portion of this litigation would be devoted to discovering which class members signed such agreements").

From April 2012 to March 2013, it was Uber's practice for riders to agree to terms and conditions in order to create an account with Uber. *See* Penn Decl. at ¶ 19. In September 2012, Uber added an arbitration agreement to these terms and conditions. *Id.* Plaintiff's class period—April 18, 2012 to March 25, 2013—straddles this date, and thus a number of class members who signed up after September 2012 will be subject to the clause, while others will not.[10] These additional individualized issues further preclude certification.

---

[10] Uber expects Plaintiff will claim that Uber's arbitration clause is unenforceable and thus does not create any individualized issues. Uber, of course, contests this as a matter of law. Regardless, however, this dispute only adds further individualized issues into this case: whether that arbitration clause is enforceable or unconscionable with regard to any particular class member. In the context of a different arbitration clause, this Court's prior rulings have demonstrated that the enforceability of Uber's arbitration clauses to a particular person is a highly individualized inquiry, depending on that person's unique characteristics and circumstances. *See Mohamed v. Uber Technologies, Inc.*, No. C-14-5200 EMC, 2015 WL 3749716, at *7, *15, *20 (N.D. Cal. June 9, 2015) (determination of enforceability turned on, *inter alia*, whether the individual "had the opportunity to review the" terms of the agreement, whether the individual "could [] afford to pay the arbitration fees that would be required," whether the individual was a "lower-level laborer" and whether the arbitration clause would have been a "surprise" to the individual).

## II.    Plaintiff's Claim Is Not Typical of the Class

An additional, independent reason for denying Plaintiff's motion is that her claims and defenses will not be typical of the claims or defenses of the class.  Fed. R. Civ. P. 23(a)(3).  First, Plaintiff claims that she used uberTAXI in part because of Uber's representations about the 20% charge, but many of the putative class members never saw those representations.  *See* Roberts Decl., Ex. A.  Second, many of the class members Plaintiff seeks to represent used uberTAXI for wholly different reasons than Plaintiff, and—far from considering Uber's representations material—were actually *upset* about the fact that drivers collected an automatic 20% gratuity.  *Id.* at 2, 8 ("I don't tip unless they go above their standard job (helping with my suitcase, etc…).  This should be discretionary and I'm upset that its not.").  Third, Plaintiff is not typical in that she has not established any other rider cared about upon which portion of her payment Uber based its fee calculation; the driver keeps the same amount of money whether Uber's fee is calculated based on half of the 20% additional charge, or based on 10% of the metered fare.

Moreover, Plaintiff is not a typical class member because her claim is subject to unique defenses.  "[C]lass certification should not be granted if there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it."  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (internal quotations omitted).  As described above, Plaintiff was sent an email before taking her uberTAXI ride that explicitly divulged the practice that was allegedly hidden, telling her that the 20% charge covered "gratuity and service fees."  Penn Decl. at ¶ 13, Ex. C.  Thus, Plaintiff has no claim against Uber as a matter of law.   *See S. Bay Chevrolet*, 72 Cal. App. 4th 861, 878, 889–89; *Harris*, 2013 WL 5291142, at *5.  Other putative class members would not have to overcome this dispositive defense.  Consequently, Plaintiff is not a typical representative and her motion must be denied.  *See In re Valence Tech. Sec. Litig.*, No. C 95-20459 JW, 1996 WL 119468, at *4 (N.D. Cal. Mar. 14, 1996) (holding that plaintiff was not a typical representative because he would be subject to the unique defense that he "continued to trade in the stock [of defendants] after he learned of the alleged misrepresentations of defendants").

### III. The Class Cannot Be Certified Because Many Class Members Lack Article III Standing

Plaintiff's motion for class certification must be denied for the additional reason that many putative class members lack Article III standing. "No class may be certified that contains members lacking Article III standing." *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 594 (9th Cir. 2012). As discussed above, many of the putative class members were never exposed to—and thus could not have relied upon—*any* representations about the 20% gratuity. *See supra* § I.A. Many others were undeniably informed of the facts Plaintiff asserts Uber concealed—that the 20% charge was a "gratuity and service charge." *See supra* § I.B. Still others would likely not care about the basis for Uber's fee calculation, given that the driver kept the same amount of money whether the calculation was based on the metered fare or the gratuity. *See supra* § I.C. These class members could not have suffered any injury "as a result of" Uber's allegedly misleading statements and thus, regardless of their standing under state law, do not have Article III standing. *See Tietsworth v. Sears, Roebuck & Co.*, 5:09-CV-00288-JF HRL, 2012 WL 1595112 at *14 (N.D. Cal. May 4, 2012) (holding that plaintiff's proposed class was overbroad because some class members did not suffer any injury and thus the class "necessarily contain[ed] members who lack Article III standing"); *O'Shea v. Epson Am., Inc.*, CV 09-8063 PSG CWX, 2011 WL 4352458 at *12 (C.D. Cal. Sept. 19, 2011) (where not all class members had seen the allegedly misleading statements, holding that while "unnamed class members need not establish that they *relied* on the alleged misrepresentation to recover under the . . . UCL, absent a showing that their injury was *caused* by the allegedly deceptive advertising, they lack standing to proceed in federal court"). For this additional reason, Plaintiff's class cannot be certified.

### CONCLUSION

For the foregoing reasons, the Court should deny Plaintiff's Motion for Class Certification.

DATED: August 20, 2015          QUINN EMANUEL URQUHART & SULLIVAN, LLP


                                By    /s/ Stephen A. Swedlow
                                      Stephen A. Swedlow

                                      Attorneys for Defendant
                                      Uber Technologies, Inc.