Myron M. Cherry (SBN 50278)
mcherry@cherry-law.com
Jacie C. Zolna (admitted *pro hac vice*, Illinois ARDC #6278781)
jzolna@cherry-law.com
MYRON M. CHERRY & ASSOCIATES LLC
30 North LaSalle Street, Suite 2300
Chicago, Illinois 60602
Telephone: (312) 372-2100
Facsimile: (312) 853-0279

Hall Adams (admitted *pro hac vice*, Illinois ARDC #6194886)
hall@adamslegal.net
LAW OFFICES OF HALL ADAMS, LLC
33 North Dearborn Street, Suite 2350
Chicago, Illinois 60602
Telephone: (312) 445 4900
Facsimile: (312) 445 4901

Michael Ram (SBN 104805)
mram@rocklawcal.com
RAM, OLSON, CEREGHINO & KOPCZYNSKI LLP
555 Montgomery Street, Suite 820
San Francisco, California 94111
Telephone: (415) 433-4949
Facsimile: (415) 433-7311
***Attorneys for Plaintiff and the Class***

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| CAREN EHRET, individually and on behalf of a class of similarly situated persons, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| UBER TECHNOLOGIES, INC., a Delaware Corporation, | ) ) ) ) |
| Defendant. | ) ) ) |

**Case No. 3:14-cv-113-EMC**

**PLAINTIFF'S REPLY IN FURTHER SUPPORT OF HER MOTION FOR CLASS CERTIFICATION**

Date:  October 8, 2015
Time:  1:30 PM
Judge:  Edward M. Chen
Courtroom:  5

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES……………………………………………………………..ii-iv

**INTRODUCTION**……………………………………………………………….1-2

**ARGUMENT**………………………………………………………………….2-18

    **A.**     **Uber consistently and uniformly represented the 20%
             charge as a "gratuity" throughout the class period** ............................................. 2-5

    **B.**     **Plaintiff satisfies commonality and predominance
             because her claims are based on wide-spread and
             uniform misrepresentations targeted to class members** .................................... 5-10

    **C.**     **The materiality of Uber's misrepresentation is subject to
             common proof and is yet another issue common to the class** ......................... 10-13

    **D.**     **Uber's purported arbitration provision
             poses no barriers to class certification** ................................................................ 13-15

    **E.**     **Plaintiff satisfies the typicality requirement**...................................................... 15-16

    **F.**     **Uber's Article III standing argument is baseless** ............................................. 16-18

# TABLE OF AUTHORITIES

*Arnott v. U.S. Citizenship & Immigration Servs.*,
290 F.R.D. 579 (C.D. Cal. 2012) ..................................................................17

*Astiana v. Kashi Co.*, 291 F.R.D. 493 (S.D. Cal. 2013) .................................. 10-12

*Badella v. Deniro Marketing LLC*, 10-cv-3908, 2011 WL 5358400 (N.D. Cal. 2011)................11

*Bates v. United Parcel Serv., Inc.*, 511 F.3d 974 (9th Cir. 2007) ....................................17

*Berger v. Home Depot USA, Inc.*, 741 F.3d 1061 (9th Cir. 2014)..............................................8-9

*Brown v. Hain Celestial Grp., Inc.*, 11-cv-3082,
2014 WL 6483216 (N.D. Cal. Nov. 18, 2014) ......................................... 9-10

*Cohen v. DIRECTV, Inc.*, 178 Cal. App. 4th 966 (2009)...................................................4

*Davis v. Four Seasons Hotel Ltd.*, 08-cv-525,
2011 WL 4590393 (D. Haw. Sept. 30, 2011) ...............................................15

*Davis-Miller v. Auto. Club of S. California*,
201 Cal. App. 4th 106 (2011), *as modified* (Nov. 22, 2011) ...............................9

*Ellis v. Costco Wholesale Corp.*, 657 F.3d 970 (9th Cir. 2011) ...............................17

*Fairbanks v. Farmers New World Life Ins. Co.*,
197 Cal. App. 4th 544 (2011), *as modified* (Aug. 1, 2011) ................................9

*Faulk v. Sears Roebuck and Co.*, 11-cv-2159, 2013 WL 1703378 (N.D. Cal. 2013) ...................11

*Gonzalez v. Proctor & Gamble Co.*, 247 F.R.D. 616 (S.D. Cal. 2007).............................4

*Harris v. Las Vegas Sands L.L.C.*, 12-cv-10858,
2013 WL 5291142 (C.D. Cal. Aug. 16, 2013)......................................... 3-4, 16

*Herrera v. LCS Financial Services Corp.*, 274 F.R.D. 666 (N.D. Cal. 2011)..............................15

*In re Clorox Consumer Litig.*, 301 F.R.D. 436 (N.D. Cal. 2014)......................................9

*In re Evanston Nw. Corp. Antitrust Litig.*, 2013 WL 6490152 (N.D. Ill. Dec. 10, 2013) .............15

*In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*,
903 F. Supp. 2d 942 (S.D. Cal. 2012).............................................................3

*In re Titanium Dioxide Antitrust Litig.*, 962 F. Supp. 2d 840 (D. Md. 2013)................................15

ii

*Jones v. ConAgra Foods, Inc.*, 12-cv-1633, 2014 WL 2702726 (N.D. Cal. 2014) ......................11

*Kaldenbach v. Mut. of Omaha Life Ins. Co.*,
178 Cal. App. 4th 830 (2009), *as modified* (Oct. 26, 2009) ...........................................9

*Knapp v. AT & T Wireless Servs., Inc.*, 195 Cal. App. 4th 932 (2011) ...........................................4

*Krueger v. Wyeth, Inc.*, 03-cv-2496, 2011 WL 8971449 (S.D. Cal. Mar. 30, 2011)..................10

*Lara v. Onsite Health, Inc.*, 896 F.Supp.2d 831 (9th Cir. 2012) ....................................13

*Lewis v. Casey,* 518 U.S. 343 (1996) ..........................................................17

*Makaeff v. Trump Univ., LLC*, No. 10-cv-940,
2014 WL 688164 (S.D. Cal. Feb. 21, 2014) ............................................................7, 9

*Martinez v. Welk Grp., Inc.*, No. 09-cv-2883,
2012 WL 2888536 (S.D. Cal. July 13, 2012) .............................................................4

*Massachusetts Mut. Life Ins. Co. v. Superior Court*,
97 Cal. App. 4th 1282 (2002), *as modified on denial of reh'g* (May 29, 2002) ...........................10

*Mazza v. Am. Honda Motor Co.*, 666 F.3d 581 (9th Cir. 2012) ...........................................8, 16-17

*McAdams v. Monier, Inc.*, 182 Cal. App. 4th 174 (2010) ...........................................................7

*McCrary v. Elations Co., LLC*, 13-cv-0242,
2014 WL 1779243 (C.D. Cal. Jan. 13, 2014) ...........................................................10

*Mora v. Harley-Davidson Credit Corp.*, 08-cv-1453,
2012 WL 1189769 (E.D. Cal. Apr. 9, 2012), *report and
recommendation adopted*, 2012 WL 3245518 (E.D. Cal. Aug. 7, 2012) ...............................14-15

*Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171 (9th Cir. 2014) ...........................................13-14

*O'Connor v. Uber Technologies, Inc.*, 13-cv-3826,
2013 WL 6354534 (N.D. Cal. Dec. 5, 2013) ...........................................................12

*O'Connor v. Uber Technologies, Inc.*, 13-cv-3826,
2015 WL 5138097 (N.D. Cal. Sept. 1, 2015) ...........................................................2, 7

*Pablo v. ServiceMaster Global Holdings Inc.*, 08-cv-3894,
2011 WL 3476473 (N.D. Cal. Aug. 9, 2011) ...........................................................15

iii

*Perrine v. Sega of Am., Inc.*, No. 13-cv-1962,
2015 WL 2227846 (N.D. Cal. May 12, 2015) ....................................................4

*Pfizer Inc. v. Superior Court*, 182 Cal. App. 4th 622 (2010)..........................9

*S. Bay Chevrolet v. Gen. Motors Acceptance Corp.*, 72 Cal. App. 4th 861 (1999)...................16

*Sevidal v. Target Corp.*, 189 Cal. App. 4th 905 (2010)..............................9

*Stearns v. Ticketmaster Corp.*, 655 F.3d 1013 (9th Cir. 2011) ......................17

*Tschudy v. J.C. Penney Corp.*, 11-cv-1011,
2014 WL 7205605 (S.D. Cal. Dec. 17, 2014)..................................15

*Walker v. Life Ins. Co. of the Sw.*, 10-cv-9198,
2012 WL 7170602 (C.D. Cal. Nov. 9, 2012)...........................7, 18

*Waller v. Hewlett-Packard Co.*, 295 F.R.D. 472 (S.D. Cal. 2013)..................16-17

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011) ......................2

iv

**Plaintiff's Reply to Motion for Class Certification**
**3:14-cv-113-EMC**

**INTRODUCTION**

Uber spends the vast majority of its opposition brief attempting to convince the Court that it will prevail on the merits of this case. In support of this effort, Uber attaches a number of declarations that it claims demonstrate that it never kept any part of the gratuity charged to consumers. Aside from the fact that 1) Uber's own internal documents unequivocally demonstrate that it kept 8-10% of the amount represented as a gratuity (*see* Exs. C-D to Plaintiff's Motion), 2) Uber internally referred to this practice as "hiding" a fee in the gratuity charge (*see* Ex. F to Plaintiff's Motion), and 3) its internal payment records show that drivers were paid only 12% of the 20% gratuity charge (*see* Ex. F to Plaintiff's Motion), a closer look at these carefully drafted declarations reveals that they do not support Uber's position at all.

For example, the declaration of Josh Moher states that Uber's fee was "calculated as 8% of the metered fare." *See* Doc. 106 at ¶ 8. Notably, nowhere in Mr. Moher's declaration – or in any of the declarations submitted by Uber – does it state that that amount was not taken from the portion represented to consumers as a gratuity. In fact, Mr. Moher's declaration confirms just the opposite as the "driver-onboarding document" attached thereto confirms that the driver will be receiving only a 12% tip (*i.e.*, Uber keeps the other 8%). What Uber fails to recognize is that regardless of its characterization of this amount as being 8% of the "metered fare," it represented that amount to consumers as a "gratuity" for the driver when, in fact, it was not.[1]

But alas, this Court need not decide who is right and who is wrong at this juncture. All the Court needs to decide now is whether this case is suitable to be tried on a class-wide basis and Uber's opposition papers only demonstrate that to be the case. Indeed, Uber has only demonstrated what a trial of this case will look like. Plaintiff will submit common proof demonstrating, among other things, that Uber did, in fact, "hide" a service fee in its gratuity

---

[1] The fact that none of Uber's declarants would assert under penalty of perjury that Uber did not keep a portion of the amount represented as a gratuity is not surprising given the limited discovery produced to date. For example, Michael Pao asserts – like Mr. Moher – that "Uber's fee was calculated as 10% of the metered fare" and, also like Mr. Moher, attaches a document indicating that the driver receives only 10% of the 20% automatic gratuity. *See* Doc 110 at ¶ 8 and Ex. A. Mr. Pao does not disclaim the fact that Uber's fee came out of the gratuity charge, nor could he in light of the emails he produced in this litigation. *See* Ex. O to Plaintiff's Motion.

charge. Uber will attempt to rebut that evidence via common evidence from its employees. This evidence will be used to prove or disprove Plaintiff's claims and those of all class members. The decision on this common issue will certainly "drive the resolution of the litigation" making class certification not only appropriate, but a virtual necessity given the relatively small amount of each class member's claim. *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011); *see also O'Connor v. Uber Technologies, Inc.*, 13-cv-3826, 2015 WL 5138097, *9 (N.D. Cal. Sept. 1, 2015) (certifying class action in related case brought by Uber drivers, finding that "one common question important to resolving Uber's liability for the Tips Claim on a classwide basis is whether Uber ever actually remitted tips to its drivers"). As shown below, the other arguments raised in Uber's opposition brief do nothing that would change this common sense approach.

## ARGUMENT

**A.** **Uber consistently and uniformly represented the 20% charge as a "gratuity" throughout the class period.**

Uber's assertion that class members were exposed to different statements regarding the 20% gratuity charge is disingenuous and wrong. *See* Uber's Response, Section I.B. For example, Uber cites to a blog post and email from April 18, 2012 and a subsequent email sent the following day indicating that consumers are charged an additional 20% for gratuity and a "service fee." These statements, however, were applicable to only the first two days Uber offered its taxi service in Chicago. From that point forward, Uber *consistently* and *uniformly* represented on its website, in direct-to-class member emails and other marketing materials that the 20% charge was solely for a "gratuity." *See* Plaintiff's Motion at Ex. A-B. It is entirely illogical to conclude that consumers should have relied on a *past* blog post or email as opposed to the current and ongoing statements contained on Uber's website and other marketing materials throughout the relevant time period. Indeed, pricing terms constantly change and consumers should be expected to rely on current price terms, not previously advertised price terms.

Uber's assertion that its app also disclosed the "service charge" similarly does not defeat class certification. The only evidence Uber cites to in support of this assertion is the April 18, 2012 blog post, not the actual app itself. *See* Penn Declaration (Doc. 108) at ¶ 18 and Ex. C. In fact, Uber never produced the text of its app that was in existence during the relevant time period

because it claims to no longer have that information. *See* December 19, 2014 email, attached hereto as **Ex. A**.[2]  In any event, Uber does not state when and how long its app purportedly contained this disclosure, other than that it was for a "short period of time." Penn Declaration (Doc. 108) at ¶ 18.  Thus, even if true, this disclosure at best would only serve to shorten the class period, most likely only a few days given Mr. Penn's assertion that no such representation was contained on the app "[d]uring most of the period from April 2012 to March 25, 2013."  *Id.*

Uber's reliance on the receipt that it emails to customers *after the conclusion* of their ride is equally misplaced.  The reference to "gratuity and service fee" on the receipt – cryptically and lumped together, no less – does not render Uber's practice any less fraudulent, nor would it in any way affect a consumer's reliance *prior* to using Uber's taxi service.  *See, e.g., In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*, 903 F. Supp. 2d 942, 969-70 (S.D. Cal. 2012) (holding that it would be "impossible" for post-transaction representations to impact consumer reliance).  Even subsequent users of Uber's app are still presented with the same representation *prior* to using the service that the 20% charge is for a "gratuity" for the driver.  If anything, the receipt only highlights the demonstrably false position Uber has taken in this litigation.  On the one hand, Uber claims that it does not keep any portion of the 20% charge, but on the other hand paradoxically argues that even if it did "this practice would have been fully disclosed."  Uber's Response, p. 13.  Uber is talking out both sides of its mouth and nowhere reconciles its inherently contradictory arguments.

Uber also misleadingly cites to *Harris v. Las Vegas Sands L.L.C.*, 12-cv-10858, 2013 WL 5291142, *5 (C.D. Cal. Aug. 16, 2013) claiming, erroneously, that the court dismissed UCL and CLRA claim where the fee was disclosed "in an e-mail sent to the consumer after the transaction."  Uber's Response, p. 16 n.6.  The *Harris* court did nothing of the sort.  The plaintiff in *Harris* claimed that he was improperly charged an undisclosed "resort fee" by a hotel.  The *Harris* court dismissed his claims not because of a post-transaction disclosure, but rather because the resort fee was disclosed no less than three times on the website on which the plaintiff booked

---

[2] Plaintiff originally brought this suit on October 1, 2012.  Uber nonetheless failed to maintain the representations at issue in this suit that were contained on its mobile phone application despite their clear relevance to the pending litigation.

3

his hotel room. The email referenced by Uber, which also disclosed the resort fee, was a reservation confirmation email sent prior to, not after, plaintiff stayed at the hotel and was charged the resort fee at issue. *Id.*, *3.[3]

Lastly, Uber claims that customers may have received differing representations about the gratuity charge from taxi drivers. But, again, any such representations would have occurred *after* class members consummated the transaction and, therefore, could not have impacted their decision to use Uber's service. Contrary to the logic underlying Uber's assertion, the subsequent fraud and further confusion perpetrated by Uber's drivers do not somehow cure Uber's false and misleading representations about the price of its service.

Indeed, these emails only demonstrate further confusion in the marketplace caused by the manner in which Uber represented and charged a "gratuity." The majority of the emails Uber relies upon are complaints about drivers adding additional amounts to the metered fare, double-charging a gratuity or misleading consumers into believing that they need to pay a cash tip. In several instances it is clear that consumers knew that a gratuity was supposed to be charged, but were falsely convinced otherwise by the driver. *See, e.g.,* Doc. 105-2 at p. 14 (stating that he asked the driver if he "automatically gets the 20% added," indicating that he was aware of the 20% charge that Uber represented was a gratuity); Doc. 105-2 at p. 17 (stating that the driver "assured [him] multiple times that no gratuity was added automatically," suggesting that the

---

[3] The other cases cited by Uber involved, unlike here, differing and non-uniform advertising campaigns. *See Gonzalez v. Proctor & Gamble Co.*, 247 F.R.D. 616, 623 (S.D. Cal. 2007) (involved "a wide variety of representations in [defendant's] labeling, television commercials, website promotions, and other promotions as to a wide variety of [different] products"); *Perrine v. Sega of Am., Inc.*, No. 13-cv-1962, 2015 WL 2227846, *3 (N.D. Cal. May 12, 2015) (unlike here, was "not a case about a single misrepresentation," but rather involved "a *series* of 'actual gameplay' demonstrations," several of which did not contain the alleged misleading video and where even the plaintiff "could not 'answer ... with any degree of certainty' a question regarding which videos he saw before he preordered his copy of the game"); *Martinez v. Welk Grp., Inc.*, No. 09-cv-2883, 2012 WL 2888536, *5 (S.D. Cal. July 13, 2012) ("[T]he fraudulent practices' allegations arise from oral statements … not uniform statements to the class."); *Knapp v. AT & T Wireless Servs., Inc.*, 195 Cal. App. 4th 932, 943 (2011) (claims based on differing representations, some of which "were oral and others were made in various written materials"); *Cohen v. DIRECTV, Inc.*, 178 Cal. App. 4th 966, 971-72 (2009) (involved several advertisements " that contained no mention whatsoever of [the misleading] technical terms").

4

consumer was originally under the impression that there was an automatic gratuity charge, but was falsely convinced otherwise by the driver). By taking a substantial portion of their tips it certainly is not surprising that Uber's drivers made further misleading statements to riders in an effort to recoup that amount. Indeed, this was the natural and foreseeable consequence of Uber's fraudulent conduct. It certainly is not grounds for denying class certification here.

**B. Plaintiff satisfies commonality and predominance because her claims are based on wide-spread and uniform misrepresentations targeted to class members.**

Uber asserts that commonality and predominance are not satisfied because some class members may have never seen, and thus did not rely on, the misrepresentation at issue. Uber further asserts that it would be inappropriate to apply a presumption of reliance because the advertisements at issue here are more "limited [in] scope" than those in *Tobacco II* and because Uber has submitted "proof" that "many" class members purportedly "never saw the allegedly misleading statements." Uber is wrong, and relies on cases that are readily distinguishable and customer emails that represent an infinitesimal fraction of the relevant consumer base, several of which are duplicates and most of which are grossly mischaracterized by Uber.

With respect to the customer emails, Uber far overplayed its hand in terms of what they ostensibly "prove." Even assuming that these emails prove that 84 customers never saw Uber's representation about the 20% gratuity (as shown below, they do not), that represents less than .0083% of the over 1 Million class members at issue. In fact, this only further demonstrates the class's mass exposure to Uber's gratuity misrepresentation as it is reasonable to conclude that had consumers not known about the additional gratuity charge many more would have complained about being charged an additional 20% without their knowledge.

In any event, these emails prove nothing in terms of class member exposure. Contrary to Uber's characterization of these emails, in most cases the consumer does not indicate one way or the other whether they saw Uber's representation regarding the gratuity charge. For example, several emails involved consumers who simply inquired as to whether the 20% gratuity charge could be changed or who thought that 20% was too high for gratuity. *See* Doc. 105-1 at p. 22 (asking if the 20% tip is obligatory); Doc. 105-1 at p. 24 (asking if the 20% tip is standard); Doc.

5

105-1 at p. 29 (asking whether the 20% gratuity is "hard coded", *i.e.*, cannot be changed); Doc. 105-1 at p. 63 (inquiring as to whether the 20% gratuity is automatic); Doc. 105-1 at p. 32 (complaining that the 20% gratuity is "too much for a cab ride"); Doc. 105-1 at p. 65 (same).

Some emails involved situations where consumers asked the driver whether gratuity was added or included – likely because they were lead to believe so by Uber's advertisements – but were convinced otherwise by the driver and ended up paying both a cash tip and later charged an additional gratuity. *See, e.g.,* Doc. 105-1 at p. 46 (stating that the driver "assured [him] multiple times that no gratuity was added automatically"). In other instances, it was clear that the consumer was, in fact, exposed to Uber's gratuity representation, but was simply mischarged by the driver. *See, e.g.,* Doc. 105-1 at p. 77 (consumer claiming that she was charged $20.40 for an $8.45 fare and requesting a refund of the "appropriate amount after tip," noting that the total should have been $10.14, thus indicating that she was aware of the 20% gratuity charge); Doc. 105-1 at p. 81 (stating that at the conclusion of his ride an additional $2 was added to the meter, which he "thought was the Uber tip," suggesting that he was aware of the automatic gratuity charge, but was also charged an additional $2 on top of that amount); Doc. 105-1 at p. 85 (same).

Some of these emails even evidence Uber's perpetuation of the fraud by continuing to falsely assure consumers that the entire 20% gratuity charge is paid to the driver. *See* Doc. 105-1 at p. 87 (email from Uber representative to consumer stating that "20% of the metered fare will be automatically added and paid to the driver as a gratuity"). An alarming number are simply duplicates. *Compare* Doc. 105-1 at p. 30 *with* Doc. 105-1 at p. 89; *compare* Doc. 105-1 at p. 57 *with* Doc. 105-1 at p. 138; *compare* Doc. 105-1 at p. 70 *with* Doc. 105-1 at p. 74; *compare* Doc. 105-1 at p. 79 *with* Doc. 105-1 at p. 145; *compare* Doc. 105-1 at p. 82 *with* Doc. 105-1 at p. 95.

In short, the emails submitted by Uber do not even prove that 84 individuals were unaware of Uber's false representations, much less that "many" class members were not so exposed. To accept Uber's argument would put an end to all consumer class actions as any defendant could easily find a small handful of class members – out of millions – who claim they did not rely on the misrepresentation. But it is well-settled that "individualized determinations as to reliance and causation are not required as long as certain facts exist to trigger the inferences

and presumptions" of class member exposure to the misrepresentation.  *Makaeff v. Trump Univ.,*

*LLC,* No. 10-cv-940, 2014 WL 688164, *12 (S.D. Cal. Feb. 21, 2014).  When, like here, a

plaintiff's UCL and CLRA claims center on a single, uniform misrepresentation that was targeted

toward its intended audience, such a presumption is appropriate and a plaintiff is not required to

prove or disprove actual exposure to defeat class certification.  *Id.*, *13; *McAdams v. Monier,*

*Inc.*, 182 Cal. App. 4th 174, 192 (2010) ("Since *individualized* proof of reliance and injury is *not*

required for non-representative class members, the issues of reliance and injury do not foreclose

a UCL class action here.") (emphasis in original).[4]

> As one court recently noted in rejecting the same argument Uber raises here:

> The critical question … as posed in *Tobacco II,* is whether the putative class members were exposed to the same alleged misrepresentations.  On one hand, the advertising and promotional activities in the instant case were not part of a massive advertising campaign.  On the other hand, unlike the limited advertising in *Mazza,* there is evidence that the … promotional campaign was uniform, highly orchestrated, concentrated and focused on its intended audience.

*Makaeff*, 2014 WL 688164, *13.

Here, Plaintiff's claims, and those of the class, are premised on a single, uniform

representation that the 20% charge was a "gratuity."  This representation was contained in

virtually all of Uber's advertisement and was targeted to reach the very members of this putative

class.  In fact, the 20% "gratuity" charge was located on the "pricing" section of Uber's website,

the most logical place consumers would go to determine the cost of Uber's service.  *See*

Plaintiff's Motion at Exs. A-B; *see also O'Connor*, 2015 WL 5138097, *31 (finding similar

evidence, including the same webpage at issue here, demonstrated "that Uber has consistently

and uniformly advertised to customers that a tip is included in the cost of its fares").  Uber also

routinely sent class members direct marketing emails and other advertisements throughout the

class period.  *See* Plaintiff's Motion at Exs. A-B.  And while Uber failed to retain past versions

---

[4] To the extent Uber wishes to submit evidence at the appropriate time to rebut this presumption, that does not "detract[] sufficiently from the predominance of the other common issues to warrant a refusal to certify the class," as "the logic of [Uber's] position would eviscerate the effect of such a presumption in class certification analysis."  *See Walker v. Life Ins. Co. of the Sw.*, 10-cv-9198, 2012 WL 7170602, *15 (C.D. Cal. Nov. 9, 2012).

of its app, Plaintiff testified that she viewed this same representation on her phone immediately prior to her hailing a cab via Uber's service, which means this representation was also on Uber's app or readily viewable via a link to its website. *See* Deposition Transcript of Caren Ehret ("Ehret Dep.") at 21:21-22:10, attached hereto as **Ex. B** ("A. When I signed up for him to come pick me up that day, it said 20 percent gratuity to the driver. Q. It said that where? A. On the app, or on my -- whatever I was looking at via the app on my phone. *** So my understanding from the view on the phone was that the driver would get the full 20 percent gratuity.").[5]

Because Plaintiff's claims are based on a uniform misrepresentation targeted to class members, class certification is appropriate. The cases cited by Uber do not hold otherwise and are readily distinguishable. The plaintiffs in *Mazza*, for example, sought to certify a class of "all consumers who purchased or leased Acura RLs equipped with a [CMBS braking system]." *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 585 (9th Cir. 2012). The plaintiffs did not allege any affirmative misrepresentations, but rather that defendant failed to warn consumers about certain limitations of the braking system. The advertising at issue in *Mazza* was "very limited" and consisted of a limited release of magazines and brochures, a commercial that ran for one week and another that ran for a few months, "smaller-scale marketing efforts" including limited-run commercials on its website and at kiosks at dealerships and statements in the ownership manual. *Id.* at 586-87, 595. These advertisements varied from one another and, more significantly, some disclosed the very limitations the plaintiffs claimed were omitted. *Id.* at 596.

Under such circumstances, the *Mazza* court found that it would be "unreasonable to presume" that all class members were exposed to uniform misleading statements. *Id.* The other cases cited by Uber similarly involved varying representations and disclosures. *See Berger v.*

---

[5] Uber blatantly misrepresents Plaintiff's testimony by claiming that she admitted that she "never saw any [of Uber's] promotional materials." Uber's Response, p 11. The testimony cited by Uber was in response to a question about whether she recalled any promotional offers she received "specifically from Uber" or any "news stories" about Uber Taxi, not whether she ever saw Uber's advertised price terms. *See* Ehret Dep. at 20:10-16 (Ex. C to Roberts Decl.). When asked later about what representations she saw prior to hailing a cab on Uber's service (testimony purposefully omitted by Uber), she unequivocally stated that she saw on the app or via the app on her phone a statement that there was a "20 percent gratuity to the driver." *See* Ehret Dep. (**Ex. B**) at 21:21-22:10.

*Home Depot USA, Inc.*, 741 F.3d 1061, 1068–69 (9th Cir. 2014) (involving claims that defendant failed to warn consumers that they could decline paying for a damage waiver; affirming denial of class certification because that fact was disclosed to consumers in signs posted in defendant's stores, by oral representations from sales associates and in the language of the final sales contract, of which there were five different versions "each of which discussed the damage waiver in a different way"); *In re Clorox Consumer Litig.*, 301 F.R.D. 436, 444-45 (N.D. Cal. 2014) (denying class certification because the alleged misrepresentation at issue appeared on only "a minority of [defendant's] packages" and did not appear on the majority of the packages).[6]

Unlike *Mazza* and the other cases cited by Uber, the misrepresentation at issue here was not sporadic and ever-changing, but rather uniform and consistent throughout the class period and advertized in a manner calculated to reach class members. Under such circumstances, class certification is appropriate. *See Makaeff*, 2014 WL 688164; *Brown v. Hain Celestial Grp., Inc.*, 11-cv-3082, 2014 WL 6483216, at *13 (N.D. Cal. Nov. 18, 2014) (distinguishing *Berger* and certifying class, noting that, like here, "the acts of alleged 'deception,' … are uniform—insofar as they are said to violate California law by wrongly making the uniform claim that the attendant

_____

[6] The California appellate court decisions cited by Uber similarly involved non-uniform business practices. *See Davis-Miller v. Auto. Club of S. California*, 201 Cal. App. 4th 106, 125-26 (2011), *as modified* (Nov. 22, 2011) (affirming denial of class certification where program at issue "was minimally advertised during the proposed class period" and because none of the plaintiffs who actually saw the advertisement stated that it "played a role in the decision to purchase a battery" through the program); *Fairbanks v. Farmers New World Life Ins. Co.*, 197 Cal. App. 4th 544, 563 (2011), *as modified* (Aug. 1, 2011) (involved alleged misrepresentations during presentations given by individual insurance agents; affirming denial of class certification because "there was no showing of uniform conduct … and the viability of a UCL claim would turn on inquiry into the practices employed by any given independent agent … and what materials, disclosures, representations, and explanations were given to any given purchaser"); *Kaldenbach v. Mut. of Omaha Life Ins. Co.*, 178 Cal. App. 4th 830, 849-50 (2009), *as modified* (Oct. 26, 2009) (same); *Pfizer Inc. v. Superior Court*, 182 Cal. App. 4th 622, 631-32 (2010) (finding class definition overbroad because it included all purchasers of mouthwash even though more than half of various types at issue "never included any label that made [the alleged misrepresentation]"); *Sevidal v. Target Corp.*, 189 Cal. App. 4th 905, 912-15 (2010) (affirming denial of class certification because alleged misrepresentation was the result of "a 'computer bug' [that] inadvertently caused imported clothing items to be displayed as 'Made in US' at certain times, and at other times the same clothing item would be correctly identified as made outside the United States" and also because defendant submitted evidence that the tab displaying such a designation "was not clicked on at all during 80% of those sessions").

9

product was 'organic.'"); *McCrary v. Elations Co., LLC*, 13-cv-0242, 2014 WL 1779243, at *13 n.10 (C.D. Cal. Jan. 13, 2014) ("*Mazza* is also distinguishable because the accused advertisements 'were allegedly misleading because of the information they omitted, rather than the information they claimed, and that while the omitted information may have been available, there was no evidence that customers received it.' Here, the alleged liability does not stem from omissions in select advertisements used to promote a single feature on a car, but rather from material misstatements of fact….").

## C. The materiality of Uber's misrepresentation is subject to common proof and is yet another issue common to the class.

Uber's assertion that Plaintiff is unable to prove materiality through common proof is baseless. Where, like here, the misrepresentation was " broadly disseminated … the ultimate question of whether [it] was material [is] a common question of fact suitable for treatment in a class action." *Massachusetts. Mut. Life Ins. Co. v. Superior Court*, 97 Cal. App. 4th 1282, 1294 (2002), *as modified on denial of reh'g* (May 29, 2002). Plaintiff can and will submit common proof demonstrating materiality of the misrepresentation at issue, including uniform representations on virtually all of Uber's advertisements that the 20% charge was a "gratuity" and internal documents confirming Uber's intention to charge a hidden fee concealed within that amount. Nothing could be more material than paying for something that was not provided.

While Uber "calls into question Plaintiff['s] evidence tending to show the materiality of the representation…, the ultimate determination is to be made by the trier of fact." *Astiana v. Kashi Co.*, 291 F.R.D. 493, 505 (S.D. Cal. 2013); *see also Krueger v. Wyeth, Inc.*, 03-cv-2496, 2011 WL 8971449, *10 (S.D. Cal. Mar. 30, 2011) ("The final determination of materiality is a question of fact for the jury, not this court."). Based on the evidence presented here and the very nature and import of the term "gratuity," it "certainly cannot be said that [Uber's misrepresentation was] so obviously unimportant that the jury could not reasonably find that a reasonable man would have been influenced by it." *Astiana* , 291 F.R.D. at 505, *quoting In re Tobacco II Cases*, 46 Cal. 4th 298, 327 (2009); *see also* Plaintiff's Motion, pp. 8-10 (citing cases, all but one of which was ignored by Uber in its response brief, holding that materiality is a

common question suitable for class treatment under similar circumstances).

The cases cited by Uber do not hold otherwise and are readily distinguishable. The plaintiff in *Faulk v. Sears Roebuck and Co.*, 11-cv-2159, 2013 WL 1703378 (N.D. Cal. 2013) not only failed to "identif[y] the advertisement(s)" at issue (*id.* at 9 n.12), but also his "own … purchase history and deposition testimony cast doubt on whether [plaintiff] himself found the alleged omissions material." *Id.* at *9. In *Badella v. Deniro Marketing LLC*, 10-cv-3908, 2011 WL 5358400 (N.D. Cal. 2011), the plaintiff sued the operator of an adult dating website claiming that it induced men into joining and paying for a subscription by promising that they can communicate with "real women in their area who are interested in dating and/or intimate relationships," when "[i]n reality … few if any of the women on the site are real." *Id.* at *1. There, the court found that materially could not be established by common proof because "each class member would have been exposed to *different* individual messages from women that were allegedly fake." *Id.* at *7 (emphasis in original). The other two cases cited by Uber are equally inapplicable as they both involved misrepresentations that defendants' products were "natural," an inherently nebulous term that is subject to varying interpretations among not only class members, but also the plaintiffs in those cases. *See Jones v. ConAgra Foods, Inc.*, 12-cv-1633, 2014 WL 2702726, *14-15 (N.D. Cal. 2014) (holding that materially could not be established by common proof because "there is no fixed meaning for the word 'natural,'" further noting that even plaintiffs' own expert testified that she "do[es] not pay much attention to 'natural' claims," because "[t]hey're not important to [her] in [her] purchase decisions"); *Astiana*, 291 F.R.D. at 508 ("Plaintiffs fail to sufficiently show that 'All Natural' has any kind of uniform definition…. Even the named plaintiffs disagree about the definition of 'All Natural,' and over whether the challenged ingredients fail to satisfy their expectations regarding "All Natural" products.").

In fact, the ruling *Astiana* actually undercuts Uber's position and demonstrates that class certification is appropriate here. There, the court refused to certify a class of purchasers of "natural" products due to the inherently subjective nature of that term, but did certify a class of consumers who purchased products represented as "Nothing Artificial," holding that:

> Unlike the phrase "All Natural," the representation "Nothing Artificial" has a
> clearly ascertainable meaning; namely, that the product contains no artificial or

11

synthetic ingredients. Plaintiff … alleges that she purchased Kashi products because of the "Nothing Artificial" representation, and would have paid less or purchased other products had she known that the products contained artificial or synthetic ingredients. *** The representation that a health food product contains "Nothing Artificial" is likely material to consumers. Given Plaintiffs' testimony, they may be able to establish the materiality of the representation to their purchasing decisions.

*Id.* 504-05 (citations omitted). The *Astiana* court reached this conclusion despite the absence of expert testimony, consumer survey or other studies, concluding that:

For the purposes of class certification, it is sufficient that the alleged material misstatement and omission was part of a common advertising scheme to which the entire class was exposed, and is a sufficiently definite representation whose accuracy has been legitimately called into question.

*Id.* 505.

The same should be found here. Uber's gratuity representation was part of deliberate and common marketing scheme involving a "sufficiently definite representation whose accuracy has been legitimately called into question." *Id.* Indeed, the term "gratuity" has a well-established and universally accepted meaning. It is clearly a material part of any transaction and, as this Court has noted, "any reasonable patron would assume that something labeled as a 'gratuity' on the bill is intended to benefit the server." *O'Connor v. Uber Technologies, Inc.*, 13-cv-3826, 2013 WL 6354534, *9 (N.D. Cal. Dec. 5, 2013). And as Plaintiff similarly observed:

I felt like I was not communicated to honestly about how the gratuity would work. *** If somebody says I'm giving you 20 percent gratuity, I expect the 20 percent gratuity to go to the person who provided the service. I think that's the definition of gratuity. *** And I think when you spell out and say 20 percent gratuity, like I saw on the screen on my phone, and I find out after the fact that it wasn't that way, I don't think that's a fair business practice.

*See* Ehret Dep. (**Ex. B**) at 21:17-19, 58:11-14, 60:20-23; *see also id.* at 41:23-42:3 ("Q. And the reason you wouldn't take another [Uber taxi] is because of this …misrepresentation? A. Yes.").

The emails relied upon by Uber, again, are not useful as none of them demonstrate that customers believed the 20% gratuity charge was immaterial to the transaction. In fact, they prove just the opposite. In one of these emails, for example, the customer indicated that he was aware of the automatic gratuity charge, but was told by the cab driver that "a cash tip could replace the card tip." Roberts Decl., Ex. A at 76. Nowhere does this individual state or even

12

suggest that it was not material to him that Uber hid a service fee in the gratuity charge and it is clear that this customer did not even know that that was the case. Uber fails to cite a single email – or any evidence for that matter – in which a consumer indicates that it was not material for Uber to disclose the hidden service fee in the gratuity charge. In fact, the only emails produced by Uber in this litigation evidencing that a consumer became aware of this practice demonstrate that they did, like Plaintiff, find Uber's misrepresentation to be material. *See* emails attached as

**Ex. C-1** 

In sum, the materiality of Uber's misrepresentation is yet another common issue that can be proven through common evidence, further demonstrating that class treatment is appropriate.

**D.     Uber's purported arbitration provision poses no barriers to class certification.**

Uber's reliance on the arbitration provision it purportedly added to its terms and conditions in September of 2012 is not grounds for denying class certification. As an initial matter, "[t]he party seeking to enforce an arbitration agreement bears the burden of showing that the agreement exists and that its terms bind the other party." *Lara v. Onsite Health, Inc.*, 896 F.Supp.2d 831, 829 (9th Cir. 2012). "While new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014), *quoting Register.com, Inc. v. Verio, Inc.,* 356 F.3d 393, 403 (2nd Cir. 2004). "One such principle is the requirement that '[m]utual

---

[7] It should be noted that all but one of these emails were produced by Uber in August of 2015, *after* Plaintiff had already filed her motion for class certification.

manifestation of assent, whether by written or spoken word or by conduct, is the touchstone of contract.'" *Id.*, quoting *Specht v. Netscape Commc'ns Corp.,* 306 F.3d 17, 29 (2nd Cir. 2002).

Here, Uber has not met its burden of demonstrating that class members assented to a binding, enforceable arbitration provision. Nowhere does Uber explain how it purportedly obtained assent of class members, identify how many class members, if any, purportedly gave their assent or even provide the actual date on which it purportedly added the arbitration provision. Rather, Uber submits a declaration from the General Manager of a single city (Chicago) stating that it was Uber's "practice" to have riders "agree to terms and conditions in order to create an account with Uber" and then attaches Uber's purported terms and conditions from "September 2012," which, notably, was not previously produced in this litigation.[8] This sparse declaration does not establish that any class members are subject to a binding, enforceable arbitration provision, much less that it defeats class certification. *See Mora v. Harley-Davidson Credit Corp.*, 08-cv-1453, 2012 WL 1189769, *13 (E.D. Cal. Apr. 9, 2012), *report and recommendation adopted*, 2012 WL 3245518 (E.D. Cal. Aug. 7, 2012) (certifying class and rejecting as insufficient the defendant's reference to a form arbitration agreement and declaration stating "[e]ffective October 2007, ESB revised the [agreements] it entered into with borrowers," noting that "[t]here is no evidence presently before the Court that a single putative Class member has waived their right to participate in representative proceedings").

Furthermore, even if Uber's manner of obtaining assent was proper (which Uber has not demonstrated), it is likely that most or at least a large number of class members created an Uber account prior to the date the arbitration clause was allegedly added to Uber's website. Plaintiff, for example, created an account with Uber in April of 2012, but did not use Uber's taxi service until September of 2012. *See* Ehret Dep. (**Ex. B**) at 8:9-13. Because Uber's black car service

---

[8] Plaintiff specifically requested all documents, to the extent they are not covered by Plaintiff's other requests, that Uber may rely on in this litigation. In response, Uber stated that it would "produce responsive, non-privileged documents within its possession, custody or control, if any, in response to this request." *See* Uber's Amended Responses to Plaintiff's First Set of Document Requests, at pp. 19-20 (Request No. 25), attached hereto as **Ex. D**. Uber, however, never produced the purported arbitration provision attached as Exhibit F to the Penn Declaration.

was already in existence at least a year prior to launching its taxi service, it is likely that most class members, like Plaintiff, had existing Uber accounts prior to September of 2012.

In all events, the fact that some class members "may have signed arbitration agreements … does not bar class certification." *Herrera v. LCS Financial Services Corp.*, 274 F.R.D. 666, 681 (N.D. Cal. 2011). Rather, as numerous courts have held, "the sensible course … is to decide whether to certify the class without considering the possibility of arbitration, bring the [class] into the case, see what their position is on arbitration, and then decide who must arbitrate." *In re Evanston Nw. Corp. Antitrust Litig.*, 2013 WL 6490152, *5 (N.D. Ill. Dec. 10, 2013); *see also Mora*, 2012 WL 1189769, *13 ("The possibility that [defendant] may seek to enforce agreements to arbitrate with some of the putative Class members does not defeat class certification."); *Tschudy v. J.C. Penney Corp.*, 11-cv-1011, 2014 WL 7205605, *10 (S.D. Cal. Dec. 17, 2014) (same); *Davis v. Four Seasons Hotel Ltd.*, 08-cv-525, 2011 WL 4590393, *3 (D. Haw. Sept. 30, 2011) ("Several courts have addressed the effect of arbitration agreements among members of a putative class, and concluded that they do not bar class certification.") (citing cases).[9]

This is particularly appropriate here given that Uber has provided no information on how and if any class members purportedly assented to arbitration, nor did it even produce the arbitration clause it now relies upon (and, thus, no discovery has been taken on the issue). For these reasons, the arbitration clause relied upon by Uber poses no barriers to class certification.

**E.    Plaintiff satisfies the typicality requirement.**

Uber's assertion that Plaintiff's claim is not typical of other class members is premised on the erroneous proposition that because she allegedly received an email in April of 2012

---

[9] Even the cases cited by Uber are in accord with this procedure. *See In re Titanium Dioxide Antitrust Litig.*, 962 F. Supp. 2d 840, 846 (D. Md. 2013) (amending class definition *after* class had already been certified, noting that "a determination regarding whether mandatory contractual provisions would be enforceable against putative class members should await the expiration of the class opt-out period, when the parties to this action would be known."); *Pablo v. ServiceMaster Global Holdings Inc.*, 08-cv-3894, 2011 WL 3476473, *3 (N.D. Cal. Aug. 9, 2011) (acknowledging the propriety of "ruling on the merits of the class certification and reserving the [issue of arbitration for] a later juncture," but declining to do so there because, unlike here, "plaintiffs' legal claims are already complex, defendants have presented significant evidence of numerous enforceable arbitration agreements," and the case had already been pending for three years).

describing the 20% charge as both a gratuity and service fee that absolves Uber of its subsequent (and uniform) fraud of representing the 20% charge solely as a "gratuity" for the driver throughout the class period. As noted above, it is illogical to conclude that a consumer, like Plaintiff, would rely on an outdated email as opposed to Uber's then-current and uniform representations regarding the price of its service, which were contained not only on its website, but also in subsequent marketing emails sent directly to Plaintiff and class members.[10]

As Plaintiff repeatedly confirmed at her deposition, the representation she consulted and relied upon when using Uber's service in September of 2012 was the then-current representation that the 20% charge was for "gratuity," a representation that remained unchanged throughout the class period. *See* Ehret Dep. (**Ex. B**) at 21:21-22:10, 31:24-32:24, 34:19-22. The cases cited by Uber are inapposite as they all involved appropriate disclosure at the time of the transaction. *See S. Bay Chevrolet v. Gen. Motors Acceptance Corp.*, 72 Cal. App. 4th 861, 878 (1999) (noting that "the record contained substantial evidence indicating that … when requesting the disputed wholesale floor plan loans, [the plaintiff] knew, understood, agreed and expected that GMAC would use" the allegedly undisclosed method of calculating interest); *Harris*, 2013 WL 5291142 (dismissing fraud claims where the allegedly undisclosed resort fee was disclosed at least three times on the website on which plaintiff booked his hotel room).

In short, Plaintiff has an actionable claim against Uber, one that is identical to all other members of the class. Plaintiff, therefore, satisfies the typicality requirement.

**F.  Uber's Article III standing argument is baseless.**

Uber's assertion that class certification is inappropriate because some class members may lack Article III standing is without basis. To support this assertion, Uber quotes a sentence from the Ninth Circuit's decision in *Mazza* stating that "no class may be certified that contains members lacking Article III standing." *Mazza*, 666 F.3d at 594. But as other courts have recognized in rejecting the same argument Uber advances here, the statement "in *Mazza* comes in a single sentence that cites Second Circuit authority without even acknowledging the earlier

---

[10] For example, on June 25, 2012 Uber sent class members, including Plaintiff, an email stating that the 20% charge was for a "gratuity." *See* Plaintiff's Motion at Ex. A (Doc. 101-1 at p. 6).

Supreme Court and Ninth Circuit authority it is contradicting." *Waller v. Hewlett-Packard Co.*, 295 F.R.D. 472, 479 (S.D. Cal. 2013), *citing Lewis v. Casey,* 518 U.S. 343, 395 (1996) ("One class representative has standing, and with the right to sue thus established ... the propriety of awarding classwide relief ... does not require a demonstration that some or all of the unnamed class could themselves satisfy the standing requirements for named plaintiffs.") (Souter, J., concurring); *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1020-21 (9th Cir. 2011) ("Nor do we agree with [defendants'] argument that because it need not be shown that class members have suffered actual injury in fact connected to the conduct of the [defendants], the alternative to the district court's ruling must be that the class lacks standing under Article III."); *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007) ("In a class action, standing is satisfied if at least one named plaintiff meets the requirements."); *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 978-79 (9th Cir. 2011) (same); *see also Arnott v. U.S. Citizenship & Immigration Servs.*, 290 F.R.D. 579, 584-85 (C.D. Cal. 2012) ("This single line in *Mazza,* unexplained and absent any discussion of prior Ninth Circuit precedent, directly contradicts *Bates,* which was rendered *en banc.* *** Other district courts … have continued, post-*Mazza,* to hold that, in order to certify a class, a court need only find standing for *one* named plaintiff.") (emphasis in original).

In any event, the plaintiff in *Mazza* alleged the same type of class injury here: " that class members paid more for the [product] than they otherwise would have paid, or bought it when they otherwise would not have done so, because [the defendant] made deceptive claims." *Mazza*, 666 F.3d at 595; *see also* Amended Complaint (Doc. 40) at ¶¶ 16, 29, 35, 40, 57 ("But for Uber's misrepresentations Plaintiff would not have agreed to or paid Uber the full amount that Uber charged her and that she paid to Uber. *** Plaintiffs and class members suffered an injury in fact and have suffered monetary harm in that they spent money that they otherwise would have saved but for Defendant's" deceptive conduct.).  In rejecting the very same standing argument Uber raises here, the Ninth Circuit in *Mazza* held that "[t]o the extent that class members were relieved of their money by [the defendant's] deceptive conduct—as Plaintiffs allege—they have suffered an 'injury in fact'" and no more "particularized proof of injury and causation" is required.  *Id.*  Thus, *Mazza* dictates the exact opposite conclusion than that

advocated by Uber here.  *See Walker*, 2012 WL 7170602, *15 (rejecting defendant's argument that a plaintiff must "demonstrate[] that all class members suffered some injury … to establish Article III standing," holding that "application of *Mazza* precludes [such an] argument" because "Plaintiffs allege that had they been given full disclosure … they would not have purchased them or would not have paid as much for them.").  Uber's class standing argument should similarly be rejected.

Dated:  September 16, 2015

Respectfully submitted,

Myron M. Cherry & Associates LLC
JACIE C. ZOLNA (*pro hac vice*)

By:  _____/s/ Jacie C. Zolna_____
        Jacie C. Zolna
        Attorney for Plaintiff

Myron M. Cherry & Associates LLC
30 North LaSalle Street, Suite 2300
Chicago, Illinois  60602
Telephone: (312) 372-2100
Facsimile: (312) 853-0279
mcherry@cherry-law.com

18

### ***CERTIFICATE OF SERVICE***

  The undersigned hereby certifies that he served the foregoing **Plaintiff's Reply in Further Support of Her Motion for Class Certification** upon:

  Arthur Miles Roberts
  arthurroberts@quinnemanuel.com
  QUINN, EMANUEL, URQUHART & SULLIVAN, LLP
  50 California Street, 22nd Floor
  San Francisco, California 94111

  Stephen A. Swedlow
  stephenswedlow@quinnemanuel.com
  Amit B. Patel
  amitbpatel@quinnemanuel.com
  QUINN, EMANUEL, URQUHART & SULLIVAN, LLP
  500 West Madison Street, Suite 2450
  Chicago, Illinois 60661

via the electronic filing system on this 16th day of September, 2015.


                 _____/s/ Jacie C. Zolna_____