United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CAREN EHRET, | Case No.  14-cv-00113-EMC |
| Plaintiff, | |
| v. | **ORDER GRANTING  IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR CLASS CERTIFICATION** |
| UBER TECHNOLOGIES, INC., | |
| Defendant. | Docket No. 99 |

## I.   INTRODUCTION

Plaintiff Caren Ehret filed the instant putative class action against Defendant Uber Technologies, Inc., alleging that Defendant violated the California Unfair Competition Law (UCL) and Consumers Legal Remedies Act (CLRA).  Docket No. 40 (First Amended Complaint) (FAC). Plaintiff contends that Uber made misrepresentations when it informed consumers that it would automatically charge a 20% "gratuity" when taxi rides were arranged through its app when in fact, Uber kept a substantial portion of the purported "gratuity" for itself.  *Id.* at ¶¶ 11, 13.

Plaintiff's motion for class certification came on for hearing before the Court on October 8, 2015.  In her motion, Plaintiff proposed to certify the following class: "All individuals who arranged and paid for taxi rides through Uber's service from April 18, 2012 to March 25, 2013." Docket No. 101 at 3 (Mot.).  For the reasons explained before, the Court will certify the following class: "All individuals who received Uber's e-mail with the representation that the 20% charge would be gratuity only, who then arranged and paid for taxi rides through Uber's service from April 20, 2012 to March 25, 2013."[1]

---

[1] The Court is not aware of any e-mails that represented that the 20% charge is gratuity only other than the June 25, 2012 e-mail that was sent from Uber to Chicago residents, including Plaintiff. *See* Motion, Exh. A.

1

## II.  BACKGROUND

Uber provides a software application (Uber app) that permits riders to "summon, arrange and pay for taxi cab rides and other transportation services electronically via their mobile phone." FAC at ¶ 10.  During the proposed class period of April 18, 2012 to March 25, 2013, one of the options available in five cities was "uberTAXI," which allowed users to request a ride in a traditional taxi cab.  Docket No. 106 (Mohrer Dec.) at ¶ 5; Docket No. 107 (Holt Dec.) at ¶ 5; Docket No. 108 (Penn Dec.) at ¶ 6; Docket No. 109 (Abyzov Dec.) at ¶ 5.  The uberTAXI option required taxi cab drivers to use their meters as normal, who would then enter the metered fare into the Uber app at the end of the trip.  Mohrer Dec. at ¶ 7; Holt Dec. at ¶ 7; Penn Dec. at ¶ 8; Abyzov Dec. at ¶ 7; Pao Dec. at ¶ 7.  Uber would then automatically add 20% of the metered fare to determine the total amount charged to the rider through the Uber app.[2]  In some cities, a separate booking fee was also charged.  Holt Dec. at ¶ 7; Abyzov Dec. at ¶ 8; Pao Dec. at ¶ 7.  Beginning on March 25, 2013, Uber no longer automatically added 20% of the metered fare, but either enabled users to adjust the gratuity or required riders to pay the driver directly.  Mohrer Dec. at ¶ 7; Holt Dec. at ¶ 11; Penn Dec. at ¶ 16; Abyzov Dec. at ¶ 11; Pao Dec. at ¶ 11.

At issue are Uber's representations as to the 20% automatic charge.  FAC at ¶ 11.  Plaintiff contends that on Uber's website and in various blog posts and e-mails, Uber advertised the 20% automatic charge solely as a "gratuity" for the drivers.  *See* Mot., Exh. A (screenshot of Uber's Chicago webpage from December 11, 2012, stating that for taxis, "No need to pay your driver - the metered fare + 20% gratuity will be charged to your credit card on file"), B (Uber blog post from November 28, 2012, stating "Use Uber to request and pay for a taxi, at standard taxi rates.  A 20% gratuity is automatically added for the driver.").  However, Uber in fact took a fee of approximately 10% of the metered fare, including a 2% credit card processing fee.  Mohrer Dec. at

---

[2] In New York City, the uberTAXI option was available between August 2012 and October 16, 2012.  Mohrer Dec. at ¶ 7.  In Washington D.C., the uberTAXI option was available between January 2013 and March 25, 2013.  Holt Dec. at ¶ 7.  In Chicago, the uberTAXI option was available between April 2012 and March 25, 2013.  Penn Dec. at ¶ 8.  In San Francisco, the uberTAXI option was available between October 2012 and March 25, 2013.  Abyzov Dec. at ¶ 7.  In Boston, the uberTAXI option was available between September 2012 and March 25, 2013.

**United States District Court**
For the Northern District of California

¶ 8; Holt Dec. at ¶ 8; Penn Dec. at ¶ 10; Abyzov Dec. at ¶ 8; Pao Dec. at ¶ 8.  Thus, the driver ultimately received about half of the 20% gratuity charged to riders, with the rest going to Uber.

On September 9, 2012, Plaintiff used the uberTAXI option to arrange for a taxi ride in Chicago.  FAC at ¶ 15.  Plaintiff contends that when she "signed up for [the taxi driver] to come pick [her] up that day, it said 20 percent gratuity to the driver," with "it" being the app or "whatever [she] was looking at via the app on [her] phone."  Mot., Exh. I (Mot. Ehret Dep.) at 21-22:1. During the ride, Plaintiff asked the driver about the 20% gratuity, to which the driver responded that he actually received only half of the gratuity.  Mot. Ehret Dep. at 21:14-21.  After her trip, Plaintiff received a receipt that broke down the $15.90 charge as a $13.25 meter fare, and a $2.65 "Gratuity & Service Charge."  Docket No. 105 (Roberts Dec.), Exh. D.

On January 8, 2014, Plaintiff filed the instant putative class action against Uber.  Docket No. 1.  In her amended complaint, Plaintiff alleges that the representation of a 20% gratuity "is false, misleading, and likely to deceive members of the public," as "the term 'gratuity' suggests a sum paid to the driver/owner in recognition of transportation service that is distinct and different from the actual fare."  FAC at ¶ 14.  Following this Court's ruling on Uber's motion to dismiss, the remaining causes of action are for violations of the UCL for unfair, unlawful, and fraudulent business practices, and violations of the CLRA.  Docket No. 64 at 22.

### III.   DISCUSSION

To obtain class action certification, a proposed class must satisfy the prerequisites of Rule 23(a), which are:

> (1)   the class is so numerous that joinder of all members is impracticable;
>
> (2)   there are questions of law or fact common to the class;
>
> (3)   the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4)   the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a)(1)-(4).  The purpose of these Rule 23(a) requirements is largely to "ensure[] that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate," and to "effectively limit the class claims to those fairly encompassed by the named

United States District Court
For the Northern District of California

3

**United States District Court**
For the Northern District of California

1    plaintiff's claims." *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2550 (2011) (citation

2    omitted). In addition, "the proposed class must qualify as one of the types of class actions

3    identified in Rule 23(b)." *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 985 (9th Cir.

4    2015). Here, Plaintiffs seek certification under Rule 23(b)(3), which, in addition to the requisites

5    of Rule 23(a), requires that the Court find "that the questions of law or fact common to class

6    members predominate over any questions affecting only individual members, and that a class

7    action is superior to other available methods for fairly and efficiently adjudicating the

8    controversy." Fed. R. Civ. P. 23(b)(3).

9       The class action is "an exception to the usual rule that litigation is conducted by and on

10    behalf of the individual named parties only." *Dukes*, 11 S.Ct. at 2550 (citation omitted). Thus,

11    the burden is on the "party seeking class certification [to] affirmatively demonstrate his

12    compliance with the Rule -- that is, he must be prepared to prove that there are *in fact* sufficiently

13    numerous parties, common questions of law or fact, etc." *Id.* at 2551. The court in turn must

14    conduct a "rigorous analysis" to ensure that the prerequisites of Rule 23 are met, which may

15    require "prob[ing] behind the pleadings before coming to rest on the certification question." *Id.*

16    (citation omitted).

17       Plaintiff now moves to certify the following class: "All individuals who arranged and paid

18    for taxi rides through Uber's service from April 18, 2012 to March 25, 2013."

19    A.    <u>Rule 23(a) Criteria</u>

20       1.    <u>Ascertainability</u>

21       Before analyzing numerosity under Rule 23(a)(1), the district courts have required a

22    showing that the class to be certified is ascertainable. *See Xavier v. Philip Morris USA, Inc.*, 787

23    F. Supp. 2d 1075, 1089 (N.D. Cal. 2011). Ascertainability requires that the class definition be

24    "definite enough so that it is administratively feasible for the court to ascertain whether an

25    individual is a member" before trial, and by reference to "objective criteria." *Daniel F. v. Blue*

26    *Shield of Cal.*, 305 F.R.D. 115, 122 (N.D. Cal. 2014). This requirements makes clear "on whose

27    rights are merged into the judgment, that is, who gets the benefit of any relief and who gets the

28    burden of any loss," and avoids subsequent litigation "over who was in the class in the first place."

United States District Court
For the Northern District of California

1   *Xavier*, 787 F. Supp. 2d at 1089.

2       In the instant case, neither party addresses ascertainability.  However, the class that

3   Plaintiff originally sought to certify would have met this criteria, as the evidence on the record

4   shows that Uber maintains records of customers who used the uberTAXI option.  Furthermore, the

5   Court finds that membership in the class being certified here[3] is objectively ascertainable from

6   Uber's business records.  Uber has presumably maintained copies of the promotional e-mails that

7   were sent, judging by Uber's ability to produce the e-mails that were sent specifically to Plaintiff

8   in its opposition to the instant motion.  *See* Penn Dec., Exh. C.  Thus, the ascertainability

9   requirement is satisfied here.

10          2.      Numerosity

11      A plaintiff satisfies the numerosity requirement if "the class is so large that joinder of all

12  members is impracticable."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998)

13  (citation omitted).  "While there is no fixed number that satisfies the numerosity requirement, as a

14  general matter, a class greater than forty often satisfies the requirement, while one less than

15  twenty-one does not."  *Ries v. Ariz. Beverages USA LLC*, 287 F.R.D. 523, 536 (N.D. Cal. 2012).

16      Uber does not suggest that numerosity is not satisfied here.  There is also sufficient

17  evidence in the record to suggest that the class being certified will number at least over forty,

18  whether it is the class Plaintiff seeks to certify (all individuals who used the uberTAXI service

19  from April 18, 2012 to March 25, 2013) or the class that the Court will certify (all individuals who

20  received Uber's e-mail representation that the 20% charge is gratuity only, and then used the

21  uberTAXI service).  During the hearing, Uber explained that Plaintiff would have received Uber's

22  e-mails because she subscribed to the e-mail list.  Uber did not suggest that a class made up of

23  subscribers who received the allegedly misleading e-mail would not satisfy the numerosity

24  requirement, and it seems likely to the Court that the number of subscribers would number at least

25  over forty.  Thus, the Court finds that the numerosity requirement is satisfied.

26

27          [3] Again, the class being certified is defined as follows: All individuals who received Uber's
28  e-mail with the representation that the 20% charge would be gratuity only, who then arranged and
    paid for taxi rides through Uber's service from April 20, 2012 to March 25, 2013.

United States District Court
For the Northern District of California

3.     Commonality

In order to satisfy Rule 23(a)(2)'s commonality requirement, a plaintiff must "affirmatively demonstrate" that their claims depend upon at least one common contention, the truth or falsity of which "will resolve an issue that is central to the validity" of each one of the class members' "claims in one stroke." *Dukes*, 131 S. Ct. at 2551.  Not all questions of fact and law need to be common to satisfy the rule.  Instead, the lawsuit must call upon the Court or jury to decide at least one factual or legal question that will generate a common answer "apt to drive the resolution of the litigation." *Id.*; *see also id.* at 2556 ("even a single common question" will suffice to satisfy Rule 23(a)) (citation and internal modifications omitted).

The Ninth Circuit has found that Rule 23(a)(2)'s commonality requirement is "limited."  In *Mazza v. American Honda Motor Co.*, the plaintiffs alleged that Honda had misrepresented the characteristics of a Collision Mitigation Braking System (CMBS) in various advertisements, such as omitting the fact that the CMBS might not warn drivers in time to avoid an accident, and could shut off in bad weather.  666 F.3d 581, 585, 587 (9th Cir. 2012).  Honda contended that the plaintiffs could not affirmatively demonstrate a common question of fact or law because the "'crucial question' of '*which* buyers saw or heard *which* advertisements' is not susceptible to common resolution." *Id.* at 589 (original italics).  However, the Ninth Circuit found that the issue of exposure went to the Rule 23(b)(3) preponderance inquiry, not whether there was at least one significant question of law or fact. *Id.*  Because there were common questions as to whether Honda had a duty to disclose or whether the omitted information was material and misleading, the Ninth Circuit held that the plaintiffs had "satisfied their limited burden under Rule 23(a)(2) to show that there are questions of law or fact common to the class." *Id.*

Likewise, in *Astiana v. Kashi Co.*, the district court found that commonality was satisfied in a case contending that food products contained deceptive and misleading labeling which violated the UCL and CLRA.  291 F.R.D. 493, 502 (C.D. Cal. 2013).  There, the plaintiffs alleged that the defendant had "packaged, marketed, distributed, and sold Kashi food products as being 'Nothing Artificial' or 'All Natural,'" when in fact the products used certain ingredients or processes that were synthetic. *Id.* at 498.  When requesting class certification, the plaintiffs

6

"identified several legal and factual issues common to the putative class's claims, including whether the use of the term 'Nothing Artificial' to advertise food products that contain the allegedly synthetic ingredients violates the UCL [and] CLRA . . . ." *Id.* at 501. As all class members were exposed to such representations and purchased the food product, there was a "common core of salient facts." *Id.* (citation omitted). Defendants' argument that differences in the products and the motivations of customers prevented commonality was unavailing, as "[v]ariation among class members in their motivation for purchasing the product, the factual circumstances behind their purchase, or the price that they paid does not defeat the relatively 'minimal' showing required to establish commonality." *Id.* at 502 (citation omitted). Of significance, the court found predominance (rather than commonality) lacking. In particular, the court found that there would be variation because there was insufficient evidence that consumers or food producers have a "uniform definition" of the term "All Natural" that affects purchasing decisions. Accordingly, reliance could not uniformly be inferred under the predominance prong.

Here, Plaintiff alleges twelve common questions of law and fact,[4] including, *e.g.*, whether Uber represented that the 20% additional charge was gratuity only. Mot. at 5-6. Uber does not

---

[4] The questions as alleged by Plaintiff are:

(1) Whether Defendant represented on its website and other marketing materials that gratuity will be automatically added at a set percentage of the metered fare;

(2) Whether Defendant kept a portion of the amount that it represented was for gratuity as a hidden fee;

(3) Whether Defendant's misrepresentations were material under the reasonable consumer standard;

(4) Whether Defendant's misrepresentations would likely deceive a reasonable consumer;

(5) Whether Defendant's conduct constituted an unfair business practice in violation of the UCL;

(6) Whether Defendant's conduct constituted an unlawful business practice in violation of the UCL;

(7) Whether Defendant's conduct constituted a fraudulent business practice in violation of the UCL;

(8) Whether Defendant's conduct constitutes a violation of Cal. Civ. Code § 1770(a)(5);

(9) Whether Defendant's conduct constitutes a violation of Cal. Civ. Code § 1770(a)(9);

(10) Whether Defendant's conduct constitutes a violation of Cal. Civ. Code § 1770(a)(14);

(11) Whether Plaintiff and class members are entitled to damages and the proper measure of such damages; and

(12) Whether Defendant should be required to make restitution under the UCL and, if so, the proper measurement of restitution.

United States District Court
For the Northern District of California

argue that any of the questions identified by Plaintiff are not common to the class.  Instead, Uber argues that there are too many dissimilarities and individualized issues, including whether individuals in the class saw any representation about the 20% gratuity, which of the representations the individual saw and whether the individual considered that representation material.  Opp. at 7.  As the Ninth Circuit held in *Mazza*, these concerns are more appropriately considered under Rule 23(b)(3)'s predominance, rather than commonality analysis.  *See Mazza*, 666 F.3d at 589; *Astiana v. Kashi Co.*, *supra*.  The common questions regarding, *e.g.*, whether Uber made the alleged misrepresentation, and if so, whether those misrepresentations are material and likely to deceive a reasonable consumer are apt to drive the resolution of Uber's liability, affecting the entire class.  Thus, commonality is satisfied here.[5]

### 4.    Typicality

In determining typicality, the Court "looks to whether the claims of the class representatives are typical of those of the class, and is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability."  *Stearns*, 655 F.3d at 1019.  Furthermore, "[u]nder the rule's permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical."  *Hanlon*, 150 F.3d at 1020.

In *Astiana*, the district court found that typicality was satisfied despite defendant's arguments that the plaintiffs' "perception and knowledge about Kashi products, as well as differences in their preferences and reasons for purchasing Kashi products, render them atypical of the proposed classes."  291 F.R.D. at 502.  The district court found that under the typicality test, "the focus should be on the defendants' conduct and the plaintiffs' legal theory, not the injury caused to the plaintiff."  *Id.* (citation omitted).  With respect to the UCL and CLRA claims, the district court explained:

---

[5] We should note that even if individual variations as to whether individual class members saw any representation were relevant to the commonality rather than predominance, for the reasons stated below those asserted variablities are not sufficient to defeat commonality as to the class certified herein.

8

> individual experience with a product is irrelevant because the injury under the UCL [and] CLRA is established by an objective test. Specifically, this objective test states that injury is shown where the consumer has purchased a product that is marketed with a material misrepresentation, that is, in a manner such that members of the public are likely to be deceived.

*Id.* There was no requirement "that the representations were the only cause, or 'even the predominant or decisive factor,' influencing their conduct." *Id.* (citing *In re Tobacco II Cases*, 46 Cal.4th 298, 326-27 (2009). The mere fact that the plaintiffs considered other factors in purchasing the products with deceptive labeling did not automatically make the plaintiffs "atypical." *Id.* at 503. In short, it was sufficient that the plaintiffs alleged the same type of economic injury and sought the same type of damages as the putative class members. *Id.* at 502.

Uber challenges typicality on two grounds. First, Uber contends that Plaintiff is atypical because there are many variations in the proposed class, such as putative class members who never saw Uber's 20% gratuity representation, members who used uberTAXI for different reasons than Plaintiff, and members who would not care that Uber did not provide the full 20% gratuity to the drivers. Opp. at 22. For purposes of typicality, these distinctions are not relevant. The issue is not Plaintiff's individual experience with uberTAXI, but the objective test of whether Uber made material misrepresentations likely to deceive members of the public. *See Astiana*, 291 F.R.D. at 502. This is because under the UCL, "it is necessary only to show that *members of the public* are likely to be deceived." *In re Tobacco II Cases*, 46 Cal. 4th at 312 (citations omitted) (emphasis added). Similarly, the CLRA requires a deceptive practice that causes harm, and such causation can be demonstrated through the reasonable man test. *In re Vioxx Class Cases*, 180 Cal. App. 4th 116, 129 (2009). Here, Plaintiff contends that she took an uberTAXI, which was marketed with the allegedly material misrepresentation that the 20% charge would go to the driver, when in fact Uber took nearly half of that amount. Whatever her subjective reasons or motivations (affecting her decision to take the ride), her general claim challenges Uber's conduct under an objective test and is sufficiently co-extensive with the remainder of the class to satisfy typicality.

Second, Uber argues that Plaintiff is subject to a unique defense because on April 18, 2012, prior to her taking uberTAXI, Plaintiff received an e-mail that explicitly stated that "[a] 20%

charge to cover gratuity *and* service fees will automatically be added to the fare." Penn Dec., Exh. C (emphasis added). Thus, Uber contends that Plaintiff has no claim because the allegedly hidden practice was fully disclosed to her. Opp. at 22. The Court rejects this argument. While Plaintiff did receive an e-mail stating that the 20% charge covered both gratuity and service fees, she *subsequently* received an e-mail on June 25, 2012, which stated "No need to pay your driver - the metered fare + 20% gratuity will be charged to your credit card on file." Mot., Exh. A. Moreover, Plaintiff stated in her deposition that when she signed up for the taxi driver to pick her up, "whatever [she] was looking at via the app on [her] phone" "said 20 percent gratuity to the driver." Mot. Ehret Dep. at 21:21-22:1. In short, even though Plaintiff may have received the correct information at one point, it was then allegedly followed by the allegedly materially false statement that the 20% charge was only gratuity for the driver. Thus, Plaintiff's claim is substantially similar to those of other class members who received only the misleading email and may have been exposed to the Uber website and blog posts.

Cases cited by Uber to the contrary are distinguishable. In *Harris v. Las Vegas Sands L.L.C.*, the court found that a hotel website which explicitly disclosed at the time of the transaction that the "Grand Total" cost did not include an applicable daily resort fee was not false or misleading as a matter of law. No. CV-12-10858 DMG (FFMx), 2013 WL 5291142, at *5 (C.D. Cal. Aug. 16, 2013). Likewise, in *South Bay Chevrolet v. General Motors Acceptance Corp.*, the court rejected a UCL claim that was premised on the defendant's failure to disclose the use of a particular method to calculate interest because the plaintiff's business manager, who was in charge of wholesale floor plan financing, already knew that the method would be used. 72 Cal. App. 4th 861, 874, 878, 889-890 (1999). In both cases, the plaintiff knew or should have known the information that they claimed had been misleadingly omitted. However, in neither case did the defendants subsequently provide contradictory and allegedly incorrect information to the plaintiffs, as is the case here when Uber later sent Plaintiff an e-mail stating that the 20% automatic charge was for gratuity, not for gratuity *and* service fees.

Plaintiff therefore satisfies the typicality requirement, both for her proposed class and that which will be certified by the Court. However, as discussed in Section III.B.1.a., Plaintiff's

United States District Court

For the Northern District of California

1    proposed class has a problem of predominance, namely the absence of proof that the entire

2    proposed class would have been exposed to the allegedly misleading statement that the 20%

3    automatic charge was for gratuity only.

4            5.    Adequacy

5            The adequacy requirement looks at whether the putative class member will "fairly and

6    adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  A named plaintiff satisfies

7    the adequacy test if the individual has no conflicts of interest with other class members and if the

8    named plaintiff will prosecute the action vigorously on behalf of the class. *See Ellis v. Costco*

9    *Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011).  The parties do not dispute this issue, and

10   there is no evidence that Plaintiff is not an adequate class representative.  For example, there are

11   no questions of credibility or any conflicts of interest, and Plaintiff does not propose to waive any

12   elements of damage on behalf of the class to the detriment of other class members.  Plaintiff's

13   counsel is also adequate, and has significant experience in similar class actions, including several

14   consumer class actions. *See* Mot., Exh. L.  Uber does not challenge Plaintiff or Plaintiff's counsel

15   on adequacy grounds, and the Court is satisfied that Plaintiff and her counsel have and will

16   continue to vigorously prosecute the instant action.  The Court finds that Plaintiff satisfies the

17   adequacy requirement.

18   B.    Rule 23(b)(3)

19           Having satisfied the Rule 23(a) inquiry, Plaintiff must next show that the proposed class

20   claim meets the requirements of Rule 23(b), which requires the Court to determine that common

21   questions of law and fact predominate over individualized issues, and that class adjudication is

22   superior to individual litigation of the Plaintiff's claims. *See* Fed. R. Civ. P. 23(b)(3).

23           1.    Predominance

24           "Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)."

25   *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013); *see also Astiana*, 291 F.R.D. at 504

26   ("The predominance analysis under Rule 23(b) is more stringent than the commonality

27   requirement of Rule 23(a)(2).").  It is not enough simply to "establish that common questions of

28   law or fact exist, as it is under Rule 23(a)(2)'s commonality requirement.  The predominance

11

1    inquiry under Rule 23(b) is more rigorous as it tests whether proposed classes are sufficiently

2    cohesive to warrant adjudication by representation." *Id.* (citation omitted).  The Ninth Circuit has

3    found that "there is a clear justification for handling the dispute on a representative rather than an

4    individual basis if common questions present a significant aspect of the case and they can be

5    resolved for all members of the class in a single adjudication." *Mazza*, 666 F.3d at 589.  In short,

6    "the predominance analysis under Rule 23(b)(3) focuses on the relationship between the common

7    and individual issues in the case, and tests whether the proposed class is sufficiently cohesive to

8    warrant adjudication by representation." *Abdullah v. U.S. Sec. Assocs.*, 731 F.3d 952, 964 (9th

9    Cir. 2013).

10                    a.    UCL Claim

11           Under the UCL, "there are three varieties of unfair competition: practices which are

12   unlawful, unfair or fraudulent." *In re Tobacco II Cases*, 46 Cal. 4th at 311.  "To state a claim

13   under the UCL . . . 'based on false advertising or promotional practices, it is necessary only to

14   show that members of the public are likely to be deceived.'" *Pulaski & Middleman, LLC*, 802

15   F.3d 979, 985 (quoting *In re Tobacco II Cases*, 46 Cal. 4th at 312).  The Ninth Circuit has

16   recognized that where plaintiffs are 'deceived by misrepresentations into making a purchase, the

17   economic harm is the same: the consumer has purchased a product that he or she *paid more for*

18   than he or she otherwise would have had it been labeled accurately; thus, where a violation of the

19   UCL is found, the consumer may recover restitution which is based on what a purchaser would

20   have paid at the time of purchase if the purchaser received all the information.  *Id.* at *7 (quoting

21   *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 329 (2011)).

22           The "representative plaintiff need not prove that members of the public were actually

23   deceived by the practice, relied on the practice, or suffered damages." *Davis-Miller v. Auto. Club*

24   *of S. Cal.*, 201 Cal. App. 4th 106, 121 (2011).  While individualized proof of deception, reliance,

25   and injury is not required to seek relief under the UCL, "the question of likely deception does not

26   automatically translate into a class-wide problem," such as when there is variation in whether class

27   members were actually exposed to the challenged business practices. *Berger v. Home Depot USA,*

28   *Inc.*, 741 F.3d 1061, 1068 (9th Cir. 2014).

United States District Court
For the Northern District of California

1    Here, Uber argues that predominance cannot be established because a UCL claim requires

2    that members of the proposed class be exposed to the allegedly false advertising, and Plaintiff's

3    proposed class "includes individuals who were never exposed to any representation about the 20%

4    charge."  Opp. at 7.  Both the Ninth Circuit and California courts have expressly found that "class

5    certification of UCL claims is available only to those class members who were *actually exposed* to

6    the business practice at issue."  *Berger*, 741 F.3d at 1068 (emphasis added); *Davis-Miller*, 201

7    Cal. App. 4th at 121 ("we do not understand the UCL to authorize an award for injunctive relief

8    and/or restitution on behalf of a consumer who was never exposed in any way to an allegedly

9    wrongful business practice") (citation omitted).  Thus, "when the class action is based on alleged

10   misrepresentations, a class certification denial will be upheld when individual evidence will be

11   required to determine whether the representations at issue were *actually* made to each member of

12   the class."  *Davis-Miller*, 201 Cal. App. 4th at 121 (citation omitted) (emphasis added).

13   On the other hand, in numerous cases involving claims of false-advertising, class-wide

14   exposure has been inferred because the alleged misrepresentation is on the packaging of the item

15   being sold.  In such a case, given the inherently high likelihood that in the process of buying the

16   product, the consumer would have seen the misleading statement on the product and thus been

17   exposed to it, exposure on a classwide basis may be deemed sufficient.  *See Astiana*, 291 F.R.D. at

18   500; *see also Wolph v. Acer Am. Corp.*, 272 F.R.D. 477, 488 (N.D. Cal. 2011).

19   The issue here is whether class-wide exposure can be inferred where Uber's alleged

20   misrepresentations regarding the 20% gratuity were primarily on its website, blog, and e-mail

21   messages, rather than on the Uber app itself.  Plaintiff did not dispute during the hearing on this

22   matter that the Uber app lacks the alleged misrepresentation.  *See also* Mohrer Dec. at ¶ 11; Holt

23   Dec. at ¶ 11; Penn Dec. at ¶ 17; Abyzov Dec. at ¶ 12; Pao Dec. at ¶ 12.  Hence, this case is not like

24   the product labeling cases.

25   Nonetheless, class-wide exposure can be inferred outside of product labeling cases where

26   there is an extensive advertising campaign.  In *In re Tobacco II Cases*, the California Supreme

27   Court found that reliance on misrepresentations about the health hazards of cigarette smoking

28   could be presumed because there was evidence of a "decades-long campaign of the tobacco

13

industry to conceal the health risks of its product while minimizing the growing consensus regarding the link between cigarette smoking and lung cancer and, simultaneously, engaging in saturation advertising targeting adolescents, the age group from which new smokers must come." 46 Cal. 4th at 327.  The California Supreme Court concluded that in light of this "long-term advertising campaign, the plaintiff is not required to plead with an unrealistic degree of specificity that the plaintiff relied on particular advertisements or statements."  *Id.* at 328.

In subsequent cases, however, the courts have not been willing to assume class-wide exposure based simply on an advertising campaign.  In *Mazza*, the plaintiff alleged that Honda's advertising for the CMBS misrepresented the CMBS's characteristics and omitted material information on its limitations.  669 F.3d at 585.  Honda's advertising campaign included a 2006 product brochure, television commercials describing the system's operation -- including one that ran for a week in November 2005 and another that ran from February to September 2006 -- and a print ad in some magazines from March to September 2006.  *Id.* at 586.  When Honda ceased mass advertising, it continued smaller-scale market efforts that included two intranet commercials that were viewable on kiosks at Acura dealerships, which dealers were encouraged to show to potential customers.  *Id.*  Honda also operated an "Owner Link" website that contained video clips describing the CMBS system, and was available to all customers.  *Id.* at 587.  Finally, the Acura Style magazine, a periodical sent to Acura dealerships, subscribing Acura owners, and interested customers, ran an article on the CMBS in 2007.  *Id.*

The Ninth Circuit concluded that this level of advertising did not "justify a presumption of reliance . . . because it is likely that many class members were never exposed to the allegedly misleading advertisements, insofar as advertising of the challenged system was very limited."  *Id.* at 595.  While the Ninth Circuit acknowledged that the *Tobacco II* decision had "reconfirmed that class members do not need to demonstrate individualized reliance," it explained that this "holding was in the context of a 'decades-long' tobacco advertising campaign where there was little doubt that almost every class member had been exposed to defendants' misleading statements, and defendants were not just denying the truth but representing the opposite."  *Id.* at 595-96.  In contrast, "Honda's product brochures and TV commercials fall short of the extensive and long-

14

United States District Court
For the Northern District of California

term fraudulent advertising campaign at issue in *Tobacco II*, and this difference is meaningful." *Id.* at 596 (citation omitted).  The court concluded that "[f]or everyone in the class to have been exposed to the omissions . . . it is necessary for everyone in the class to have viewed the allegedly misleading advertising."  *Id.*  However, because of the limited scope of the advertising, it was "unreasonable to assume that all class members viewed it."  *Id.*  Thus, "[i]n the absence of the kind of massive advertising campaign at issue in *Tobacco II*, the relevant class must be defined in such a way as to include only members who were exposed to advertising that is alleged to be materially misleading."  *Id.*

Similarly, the district court in *In re Clorox Consumer Litigation* declined to certify a class action in connection with the marketing and advertising of Fresh Step cat litter.  301 F.R.D. 436, 439 (N.D. Cal. 2014).  Clorox had a marketing campaign that allegedly misrepresented that Fresh Step's carbon formula was more effective at eliminating odors than other products, which included television commercials that ran for a total of sixteen months.  *Id.* at 439, 444.  However, Clorox produced evidence that the advertising campaign was not effective, as an advertising analytics company had concluded that "not enough people are seeing, or possibly remembering, the advertising."  *Id.* at 444.  Notably, even when the plaintiffs argued that the misleading statement appeared on the Fresh Step packaging itself, the district court found insufficient exposure because the performance claim "appeared only on the *back* of *some* [*i.e.*, not all] Fresh Step packaging during the proposed class period."  *Id.* (original emphasis).  Clorox further produced evidence that only 11% of consumers read the back panel of cat litter packaging.  *Id.*  As the proposed class had to be limited "to include only persons exposed [to] the allegedly misleading advertisements," the proposed class that included all purchasers of Fresh Step was overbroad.  Thus, the district court concluded that issues common to all class members would not predominate over individualized issues.  *Id.* at 446.

In *Cohen v. DirecTV, Inc.*, the plaintiff alleged that he was induced into purchasing High Definition (HD) television services in reliance on DirecTV's false advertising.  178 Cal. App. 4th 966, 969 (2009).  In support of his motion to certify a class of all United States residents who subscribed to DirecTV's HD Programming Package, the plaintiff presented evidence of print

United States District Court
For the Northern District of California

advertising and promotional materials. *Id.* The Court of Appeal upheld the trial court's denial of class certification on the ground that common issues of fact did not predominate because the class included subscribers who never saw DirecTV's advertisements before purchasing the company's HD services, such as customers who decided to purchase the HD package based on word of mouth or because they saw the HD package in a store or at another person's house. *Id.* at 979. Because the UCL did not authorize an award for injunctive relief or restitution on behalf of consumers who were never exposed to the allegedly wrongful business practice, the motion for class certification failed. *Id.* at 980.

Here, Plaintiff contends that exposure can be inferred in the instant case because there was a single, uniform misrepresentation by Uber that the 20% charge was gratuity, and that the misrepresentation was targeted towards its intended audience. Docket No. 114 (Reply) at 7. Plaintiff relies primarily on *Makaeff v. Trump University*, in which a district court found sufficient evidence of class-wide exposure based on an advertising campaign.[6]

In *Makaeff*, the plaintiffs alleged that the defendants "made false representations in advertisements, mailings and programs regarding Donald Trump's involvement in TU [Trump University] and the contents of the programs that students would receive." No. 3:10-cv-0940-

---

[6] During the hearing on this motion, Plaintiff also cited *McAdams v. Monier, Inc.*, 182 Cal. App. 4th 174 (2010). However, *McAdams* did not discuss exposure, except to state that with respect to defining the class, "[t]he definition of the CLRA and UCL classes is subject to the following proviso: The members of these classes, prior to purchasing or obtaining their Monier roof tile product, had to have been exposed to a statement along the lines that the roof tile would last 50 years, or would have a permanent color, or would be maintenance-free." *Id.* at 192. The Court of Appeal did not suggest that exposure could be inferred based on the pervasiveness of an advertising campaign, but specifically *added* a requirement of exposure: it certified the class with the proviso that the class would be limited to people who were exposed. To the extent that the court discussed the existence of "a single material misrepresentation to class members," it was in regard to reliance under the CLRA. *See id.* at 184.

Similarly, Plaintiff's other citations are distinguishable. Both *Brown v. Hain Celestial Group, Inc.*, No. C-11-03082 LB, 2014 WL 6483216 (N.D. Cal. Nov. 18, 2014), and *McCrary v. Elations Co., LLC*, No. EDCV 13-00242 JGB (OPx), 2014 WL 1779243 (C.D. Cal. Jan. 13, 2014), concerned situations where the misleading statements were on the packaging of the product itself. Thus, exposure could easily be inferred. *See Brown*, 2014 WL 6483216, at *2 (product packaging identified it as "organic"); *McCrary*, 2014 WL 1779243, at *13 ("a presumption of exposure is inferred where, as here, the alleged misrepresentations were on the outside of the packing of every unit for an extended period"). As noted above, exposure has often been found where the misrepresentation is on product packaging, a situation distinguishable from the case at bar.

16

United States District Court
For the Northern District of California

1    GPC-WVG, 2014 WL 688164, at *1 (S.D. Cal. Feb. 21, 2014).  For example, the advertisements

2    represented included quotes such as "I can turn anyone into a successful real estate investor,

3    including you" and "I'll show you how," as well as "76% of the world's millionaires made their

4    fortunes in real estate . . . I'm ready to teach you how to do it too."  *Id.* at *3.  Print advertisements

5    and letters were "signed" by Mr. Trump, and informed prospective customers that "they would be

6    shown real estate strategies by Mr. Trump's 'hand-picked experts.'"  *Id.*  Specifically, TU used an

7    "orchestrated outreach campaign utilizing mailed invitations as well as a TU website, Facebook

8    page, radio, and newspaper advertising."  *Id.* at *3.  The materials uniformly referred to the

9    business as "Trump University," and uniformly claimed that Mr. Trump was "integrally involved

10   in the teaching of students at Trump University."  *Id.*  The plaintiffs also alleged that "TU relied

11   on free introductory previews throughout the United States," the goal of which was to up-sell

12   attendees to a $1,495 Fulfillment Seminar, which promised a three-day seminar and one full year

13   of expert interactive support.  *Id.*  However, the goal of the Fulfillment Seminar was in fact to up-

14   sell participants to the $34,995 Trump Gold Elite Program, which in turn promised the unlimited

15   mentoring for an entire year.  *Id.* at *3-4.  Plaintiffs alleged that the TU instructors were not hand-

16   picked by Mr. Trump, and that the Trump Gold Elite Program informed mentors that mentors

17   would not be paid for more than six one-hour mentoring sessions per consumer.  *Id.* at *4.  Each

18   of the Plaintiffs alleged that they purchased the Fulfillment Seminar and/or Trump Elite program

19   "after exposure to representations made at the free preview," and that this experience was "typical

20   of the proposed class."  *Id.* at *4.  When the plaintiffs sought to certify a class action for claims

21   under the UCL's fraud prong, the defendants argued that there would need to be an individualized

22   inquiry because "there were no scripts or uniform promotional materials containing any material

23   misrepresentation."  *Id.* at *12.  The district court rejected this argument.  While the court

24   acknowledged that the advertising and promotional activities were not part of a massive

25   advertising campaign, it found that "unlike the limited advertising in *Mazza*, there is evidence that

26   the TU multi-media promotional campaign was uniform, highly orchestrated, concentrated and

27   focused on its intended audience.  While it was not a long-term campaign as in *Tobacco II*, it was

28   much more targeted, concentrated, and efficient than *Tobacco II*."  *Id.* at *13.  Thus, "[t]he effect

17

of this campaign was to make it highly likely that each member of the putative class was exposed to the same misrepresentations[, and t]here is substantial evidence that class members paid for TU seminars for reasons that track the advertising and promotional information provided in the highly orchestrated campaign." *Id.*  Even the name "Trump University" was misleading, as it suggested that TU was an accredited university and that students would be taught by professors and mentors hand-picked by Mr. Trump, neither of which was the case. *Id.* at *12.

Here, the Court agrees with Plaintiff that there was a uniform and consistent misrepresentation throughout the class period.  While Uber argues that there were other advertisements and statements describing the 20% gratuity as other than just gratuity, the Court finds that each of these arguments fail.

First, Uber points to advertisements and statements which did describe the 20% charge as a gratuity *and* service charge.  As evidence, Uber produces an April 18, 2012 e-mail, and April 19, 2012 e-mail, and an April 18, 2012 blog post which state that the 20% charge covers gratuity and service fees.  *See* Penn Dec., Exhs. B-D.  These statements cover only the first two days Uber offered its taxi service in Chicago (prior to the commencement of the class period certified here).  There is no evidence that *after* these first two days, Uber ever advertised that the 20% charge was for anything but gratuity.  Furthermore, for the same reasons that typicality is not defeated, the fact that Uber accurately described the 20% charge for two days does not preclude a UCL and CRLA claims based on subsequent information which contained contrary misleading representations.  The fact that for a mere two days, Uber stated that the 20% charge covered both gratuity and service fees does not negate the uniform and consistent misrepresentation thereafter throughout the class period.[7]

Second, Uber argues that the e-mailed receipts sent to uberTAXI users identified the 20% charge as a "gratuity *and* service charge."  Opp. at 16 (emphasis added).  Thus, all uberTAXI users would have been exposed to the correct information, contradicting the allegedly misleading

---

[7] The class period does not include the first two days of Uber's taxi service; Plaintiff has provided no evidence that allegedly misleading advertisement was disseminated to the class during these two days.

United States District Court
For the Northern District of California

1   statement that the 20% charge was gratuity only.  But the fact that the post-trip receipts stated that

2   the 20% charge included both gratuity and a service fee are immaterial with respect to class

3   exposure.  Simply put, these *post*-trip receipts came *after* the customer had already taken the trip,

4   and would certainly have not informed customers about the true nature of the 20% charge prior to

5   the trip, when they decided to use the uberTAXI service.

6          Finally, Uber argues that taxi drivers gave riders different information during the trip about

7   the nature of the 2006 charge.  But this is likewise immaterial as again, that information would

8   come *after* the customer already used the Uber app to request a taxi ride.  Uber's reliance on

9   *Berger*, which concerned Home Depot's 10% damage waiver surcharge for tool rentals, is

10  misplaced.  741 F.3d at 1064.  There, Home Depot argued that customers were told of their ability

11  to decline the surcharge by signs posted in the stores, sales associates, and the language of the

12  final sales agreement.  *Id.* at 1066.  While the Ninth Circuit did not explicitly state, it seems

13  reasonable that for these disclaimers to have any impact on the customer's decision, it would have

14  had to come prior to the transaction having occurred.  Here, by the time the taxi driver informed a

15  rider that the 20% charge was not just for gratuity, the rider would have already used the Uber app

16  to hail a taxi, creating a transaction that the rider was obligated to pay for.  Even if the rider

17  immediately cancelled the trip, he or she would still be subject to dispatch fees or a cancellation

18  fee.  Thus, like the post-trip receipt, disparate information by taxi drivers do not defeat Plaintiffs'

19  claim that there was evidence of a uniform and consistent misrepresentation throughout the class

20  period.

21         However, apart from these issues, the Court finds that although there may have been a

22  consistent misrepresentation, there is insufficient evidence that all customers during the class

23  period were likely exposed to the misrepresentation.  Plaintiff cannot show that Uber advertised

24  the 20% gratuity in a manner such that there is "little doubt that almost every class member had

25  been exposed" to the misrepresentation, *Mazza*, 669 F.3d at 595-96, or that it was "highly likely"

26  that each class member was so exposed.  *Makaeff* at *13.

27         Plaintiff provides evidence that Uber allegedly misrepresented the 20% charge as gratuity

28  on its website and blog posts.  *See* Mot., Exhs. A-B.  But this falls short of the "decades-long"

19

advertising campaign in *Tobacco II*, or the highly targeted advertising campaign in *Makaeff*, which not only included advertisements and mailings but free introductory previews which were dedicated to up-selling attendees on more expensive programs.  In contrast, Uber's advertisements on its website and blog posts here are comparable to that in *Mazza* which included television commercials, print ads, website information, and intranet commercials that were to be shown to directly to potential customers at the dealership, in *In re Clorox Litigation* which included a television commercial ad that ran for sixteen months, and in *Cohen* which included print advertising and promotional materials.  In each of these cases, as well as the instant case, there is no evidence that it was "highly likely" all members of the proposed class saw the allegedly misleading statements made in the advertisements.  This is especially true here, where individuals may have downloaded the Uber app based on word of mouth, or used the uberTAXI service because they were previous Uber users who saw that there was a new option on the Uber app and thus never visited the Uber website or blog posts.  The lack of classwide exposure is suggested by the e-mail complaints that Uber provides, several of which express surprise that tip is being charged at all given that other Uber services do not charge for tip.  *See* Roberts Dec., Exh. A at 26, 38, 75.  The burden was on Plaintiff to prove sufficient exposure.  *See Mazza*, 666 F.3d at 588.  To the extent Plaintiff seeks to include in the class all customers who may have been exposed to the website and blog posts, Plaintiff failed to carry that burden.

At the hearing, Plaintiff proposed that a smaller class could be certified, comprised of individuals who actually visited Uber's website or received the e-mail with the alleged misrepresentation.  With respect to the website, the Court finds that there is still insufficient evidence of exposure.  Just because the information was available on the website does not necessarily imply that visitors would likely have seen it, especially when there was a good deal of other information on the website.  The 20% gratuity representation was on the top right corner describing the various vehicle types, and in the Frequently Asked Questions portion of the webpage, at the bottom left corner.  It was not highlighted or especially set off to ensure that visitors would see it.  Instead, the website included a good deal of other information about UberBLACK and UberSUV, including pricing information, flat rates, and sample fares for

1    UberBLACK and UberSUV only -- none of which involved uberTAXI and the 20% gratuity.

2    Furthermore, because individuals had various reasons for visiting Uber's website, wholly separate

3    from obtaining information about uberTAXI, this also decreases the likelihood that visitors would

4    have seen the 20% gratuity representation which pertained to uberTAXI only.  Website visitors

5    focused on obtaining pricing information about UberBLACK and UberSUV may have

6    concentrated solely on those sections rather than exploring the rest of the webpage.  Similarly, the

7    blog post found on secondary pages of the website was only one of many blog posts, covering a

8    whole range of topics including job announcements, business profiles, health advisories, and

9    appreciation events, in addition to promotions and advertisements.  In short, there was a large

10   amount and wide variety of information on the blog, with only a few posts discussing uberTAXI.

11   Significantly, Plaintiff presents no evidence of the likelihood that someone visiting the website or

12   blog would stay long enough to read the information or posts related to uberTAXI and the 20%

13   gratuity representation, instead requiring the Court to speculate on the likelihood of exposure.

14   Given this absence of any evidence of likely consumer behavior and the lack of any basis to

15   engage in assumptions which under the facts of this case appear speculative, the Court finds that

16   the website and blog are comparable to *In re Clorox*, in which the misleading statement made on

17   the back of some of the boxes was found insufficient to establish the requisite consumer exposure.

18          However, the Court will certify a class of individuals who received e-mails advertising

19   uberTAXI which included the alleged misrepresentation that the 20% charge was for gratuity only.

20   Unlike the website, the e-mail specifically and heavily promoted the uberTAXI service; its focus

21   only on uberTAXI was not diluted by information about UberBLACK and UberSUV.  The email

22   featured three bullet points expressly stating that "the metered fare + 20% gratuity will be

23   charged" to the rider.  Those customers who received the email were highly likely to have seen

24   and been exposed to the alleged misrepresentation about the 20% tip.  That likelihood is enhanced

25   by the potential additional exposure to the website and blog posts (which while alone do not create

26   sufficient exposure, adds to the exposure by email recipients).  For those who received the emails,

27   sufficient classwide exposure can thus be inferred as in *Tobacco II and Makaeff*.  Accordingly, for

28   purposes of Plaintiff's UCL claim, the Court will certify this limited class.

**United States District Court**
For the Northern District of California

b.        CLRA Claim

Like the UCL claim, the CLRA requires "at a minimum, that the class be exposed to the allegedly false advertising at issue . . . ." *Davis-Miller*, 201 Cal. App. 4th at 124-25.  As there is insufficient evidence of class-wide exposure, Rule 23(b)(3)'s predominance requirement cannot be satisfied for the CLRA claim, with the exception of the limited class identified above.

In addition to exposure, unlike the UCL claim, the CLRA claim requires "an additional showing of reliance."  *Id.* at 125; *see also Stearns*, 655 F.3d at 1022.  However, reliance can be established on a class-wide basis by materiality.  In short, "[i]f the trial court finds that material misrepresentations have been made to the entire class, an inference of reliance arises as to the class." *In re Vioxx Class Cases*, 180 Cal. App. 4th at 129.  In California, materiality is typically achieved by applying a "reasonable man" test, in which:

> a misrepresentation is deemed material if a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question, and as such materiality is generally a question of fact unless the fact misrepresented is so obviously unimportant that the jury could not reasonably find that a reasonable man would have been influenced by it.

*Steroid Hormone Prod. Cases*, 181 Cal. App. 4th 145, 157 (2010) (internal quotations omitted). *See Astiana*, 291 F.R.D. at 504 ("The causation required by the CLRA does not make plaintiffs' claims unsuitable for class treatment because causation as to each class member is commonly proved more likely than not by materiality.") (citations and internal modifications omitted).

Given the reliance under CLRA turns on materiality which is judged by an objective reasonable person standard, proof focuses on Uber's conduct which applied to the entire class and can be determined relative to the class as a whole.  Common issues thus predominate.[8]

c.        Arbitration Clause

Uber contends that in the alternative, the class cannot be certified because there would need to be an individualized inquiry as to whether the individual class members are bound by an

---

[8] Although Uber challenges the evidence (or lack thereof) of reliance, even as to Plaintiff's individual circumstance), that goes to the merits of the issue of reliance/materiality, not to whether common issues predominate for Rule 23(b)(3) purposes.

arbitration clause, which was added for Uber app users in September 2012.  Opp. at 21.  Notably, two district courts have found that the presence of an arbitration clause does not create a predominance of individual issues.  In *Mora*, the magistrate judge found that "[t]he possibility that Harley may seek to enforce agreements to arbitrate with some of the putative Class members does not defeat class certification."  *Mora v. Harley-Davidson Credit Corp.*, No. 1:08-cv-01453-AWI-BAM, 2012 WL 1189769, at *13 (E.D. Cal. Apr. 9, 2012), *report and recommendation adopted*, 2012 WL 3245518 (E.D. Cal. Aug. 7, 2012).  This was because at the class certification stage, the burden was not on the plaintiff to demonstrate that "Harley lacks any individual defense as to every Class member."  *Id.*  Likewise, in *Herrera*, the district court held that "[t]he fact that some members of a putative class may have signed arbitration agreements or released claims against a defendant does not bar class certification."  *Herrera v. LCS Fin. Servs. Corp.*, 274 F.R.D. 666, 681 (N.D. Cal. 2011).

Here, whether an absent class member is bound by the arbitration clause is a question that can be dealt with on a class-wide basis, as it does not appear that there will need to be an individualized inquiry as to whether the arbitration clause is generally enforceable.  In *O'Connor*, the Court did not certify a class of individuals who signed the 2014 and 2015 agreements because a finding of procedural unconscionability under *Gentry v. Superior Court*, 42 Cal. 4th 443 (2007) appeared to require an individual inquiry into the economic means of the driver and the circumstances under which he or she accepted the agreement.  Such an individualized inquiry is not required to find procedural unconscionability here, where the arbitration agreement was a contract of adhesion with no opt-out provision.  Instead, Uber can, as it has in the *O'Connor* litigation, bring a motion to compel absent class members that it contends is bound by the arbitration clause.  There does not appear to be any individualized variation that would prevent a resolution (one way or the other) common to the class.  The Court therefore finds that the arbitration clause does not result in an individualized issue predominating over the common questions of law and fact present in this case.

2.    Superiority

In addition to predominance, Plaintiff must show that "a class action is superior to other

United States District Court

For the Northern District of California

1    available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P.

2    23(b)(3).  With respect to the Court's "superiority" analysis, the Federal Rules suggest that the

3    Court should consider:

4                    (A) the class members' interests in individually controlling the
                     prosecution or defense of separate actions;
5
                     (B) the extent and nature of any litigation concerning the
6                    controversy already begun by or against class members;

7                    (C) the desirability or undesirability of concentrating the litigation of
                     the claims in the particular forum; and
8
                     (D) the likely difficulties in managing a class action.
9

10   Fed. R. Civ. P. 23(b)(3)(A)-(D).

11           Uber does not contest the superiority element, and it appears easily satisfied.  Given the

12   very low recovery likely at issue, it seems unlikely that class members will have an interest in

13   individually controlling the prosecution of separate actions.  Neither party identifies any pending

14   litigation regarding these claims.  Taken together, a class action is a superior method of resolving

15   the class members' claims through one adjudication, rather than separate individual suits.

16   C.      Standing

17           Finally, Uber argues that the class cannot be certified because many of the class members

18   lack Article III standing.  In so arguing, Uber relies on *Mazza*'s holding that: "No class may be

19   certified that contains members lacking Article III standing."  Opp. at 23.  However, the Ninth

20   Circuit has been clear that "our law keys on the representative party, not all of the class members,

21   and has done so for many years."  *Stearns*, 655 F.3d at 1021.  "In a class action, standing is

22   satisfied if at least one named plaintiff meets the requirements.  Thus, we consider only whether at

23   least one named plaintiff satisfies the standing requirements."  *Id.* (citations and internal

24   modifications omitted).  While *Mazza* quotes from a Second Circuit case to conclude, without

25   explanation, that "No class may be certified that contains members lacking Article III standing," it

26   did not address *Stearns*, let alone claim to overrule it.  Many district courts have declined to apply

27   the *Mazza* language and have instead adhered to the *Stearns* ruling that only one named plaintiff

28   must meet standing requirements.  *See K.M. v. Blueshield*, No. C13-1214 RAJ, 2014 WL 801163,

United States District Court
For the Northern District of California

at *3 (W.D. Wash. Feb. 27, 2014) ("the court declines to follow the rule cited in *Mazza*, and instead follows prior Ninth Circuit and Supreme Court precedent that the Article III standing inquiry is only applicable to the named plaintiff, not putative class members"); *Waller v. Hewlett-Packard Co.*, 295 F.R.D. 472, 479 (S.D. Cal. 2013) ("the contrary rule in *Mazza* comes in a single sentence that cites Second Circuit authority without even acknowledging the earlier Supreme Court and Ninth Circuit authority it is contradicting."); *Arnott v. U.S. Citizenship & Immigration Servs.*, 290 F.R.D. 579, 584 (C.D. Cal. 2012) ("This single line in *Mazza*, unexplained and absent any discussion of prior Ninth Circuit precedent, directly contradicts *Bates*, which was rendered *en banc*.").  Notably, even in *Mazza*, the Court found that standing was satisfied based on the Plaintiffs' allegation that class members paid more for the CMBS than they otherwise would have paid, or bought it when they otherwise would not have, based on the deceptive practices.  666 F.3d at 595.

Regardless, because of the limited class that the Court will certify, Uber's concerns with respect to exposure are alleviated.  Thus, Uber's arguments with respect to standing do not stand in the way of class certification, as this Court has already ruled that Plaintiff has sufficient standing under the UCL and CLRA, a ruling that Uber does not challenge here.[9]  *See* Docket No. 64 at 9-15.

## IV.    CONCLUSION

For the reasons stated above, the Court will certify a class on behalf of the following individuals to pursue their claim that Uber has violated California's Unfair Competition Law and the California Legal Remedies Act: "All individuals who received Uber's e-mail with the representation that the 20% charge would be gratuity only, who then arranged and paid for taxi rides through Uber's service from April 20, 2012 to March 25, 2013."

The parties are ordered to meet-and-confer regarding the contents and logistics of class notice and other relevant procedural details.  The parties shall stipulate to form of class notice and

---

[9] Uber did not contend that Plaintiff herself lacked standing, just that because some of the putative class members lacked Article III standing, then the entire class as a whole could not be certified.

a proposed timeline, which shall be submitted to the Court for its approval no later than **January 7, 2016**.  The next Case Management Conference (CMC) is scheduled for January 14, 2016 at 10:30 a.m.; a joint CMC statement shall be filed by January 7, 2016.

This order disposes of Docket No. 99.


**IT IS SO ORDERED**.


Dated: December 2, 2015

_____
EDWARD M. CHEN
United States District Judge